

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00157-CR

CHARLES STOBAUGH                                    APPELLANT

V.

THE STATE OF TEXAS                                         STATE

----------

## FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

----------

## OPINION

----------

### I. INTRODUCTION

A jury found Appellant Charles Stobaugh guilty of the offense of murder for causing the death of Kathy Stobaugh and assessed his punishment at 25 years' confinement; the trial court sentenced him accordingly. The State contended at trial that the murder occurred on December 29, 2004, the date that Kathy disappeared. Charles perfected this appeal, raising six points. His first point challenges the sufficiency of the evidence to support his conviction; he points out

that Kathy has never been located—dead or alive, either during the seven years before his 2011 trial or since—and contends that no physical, forensic, or direct evidence was presented at trial linking him to the alleged offense of murder. That is, there is no body, no murder weapon, no witnesses, and no blood or DNA evidence; there are no fibers or hairs or any type of forensic evidence establishing that a murder occurred or linking Charles to a murder; and there is no confession or directly incriminatory statement by Charles. Charles argues that the circumstantial evidence presented by the State at trial is insufficient to establish beyond a reasonable doubt that he acted with the requisite *mens rea* to commit the offense of murder. Charles argues that insufficient evidence exists that he committed any act directed toward Kathy on or about December 29, 2004, much less that, "with intent to cause serious bodily injury to an individual, namely Kathy Stobaugh, [he] commit[ted] an act clearly dangerous to human life that caused the death of said Kathy Stobaugh, by manner and means unknown," as alleged in the indictment, or that he intentionally or knowingly caused Kathy's death by a manner and means unknown as alleged in the indictment. We hold that, viewed in the light most favorable to State, the cumulative force of the circumstantial evidence and any reasonable inferences from that evidence that could be considered incriminating are insufficient to convince any rational factfinder beyond a reasonable doubt that Charles acted with the requisite *mens rea* necessary to support his conviction for murder. Accordingly, we sustain Charles's first point and render a judgment of acquittal.

2

## II. THE FACTS PRESENTED AT TRIAL[1]

### A. The Family

Charles and Kathy married in 1984. Their daughter Charee was born in 1988, and their son Tommy was born in 1991. Before Tommy was born, the family purchased a farm and approximately 105 acres of land just outside Sanger, Texas. The farm was their home until Kathy left Charles in 2004. They planted a family garden every summer. They raised and harvested various crops. In addition to the family's house, there were several barns and outbuildings on the farm and several pieces of large farm equipment.

Kathy grew up in Gatesville and has two brothers, Mark Munday and Chris Munday; Mark is the oldest, then Kathy, then Chris. Charles has two brothers: Tim Stobaugh and Toby Stobaugh. Charles is the oldest, then Tim, then Toby. The Stobaugh brothers grew up on a dairy farm in Cooke County; their mother Helen still lived there at the time of trial.

---

[1]The record contains a thirty-one-volume reporter's record, including approximately 900 exhibits, and a fourteen-volume clerk's record that exceeds 2,100 pages. The record also includes eight DVDs. None of the DVDs were transcribed by the court reporter. Three DVDs were played for the jury *in toto*—State's Exhibits 15, 283, and 284; one DVD was excluded—Defendant's Exhibit 16; one DVD was not played for the jury—State's Exhibit 285; and, as discussed in detail subsequently in this opinion, three DVDs—State's Exhibits 312, 313, and 314—contain "clips" excerpted by the State from State's Exhibits 283, 284, and 285, respectively, and some, but not all, of the clips on each of these three DVDs were played for the jury. Because the sufficiency of the evidence is challenged on appeal, the undersigned author repeatedly listened to and watched the admitted DVDs and the portions thereof that were played for the jury and included their content in this opinion.

## B. Charles and Kathy's Marriage and Separations

In 1989, after Charee was born, but before Tommy was born, Kathy filed for divorce and left Charles. She did not tell Charles where she was going; she lived with her brother Chris for a few days, stayed with her mother and father in Gatesville for a few days, and then lived in Chilton in a rent house that was owned by her brother Mark. Kathy and Charles reconciled, and later that year Tommy was born.

In 2002, Kathy worked at North Central Texas College (NCTC). She told at least one co-worker, Toni Evans, that she was going to complete her college degree, get a job, and divorce Charles. Toni agreed that Kathy had been planning the divorce for two years prior to leaving Charles in 2004. During the next two years—prior to September 2004—Kathy graduated from college with a degree in education,[2] rented a house in Sanger, bought all new furniture for the rent house, took half (approximately $39,000) of the money in the couple's bank account, bought appliances for the rent house, filed for divorce, had Charles served, moved into the rent house, and obtained a job as a kindergarten teacher in Nocona.

In connection with Kathy's filing for divorce, Charles was served with notice of a hearing, an original petition, and a temporary restraining order. The hearing

---

[2]The State called numerous witnesses and introduced into evidence numerous exhibits establishing that Kathy was a top-notch student and made excellent grades.

4

never occurred because Kathy told her lawyer that she was going to try to work out the terms of the divorce with Charles. Charles did not file an answer.

After Kathy rented and furnished the house in Sanger, Charee—who could drive—and Tommy traveled freely between the two households; they could "show up anytime." There was no court-ordered visitation schedule. The rent house was less than a ten-minute drive from the farm.

All through the summer of 2004, Charee never told anyone that her parents were separated or getting a divorce. Charee testified that she did not feel it was her place to say anything about it.

Charee testified that, during a typical day in the summer of 2004, she and Tommy would spend their days at the farm because there was more to do there. Tommy had a dirt bike, there were three-wheelers to ride, and Tommy enjoyed the farming activities. Charee and Tommy usually went to Kathy's rent house for dinner and to spend the evenings because Kathy was a better cook than Charles, because Kathy's house had cable and high-speed Internet service, and because Charee and Tommy had big screen televisions in their bedrooms at Kathy's house. Charles's house at the farm had only an old box television with an antenna attached to it. Charee testified that she and Tommy also enjoyed having pizza delivered at the rent house because the pizza places did not deliver to the farm.

In the fall of 2004, after Tommy's football season was over, the usual daily schedule followed by Charee and Tommy was as follows: they would spend

nights with Kathy; Kathy would leave for her work as a kindergarten teacher in Nocona at about 6 a.m.; and Charee would get up later and drive herself and Tommy to school. After school, Charee and Tommy would go to the farm, do their homework, and "mess around outside." Charee said that she would drive herself to the rent house later, after Kathy got home from work. Charles would bring Tommy over to the rent house later—either before dinner or sometimes on his way to his job as a machine operator on the night shift at Tetra Pak. Charee said that Kathy often took Tommy—who was thirteen and could not drive yet— out to the farm. Charee said that Kathy was out at the farm two to three times per week. Linda Janoe, one of Kathy's closest friends and a former co-worker, testified that Kathy allowed Tommy to go to the farm every day.

Charee testified, and Charles said in his statements, that he never set foot in Kathy's rent house because he believed that the restraining order served on him with the divorce papers prohibited him from being anywhere near Kathy's house.

By September 2004, Kathy had taken no further action concerning the divorce. That month, Kathy's attorney sent her a letter asking about the status of the divorce because she had not heard from Kathy since June. Kathy communicated with her lawyer the week after Christmas 2004 and indicated that she wanted to finalize the divorce that week. Kathy went to her lawyer's office for an appointment on December 28, 2004, and her lawyer explained that Kathy needed to determine how she wanted to divide the assets and that they could

6

then obtain a default judgment because Charles had not filed an answer. They planned to meet at the courthouse on the morning of Thursday, December 30 to obtain the default divorce judgment. Kathy communicated her proposed asset division to her attorney's office on December 29, 2004, via an email sent at 11:17 a.m.

Linda Janoe testified that she had spoken with Kathy on either Monday, December 27 or Tuesday, December 28 and that Kathy had told her Charles had finally agreed to the divorce. Kathy had called Linda and relayed to her the conversation she had with Charles concerning the divorce: he was going to agree to it and wanted to sell everything and split the money. Linda said that this was a change of position by Charles because he had always indicated that he wanted the land and did not want the divorce. Linda said that Kathy was not excited about selling the land and wanted to keep it because Tommy loved the farm. Kathy considered Charles's proposal to just sell everything and split the money, and in a conversation with Linda on Wednesday, December 29, Kathy told Linda that she had decided that she was going to do it a different way—she would keep the land for Tommy and split everything else down the middle.

### C. Evidence that Kathy Was and Was Not Afraid of Charles

Mark Munday testified that once in 1989 when Kathy was separated from Charles and living in Mark's rent house in Chilton, she called Mark and asked him to come over because Charles was coming to visit her. Mark said that Kathy wanted him to be there while she talked with Charles because "she was afraid of

7

him." While Mark was there, Charles and Kathy talked, and Charles left without incident.

Toni Campbell, a kindergarten teacher who taught at the same school as Kathy and had known Kathy approximately three and one-half months prior to Kathy's disappearance, testified that Kathy had expressed to her that she felt very afraid of, very skittish of, and very uncomfortable with Charles. Toni had never met Charles.

Linda Janoe testified that based on one conversation she had with Kathy about her marriage, Linda felt "very afraid" for Kathy. Linda never met Charles but once saw him across the room at a going-away luncheon held for Kathy when she left her job at NCTC to return to school full-time.

Keith Jones went to high school with Kathy. They stayed in touch on and off through the years after high school. In 2004, they spoke occasionally via cell phone. He said that Kathy told him she was not happy with the position that she was in and that she was scared something might happen to her.

Charee testified that up until Charles was served with the divorce papers, he was unaware that Kathy had rented a house in Sanger. Before Charles was served with the divorce papers, Kathy had already rented the house in Sanger, she and Charee had already picked out furniture and things for the rent house, and Charee had already been to the rent house. Before Kathy had Charles served with the divorce papers, she moved the guns in the house at the farm to a different location in the house. Kathy instructed Charee that if Charee was at the

8

farm when Charles was served, Charee should take Tommy and go to the rent house.  Charee was at the farm when Charles was served.  Charles became angry and started yelling; Charee took Tommy and drove to the rent house.  Kathy later called Charee and told her to come back to the farm; at that point, Kathy, Charee, and Tommy packed up the items they wanted to move from the farm to the rent house.

Charee, Kim Munday,[3] and Linda Janoe all testified that Kathy continued to go to the farm after she filed for divorce and moved into her rent house.  Kim explained that Kathy planted a garden every summer and canned fruits and vegetables and made jams every year.  Charee testified that while she lived in the Sanger rent house with her mother, Kathy went to the farm two to three times a week to take care of the garden and also to help with the farm's harvests.  During harvests, Kathy would usually drive the truck or the grain truck.  Concerning the garden, they all helped pick the corn, the blackeyed peas, the tomatoes, and the beets.  Kathy was the one who canned.  In the summer of 2004, Kathy canned at the farm instead of taking all of the canning utensils back to her rent house.  Also at the end of the summer of 2004, Kathy, Charee, and Tommy helped Charles put up the crops.

The family spent the 2004 Fourth of July holiday together at the home of Charles's mother, Helen Stobaugh.  And they celebrated Tommy's thirteenth

---

[3]Kim Munday is the wife of Kathy's older brother Mark.

9

birthday together in July 2004. A video taken at Tommy's birthday celebration and played for the jury shows the family interacting amicably.

Charee testified that she never saw Kathy act afraid of Charles and that she never saw Charles hit Kathy. Charee said that one time, after Kathy slapped Charles across the face, she saw Charles grab Kathy's arms, hold them down, and then walk away. Charee said that Charles does not drink; she had never seen him drink an alcoholic beverage, and he had never cursed in front of her.

Linda Janoe and Charee testified that in the fall of 2004, after Kathy had filed for divorce and moved into her rent house, she invited Charles to accompany her, Charee, and Tommy to the State Fair—Kathy had received four free tickets at school. The family attended the 2004 State Fair together and did all of the "usual things."

Charles always maintained the family's automobiles; Charee and Linda Janoe testified that, even after Kathy filed for divorce, Charles continued to perform maintenance on Charee's and Kathy's vehicles, including changing the oil in Kathy's car. Linda Janoe testified that Charles and Kathy were civil to one another; Kathy had a key to the farm and would borrow Charles's tools.

Charee testified that her mother would periodically go to the farm to discuss the divorce with Charles. She said that this typically happened in the evenings and that she and Tommy stayed at the Sanger rent house and did not accompany their mother. Charee said that she assumed that her parents did not want her and Tommy around while they talked about the divorce. Charee said

10

that Kathy never expressed any concern about going to the farm. Charles never changed the locks at the farm after Kathy moved out; Kathy and Charee came and went from the farm as they pleased. Charles would frequently be there when Kathy went to the farm.

### D. Kathy's Secret Videotape

Kathy disappeared on December 29, 2004. Two months later, in February 2005, the Munday family collected and boxed up all of the things from Kathy's rent house and put them in storage. Kathy's younger brother Chris testified that they found Kathy's secretly recorded videotapes when they gathered up the things in the rent house; he watched them and turned them over to the State in April or May 2005. One of the videotapes, which was marked at trial as State's Exhibit 15, was admitted into evidence at trial.[4]

State's Exhibit 15 was recorded at the farm on the morning of April 10, 2004—a little over a month before Kathy filed for divorce[5]—after Charles came home from his 11 p.m. to 7 a.m. shift at Tetra Pak. The video recorder was set

---

[4]The other videotape secretly recorded by Kathy was marked at trial as Defense Exhibit 16 and was excluded. Charles complains of the exclusion of this videotape in his second point. Because we sustain Charles's first point and render a judgment of acquittal, we need not reach his other points. *See* Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary for disposition of appeal).

[5]Kathy scheduled and attended an initial consultation with her divorce lawyer on May 24, 2004, and her original petition for divorce was filed on May 27, 2004.

up with a view of Charles's chair at the kitchen table; the kitchen is visible in the background.

Chris said that he had watched the video and explained that it "was like a camcorder video that she [Kathy] had been recording" and showed "Kathy and Charles arguing." Charee explained that the night before the events depicted in the video, she had wrecked her car, so she was eavesdropping in on her parents' conversation to try to hear what her punishment would be. During the video, at times when Charles was not present, Kathy picked up and moved the camcorder to different locations and stopped and started it.

The video was played for the jury. After a discussion of Charee's automobile accident, the video depicts Kathy bringing up a variety of complaints to Charles with, as Charee testified, "no transfer to another conversation." Kathy complained that Charles would not pay $400 to get "my car" painted, but Charee testified that Kathy's car was a white Lincoln Towncar, not the car she was calling "my car." Kathy repeatedly asked Charles, "Where have you been? Where have you been?" She repeatedly stated, "What about me, what about me," without connecting it to any issue or conversation. And she asked Charles, "What's more important to you, money or family?" Charles responded, "Family." On the videotape, Kathy complained that she and Charee should not have to go with Charles to pick up Charee's damaged car from a wrecker service because Charles had not helped her pick up her chair or her grill; Charee testified that the chair and grill had nothing to do with the conversation.

12

Charee testified that she had no idea why her mom would be videotaping her dad. Charee said that she was sure her dad was not aware he was being videotaped because he is a modest person and on the video he undresses down to his underwear in preparation to go to sleep after working the 11 p.m. to 7 a.m. shift at Tetra Pak. Kathy never told Charee that she was secretly recording videos in the house.

### E. Kathy's Boyfriend, High School Reunion, and Unknown Callers

Kathy knew Rocky Underwood from high school. Through the years after high school, Kathy maintained contact off and on with Rocky, who was, in 2004, a funeral director in Haskell, Texas. In 2004, Rocky lived alone in a large rent house in Haskell. Kathy and Rocky would talk and occasionally meet for lunch if Rocky was in the area.

After Kathy separated from Charles, she and Rocky talked and met a lot and, according to Rocky, decided to "carry the relationship a little farther." During the summer of 2004, they met in Graham and went to a restaurant and a hotel. Two weeks before Kathy disappeared, on the weekend of December 5, 2004, after completing a teacher workshop in Wichita Falls on Friday afternoon, Kathy went to Haskell and stayed Friday and Saturday nights with Rocky. Rocky testified that their plan for the future of their relationship was to just see each other when they could and see what happened.

Kathy's cell phone records show that before she disappeared on the evening of December 29, 2004, she called Rocky at 5:07 p.m. on December 28,

13

2004, and the call lasted only one minute. She called him again at 5:32 p.m. on December 28, 2004, and the call lasted two minutes. And she called Rocky a third time at 7:39 p.m. on December 28, 2004, and the call lasted three minutes. Rocky testified at trial that he did not remember the phone calls and did not remember whether he responded. Four emails between Rocky and Kathy were introduced into evidence. One was sexually explicit.

Texas Ranger Tracey Murphree—who interviewed Charles after Kathy's disappearance and was the State's primary witness at trial—was aware in 2005 of Kathy's sexual relationship with Rocky and was aware in 2005 that Kathy had made three phone calls to Rocky on December 28, 2004, the evening before she disappeared, but did not consider Rocky a suspect.

After Charles was indicted in November 2009, Ranger Murphree and law enforcement obtained employment records documenting Rocky's whereabouts on December 29, 2004. At trial, the State questioned Rocky about records from the funeral home, establishing that there was a viewing in Haskell at the funeral home from 5:00 to 9:00 p.m. on December 29, 2004. Rocky testified that he was in Haskell at the funeral home attending to that viewing on the evening of December 29, 2004.

None of Kathy's family, friends, or confidants, who were called as witnesses by the State, knew of Kathy's intimate relationship with Rocky.[6] Linda

---

[6]Chris Munday, Debbie Stobaugh (Tim Stobaugh's wife), Kim Munday, Toni Campbell (a teacher at Kathy's school), Linda Janoe, Keith Jones (Kathy's

14

Janoe testified that in a conversation with Kathy on December 28 or 29, 2004, she learned that an old high school boyfriend of Kathy's wanted to meet up with her.

Prior to November 2004, Kathy had helped locate and contact her former high school classmates to invite them to their twenty-fifth high school reunion in Gatesville. Kathy was in touch with a lot of her high school classmates during this time. She stayed with her brother Mark and his wife Kim in Gatesville when Kathy attended her high school reunion in November 2004. Kathy and Charles had not lived together since May 2004, and Charles did not attend the reunion with Kathy. Linda Janoe testified that Kathy's high school reunion was in November 2004, approximately one month before Kathy disappeared, and that Kathy had reconnected with individuals at the reunion and had talked to a few old boyfriends and to one in particular.

Charee testified that when she was living with her mom at the rent house, she frequently answered the house phone, a land-line. Charee said that there were occasions when men called on the land-line asking for Kathy; Charee did not recognize their voices. Charee would give the phone to Kathy, and Kathy would usually take the phone into her bedroom to talk. Charee said she did not think anything of this. She just thought Kathy wanted a private conversation.

_____

high school friend), and Charee Stobaugh all testified that they were unaware that Kathy was involved in an intimate relationship with Rocky.

15

**F. Statements and Testimony about the Evening of December 29, 2004**

December 29, 2004 was a Wednesday. That Friday was December 31, New Year's Eve; that Saturday was January 1, 2005. Nocona ISD was closed that week for the Christmas holiday. Kathy drove her white Lincoln Towncar from her rent house in Sanger to the farm on the evening of December 29; she called Charee's cell phone at 9:17 p.m. that night, apparently on her way to the farm. Charee did not answer, and Kathy did not leave a message. Although Kathy's car was parked at the farm on the morning of Thursday, December 30, 2004, she was not there.[7] Kathy was never seen nor heard from again.

There was no evidence of violence or of a struggle at the farm. No forensic evidence or direct evidence was ever located at the farm or anywhere else indicating that a murder had occurred. Kathy's car was confiscated by law enforcement, and the FBI ran tests on it; no forensic evidence that could be related to a murder was found. The other cars at the farm were likewise processed by the FBI for forensic evidence that might be related to a murder, but none was found.

The following witnesses gave the following testimony, statements, or both concerning the events that occurred on the evening of December 29, 2004.

---

[7]The evidence established that Kathy's car had gas in it, would start, and would run when it was left parked at the Stobaugh farm.

16

### 1. Charee's Statement

Sixteen-year-old Charee went to the Sanger Police Department at 4:30 p.m. on January 3, 2005, to report her mother missing. She met with Sanger Police Officer Josh Vest. Officer Vest generated a missing person report while he spoke with Charee; Charee checked the box indicating that her mother was missing under circumstances indicating that the disappearance was not voluntary. Charee made an oral statement to Officer Vest and later, at the Stobaugh farm, made a hand-written statement. Officer Vest testified that Charee's verbal and written statements were consistent.

Charee's written statement was made at 11:10 p.m. on January 3, 2005—seven hours after she went to the Sanger Police Department to report her mother missing. Charee indicated that on the evening of December 29, 2004, she went to a friend's house to watch a movie. She got home around 1:30 a.m. on the morning of December 30, 2004, and saw that her mom was not home; she woke her little brother, Tommy, and asked him where their mother was. He said that she had gone to their father's house to discuss the divorce. Charee said that she went to bed, woke up at 7 a.m., and drove to her dad's house; she saw her mom's car parked there, she assumed that her mom was there too, and she drove back home to sleep some more. She returned to her dad's house at 9 a.m. and saw him standing outside. Her dad told her that Kathy had been there the previous evening but had left; when he woke up, Kathy's car was parked in the driveway but Kathy was not there. Charee wrote in her statement that her

17

mom's friend Linda and her Aunt Kim had called her saying that they had tried to call her mom but that their calls went straight to voice mail. Charee ended her written statement saying that she figured her mom wanted time to cool off by herself, that she did not think anything of it, and that she had called her mom's cell phone periodically to try to reach her.

## 2. Tommy's Statement

Twelve-year-old Tommy made a written statement on January 4, 2005, at 12:12 a.m., about an hour after Charee wrote her statement. Tommy was at the farm when Officer Vest had him write his statement. Tommy's statement is short, so it is set forth in its entirety below:[8]

> My Dad had brought me to my moms [sic] house so he could talk to her about what the lawyer had to say about what was going to happen. I went in and sat down and she said hi and I said hi. Then I asked her if I could was [sic] the dog in the bathtub. Then the phone rang and she talked to my dad. Then wile [sic] I was in the bathroom with the dog my mom said I'll be back and I said bye. After the phone had rung she started to get some paper work out and started to hum. After that she left and came over here. The last time I saw her.

## 3. Officer Vest's Testimony

After Charee filed the missing person report with Officer Vest, he asked Charee for the phone numbers of people to contact. Charee gave him the names of Linda Janoe, Toni Campbell, Mark Munday, Mr. and Mrs. Munday, Chris Munday, and Charles. Officer Vest called and spoke with several of these

---

[8]Tommy's statement contains some words that are marked through and initialed by him; we have not included the marked out words.

individuals, some of whom expressed concern for Kathy and said that she was going through a divorce. Officer Vest decided that he needed to follow up on the information he had received and to go talk to Charles. He radioed dispatch and requested that a Denton County sheriff's deputy meet him at the Stobaugh farm because it was located in unincorporated Denton County, not within Sanger's city limits. He arrived at the farm around 6:30 to 7:00 p.m. on January 3, 2005, and Denton County Sheriff's Deputy Gibbons met him at the Stobaugh farm.

Officer Vest testified that he saw Kathy's car parked at the residence. Charles seemed calm and "didn't seem too excited about his wife not being anywhere we could locate her." Officer Vest recorded his interview of Charles with his dash-mounted video camera and body microphone. He said that he tried to end his conversation with Charles several times but that Charles kept "going into an explanation of what could have happened."

After Officer Vest finished his recorded conversation with Charles, he got into his patrol car and made two calls: one to Larry Kish, an investigator with the Denton County Sheriff's Office, and one to Texas Ranger Tracey Murphree. Officer Vest met with Investigator Kish and Ranger Murphree later in the evening on January 3, 2005; they went to Kathy's rent house. Nothing in Kathy's rent house indicated that she had left for more than a few minutes. The trio then went back to the Stobaugh farm where Officer Vest obtained Charee's and Tommy's written statements.

Because Charee had indicated in her statement that both Linda Janoe and her Aunt Kim had called her to report that their calls to Kathy's cell phone were going straight to voicemail, meaning that Kathy's cell phone battery must be dead, Ranger Murphree obtained Kathy's cell phone code from Charee and retrieved the missed calls from Kathy's phone. As Ranger Murphree listened to the calls, he called them out to Officer Vest, who wrote them on a scrap of paper.[9] There was a saved call from Kathy's attorney's office canceling an appointment on December 20 and rescheduling it to December 28. Then there were the following missed calls in the following order: two calls from Charee, one call from a realtor named Jennifer Hunter, a call from Kathy's mother—Jeanne Munday, a call from Linda Janoe, another call from Jeanne Munday, two more calls from Charee, another call from Linda Janoe, two more calls from Charee, another call from Jeanne Munday, a call from Kim Munday, another call from Charee, and a call from Toni Campbell.

Around midnight on January 3, Officer Vest, Investigator Kish, Ranger Murphree, and two or three Sanger police officers conducted a search for Kathy at the Stobaugh farm. They searched for a couple of hours. They did not find Kathy and did not find any evidence of any crime. The evening of January 3, 2005, was Officer Vest's last night of investigation on the case; Investigator Kish and Ranger Murphree took over.

---

[9]Officer Vest's handwritten list was admitted as State's Exhibit 315.

## 4. Ranger Murphree's Testimony

Ranger Murphree testified that he became involved in the investigation of Kathy's disappearance on January 3, 2005. Ranger Murphree met Investigator Kish, Officer Vest, and Charee at Kathy's rent house. In Kathy's house, he did not see any evidence that she had left for a long time; nothing appeared to be missing, like her clothes, her makeup, or her toothbrush. The kitchen table was cluttered with papers—"school teacher" items. He found a black organizer on the kitchen table containing notes about Kathy and Charles's divorce proceedings. One page indicated that Kathy was scheduled to meet with her lawyer on December 28 to talk about a default judgment and another page had four property division options with a box that could be checked by each choice. The paper appeared to have been typed on a computer and printed off. Ranger Murphree pulled out this page and took it with him to question Charles with.

Ranger Murphree decided that he wanted to talk to Charles himself, so he drove back to the farm. Charles had gone to work. Ranger Murphree was driving to Charles's place of employment at Tetra Pak when he received a call that Charles had arrived home at the farm. Ranger Murphree and Investigator Kish asked Charles if he would be willing to go to the Sanger police station and make a statement. Charles agreed. Charles drove his car to the station, where Ranger Murphree and Investigator Kish conducted a three-hour interview, commencing at 1:02 a.m. and concluding at 3:58 a.m. on January 4, 2005.

Ranger Murphree and Investigator Kish later returned to the Stobaugh farm to search for Kathy. Charee told them that she, Charles, and Tommy had already searched and did not find anything. Ranger Murphree and Investigator Kish also later returned to Kathy's rent house where they conducted a more thorough search. Kathy had two computers at the house—one desktop and one laptop. Ranger Murphree and Investigator Kish did not confiscate Kathy's computers.

Ranger Murphree conceded that Kathy had never been found and that no murder weapon had ever been located. But Ranger Murphree testified that he came to his theory of the case as to how Kathy disappeared on January 3 or 4, 2005. During Ranger Murphree's testimony, he explained that the photos of the Stobaugh farm, and specifically photos of the mud room, show a variety of items that could be used as a ligature—belts, rope, sheets, pillowcases, and curtains.[10] Ranger Murphree and the prosecutor performed a strangulation reenactment for the jury; Ranger Murphree pretended to choke and strangle the prosecutor, who "went uhhh," went limp, and fell to the ground.[11] Ranger Murphree testified that

_____

[10]State's Exhibits 194 and 197 are photos showing a small, horizontal, wooden, 5-peg rail mounted to the wall in the mud room. Several belts are hanging on it; the belt buckles are hanging on the pegs.

[11]On cross-examination, Ranger Murphree testified:

    Q. You and [the prosecutor] did a reenactment, so to speak, in front of the jury on the strangulation. You recall that. Correct?

    A. I do.

22

Q. Fair to say that wasn't really reality that y'all performed in front of the jury?

A. It was a possibility.

Q. When you say "a possibility," that's a possibility of what?

A. Of that's how he killed Katherine.

. . . .

Q. So, again, it's what you believe. I believe you testified to that; well, I believe this is how it happened. Right?

A. As far as the strangulation part?

Q. Yes.

A. I said I believe that's a possibility on how it could happen.

. . . .

Q. Do you have any evidence to support your theory of what you believe?

A. As far as strangulation?

Q. Yes.

A. There is no physical evidence, no.

Q. No physical evidence, no forensic evidence. Right?

A. Correct.

Q. And let's talk about that. When you simulated a choking of [the prosecutor], he went, uhh. Right?

A. He did.

Q. Now let's talk about reality. When someone's truly being strangled to death, they're typically struggling, fighting for their life. Right?

23

A. I would hope so.

Q. They wouldn't just go uhh, limp, and fall straight down. Correct?

A. They very well could.

Q. And in your experience -- I assume you've worked strangulation cases before.

A. I have.

Q. In your experience, there's typically a struggle. Right?

A. Somewhat of one.

Q. I mean, you'd see scratch marks or claw marks on walls or holes kicked in sheetrock.

A. Not necessarily, no.

Q. So there's different ways, different possibilities. Correct?

A. Sure.

Q. Well, let's talk about a consistent.

When a person dies, their muscles relax, releasing bodily fluids. Correct?

A. Sometimes.

Q. Most of the times?

A. No. I wouldn't say most times, no.

Q. In a strangulation case where somebody's air is cut off, a person deceases that way, there's typically vomit from the air that's been trapped, regurgitating. Is that correct?

A. I've seen cases like that and then cases where it's not there.

this strangulation reenactment was one of the possible ways Kathy was killed and that "there's just a multitude of ways of killing someone, endless amount of ways, almost, with blood not being there." Ranger Murphree testified that the kitchen area of the Stobaugh farm house where Charles said Kathy was when she became upset and left contained many hard, flat surfaces, including the floor, where Kathy could have hit her head and not left any blood. In sum, Ranger Murphree testified that the State was allowed to indict Charles for killing Kathy in a manner and means unknown and that Ranger Murphree was not "wedded" to any particular possible manner of Kathy's death.

## 5. Charles's Statements

Charles made four statements concerning the events that occurred on the evening of December 29, 2004. His first statement is the forty-seven minute videotape recorded by Officer Vest's dash-cam and body microphone on January 3, 2005, at around 6:30 p.m. when Officer Vest went to investigate Kathy's

---

Q. Well, all these body fluids would leave some DNA evidence at the crime scene. Correct?

A. If in fact there were any, it may, yes.

Q. So your theory is you believe that there was a strangulation, but there just happened to be in this case no body fluids, no struggle, no vomit and there's just no evidence.

A. There's a possibility of all those things taking place and not leaving anything behind.

25

whereabouts based on the missing person report filed by Charee at 4:30 p.m. that same day (the dash-cam video statement). The second statement is the three-hour interview of Charles conducted by Ranger Murphree and Investigator Larry Kish at the Sanger Police Department in the early morning hours on January 4, 2005 (the Murphree/Kish statement or the Murphree/Kish interview). The third statement made by Charles is a hand-written statement that he made on March 3, 2005, to Mike Horton, a private investigator hired by Kathy's family, the Mundays (the Horton written statement). Mike Horton also recorded his March 3, 2005 verbal interview of Charles, and that statement is the fourth statement made by Charles concerning the events of the evening of December 29, 2004 (the Horton verbal statement).[12]

### a. The State's presentation of Charles's statements

At trial the State did not initially present to the jury the complete version of Charles's statements. Instead, the State created "clips" from the recorded statements, isolating certain answers or phrases spoken by Charles.[13] Defense

---

[12]The entire recording of Horton's verbal interview with Charles (State's Exhibit 285) was never played for the jury; only clips from this interview (State's Exhibit 313) were played.

[13]Ranger Murphree testified concerning this technique utilized by the State:

> Q. Now, you and I have spent a considerable amount of time trying to put segments of his statement into topic order. Is that correct?
>
> A. Yes, we have.

counsel objected under the rule of optional completeness to the State showing the jury various State-generated, isolated clips from Charles's statements.[14] The trial court overruled the objection.

The State assigned topic captions to each clip that reflected the State's perspective on the information conveyed on the clip and offered into evidence exhibits listing the captions assigned to each clip. The State excerpted the forty-seven-minute dash-cam video statement recorded by Officer Vest into sixteen clips and offered a DVD with the sixteen clips on it into evidence as State's Exhibit 314. The sixteen video clips vary in length, with the shortest being 7 seconds and the longest being 1 minute and 52 seconds. The State excerpted the three-hour Murphree/Kish statement into fifty-five video clips and offered a DVD with the fifty-five clips on it into evidence as State's Exhibit 312. The

---

Q. Tell the jury what we've done.

A. We've taken -- it's my understanding that the statement has already been introduced. And we've taken that statement, and different topics we'd like to address are taken out of that interview just so we can discuss that one statement or that topic we're talking about.

Q. And the tape will be played for the jury in its entirety. Eventually we're going to let them see the whole thing running. Right? We just -- we tried to break it down into topics first for examination. Is that correct?

A. That's correct.

[14]Defense counsel stated, "I'm going to object. We've got a three-hour conversation from 1:00 in the morning until 4:00 in the morning, and we're taking bits and pieces and arranging them out of context."

longest of these clips is 1 minute and 55 seconds; the shortest is 3 seconds. The State excerpted the Horton verbal statement into nine video clips and offered a DVD with the nine video clips into evidence as State's Exhibit 313. The longest is 1 minute and 42 seconds; the shortest is 16 seconds. The State selected certain clips contained on State's Exhibits 312, 313, and 314 to play for the jury; all three of these DVDs that were admitted into evidence also contain clips that were not played for the jury.[15]

The DVDs containing the clips—that is, State's Exhibits 312, 313, and 314—also each include a PowerPoint on the DVD titled, respectively, "Murphree – categories.ppt," "Horton.ppt," and "Vest.ppt." Each of these PowerPoints were created by the State and contain a Denton County seal in the upper left-hand corner of each PowerPoint slide. Each of the PowerPoints contains an initial PowerPoint screen setting forth text boxes with captions created by the State of what the State contends each clip shows, such as "Convincing the children" or "Assault 1989." Each PowerPoint also contains some of the clips created by the State from the pertinent statement; some of the PowerPoints contain clips not presented at trial. The PowerPoints themselves were never published to the jury

---

[15]For example, State's Exhibit 313 contains clips that the State created from the Horton verbal statement that Charles made, and one of the clips, titled, "Assault 1989.wmv," was not played for the jury. Although neither the clip nor the entire Horton verbal statement was played for the jury, during deliberations the jury was free to view State's Exhibit 313 and to click on and watch the clip titled, "Assault 1989.wmv."

during trial. During closing argument, the prosecutor told the jury that if they wanted to review the clips, they should play the PowerPoints.[16]

During trial, the State did not play the various clips from Charles's statements for the jury in the order that Charles made them during the statements. Most of the clips, especially the clips from the Murphree/Kish statement, do not contain the question that Charles was asked; most of the clips contain only Charles's answer to an unknown question. And many of the clips do not contain Charles's entire answer; the clips cut off mid-sentence or before Charles completes or further elaborates on his answer.[17]

---

[16]The prosecutor during closing argument stated:

> Now, so after he kills her, is there any evidence consistent with that? This is a guy who says on those tapes -- oh, before I forget, if you play the clips, you want to go to the thing that says PowerPoint. Now I'll ask Caroline if I'm wrong, but I think you go to the one that says Power Point so you can play these clips. And I've got little boxes, and you can read what the topics are.

[17]For example, the State characterized Charles as a person who loved his money and possessions. In support of this, the State played for the jury a clip from the Murphree/Kish statement that the State titled, "No Christmas presents.wmv." In the clip, Charles said, "We never did buy each other anything [for Christmas], the kids—." Ranger Murphree interrupted Charles at that point, and the clip cuts off shortly thereafter. But in the next sentence that Charles spoke after the clip cut off, Charles said, "What we always done for Christmas, I went with the kids and picked out stuff for her from them and we'd call it from the kids and she'd take the kids and they'd get stuff for me and we'd call it from the kids." Other clips that likewise cut off before Charles either completed his answer or further explained his answer include: "$ importance, not big spender.wmv" and "Kathy not walk.wmv." One of the clips, titled, "Don't drive car in garage.wmv," starts with Charles talking about an event that angered Kathy immediately before she filed for divorce—the clip does not include a question.

29

The State then played various clips from Charles's statements for Officer Vest and, primarily, for Ranger Murphree as they testified and asked them to comment on what Charles had said in the clips, to comment on Charles's body language in the clips, and to compare and contrast Charles's statements in the different clips with one another. Ranger Murphree testified that the inconsistencies between statements by Charles in clips from the Murphree/Kish statement, from the dash-cam statement, from the Horton verbal statement, and from the three-paragraph Horton written statement meant that Charles was guilty of murder. At the conclusion of Ranger Murphree's direct examination, which spans almost three-hundred pages in the reporter's record, and after the jury had already heard Ranger Murphree's compare-and-contrast-the-clips testimony, the State played the entire three-hour Murphree/Kish statement for the jury.[18]

### b. The dash-cam-statement recorded by Officer Vest at around 6:30 p.m. on January 3, 2005

The State likewise did not play the interview between Officer Vest, Deputy Gibbons, and Charles straight through for the jury. Instead, it appears that the

---

After the clip was played for the jury, Ranger Murphree testified that the answer given by Charles on the clip was in response to a question Ranger Murphree had asked. The full interview, however, does not contain the question Ranger Murphree said that he had asked. We point out these problems with the clips because the State urged the jury to draw inferences from the clips that are not supported by the entirety of Charles's answer.

[18]At the conclusion of Ranger Murphree's direct testimony, the prosecutor stated, "Judge, at this point we were going to play the full, long interview with Tracy Murphree and Kish that we've been playing clips from so the jury can see the whole thing."

30

State stopped and started the video—marked as State's Exhibit 283—repeatedly, sometimes playing the same portion over more than once. While the video was paused, Officer Vest gave a narrative of what he was doing at various points on the video and of the identity of people appearing on the video.[19] The video reflects that Officer Vest arrived at the Stobaugh farm at 6:36 p.m. on January 3, 2005. Much of the dash-cam video statement is an audio recording only from Officer Vest's body microphone; the video from the dash cam is focused in only one place, showing people as they walk in front of the dash cam. The following is a summary of the information on the DVD.

The DVD shows Charles speaking freely to Officer Vest, telling him that when he got up on Thursday morning, Kathy's car was parked in the driveway "right there." He said that "of course we had to back it out of the way," and so "we backed it out right there, I did. I had to get a trailer out of the barn." Charles explained that Kathy came to his house on Wednesday night and left around 10 p.m., driving away in her car. Charles told Officer Vest that Kathy taught school at Nocona and that she was off work for the Christmas holidays and was

_____

[19]The reporter's record identifies the DVD being played during Officer Vest's trial testimony as State's Exhibit 314, which contains the clips created by the State from Officer Vest's dash-cam video statement. But the prosecutor's comment that the State would be playing a forty-seven-minute video along with the questioning of Officer Vest reflected in the reporter's record, including the prosecutor's comment that twelve minutes of silence was playing on the DVD, indicates that, in fact, State's Exhibit 283—the entire forty-seven-minute recording of Officer Vest's dash-cam video statement—was played, not State's Exhibit 314. The State utilized the clips it created from the dash-cam video statement in questioning Ranger Murphree.

supposed to have taken her car to Muenster to be fixed because it was leaking water. He said that he had called the shop and learned that Kathy had not tried to make an appointment to get the car fixed.

Charles told Officer Vest that Kathy had filed for divorce at the end of May after she had obtained her teaching degree. He explained that Kathy had obtained a job teaching at Nocona. He said that in the past, Kathy had been known to leave and be gone for an entire weekend with her cell phone off and not want to be bothered; Charles said that this had happened twice before. Officer Vest asked if Kathy had been living at the farm, and Charles explained that she had moved out the past June. Officer Vest commented that Charles and Kathy had been separated for a while; Charles responded that Kathy's filing for divorce was as much of a surprise to him as it was to her family. Charles said that a strange thing was that Kathy had a cell phone and paid her bill online so that he could not see her cell phone records. He said there could be another man involved.

Charles discussed with Officer Vest the conversation that he had with Kathy on the evening of December 29, 2004. Charles said that Kathy had explained how she wanted the property divided in the divorce. He said that Kathy wanted half the land, wanted to be paid half the value of the farm equipment, and wanted everything out of the house. Charles said that he had asked Kathy whether, if he wanted to contest the way she wanted to divide the property, he would have to get a lawyer and she said that he would. Charles

32

said he told Kathy that even though he had previously said he was not going to get a lawyer or contest it, he was going to contest it. Kathy asked how he wanted the property divided, and Charles said he wanted everything sold and split down the middle. He said he did not want her coming back later and saying that he had cheated her. Charles said he asked Kathy why she did not want to sell everything and split it down the middle and that Kathy said that was not what she wanted to do. Charles said that was what he wanted to do. Kathy said, "You know, you gotta always have your way," and he replied that he just wanted it to be fair. At that point, Kathy said, "I am leaving, there ain't nobody gonna find me and don't try look for me." Charles explained that he said, "Oh, you're going to do one of them trips, huh." And Kathy responded, "No, I am leaving." Charles said he shut the door and went to bed. He saw her driving away down the driveway.

Charles said when he awoke the next morning, he "saw her car parked right here." He explained that when Kathy had pulled up at the farm that night, she had parked in a different place: "She parked around here—so she did leave." Charles said he did not think much about it. He summed up that "we didn't really get alarmed until this morning [Monday morning, January 3, 2005]." At that point, Officer Vest moved away from Charles, and although Charles was still talking in the background, his words are not discernable on the recording. When the body microphone picked up Charles's voice again, he said, "But that's kind of all of it in

33

a nutshell.  Neither one of us has ever laid a hand on each other. . . .  My deal is she has never left with somebody, she has always left in the car."

Officer Vest asked Charles to "hang out here" while he and Deputy Gibbons looked at Kathy's car.  He asked Charles where he had touched the car, and Charles said that he had touched the steering wheel to move the car and the driver's side door to see if water was leaking in, and it was.  The video shows Officer Vest and Deputy Gibbons examining Kathy's car; Officer Vest commented that the car was immaculate.  There is twelve minutes of silence on the recording; Officer Vest turned off his body microphone while he inspected Kathy's car.

After completing his inspection of the car, Officer Vest resumed his conversation with Charles and asked whether Kathy had any best friends. Charles said, "That is who I am fixing to call here tonight: Linda Janoe."  Officer Vest asked whether Charles had a phone number for Linda Janoe, and Charles said that he did in the house and invited Officer Vest inside.  As they entered the house, Charles asked, "Was y'all out here last year when this woman got killed down here?"  Officer Vest responded that they were not and explained that the only reason he was at the farm was because Kathy was a resident of Sanger and a missing person report was filed in Sanger.

Charles said, "It's been about a year ago when that woman down here— Marilyn, nice lady," when Officer Vest stated, "Yeah, I knew her, I know her son, I'm trying to think of his name."  Charles said, "Lee and Robert, Junior."  And

34

Officer Vest said, "Robert. I've known Robert for a long time." Charles stated, "See, first, though Robert's granddad lived right over here and he passed away in November, and then the next month this woman got killed down here and I don't think they've ever found out anything." Officer Vest responded, "Not as far as I know they haven't."

Charles then located Linda Janoe's cell phone number and provided it to Officer Vest. Charles explained how Kathy knew Linda Janoe and again said he was going to call Linda "tonight." Officer Vest then attempted to wrap up the interview, stating, "If you hear of anything, if she comes and gets the car, let us know so we can get it off the computer." But Charles interjected, "Y'all haven't had any reports of anybody being found or anything have you? It might be all for nothing. I don't know what to tell you. If this was something new, I might have jumped on it, but that woman called from school." Officer Vest confirmed that someone from Kathy's work had called. Charles said that the school had called him about 10:30 that morning looking for Kathy; he was told that it was a teacher workday. He said it was not a big deal, but stated, "We haven't heard anything. Her parents haven't heard anything. You know, you just don't ever know." Officer Vest then asked for the phone numbers for Kathy's parents and brother, and Charles provided Officer Vest phone numbers for Kathy's mother, Jeanne Munday, and her brother, Mark Munday. Charles explained that Chris Munday had just moved and that Kathy did not have his new phone number written down in the address book.

Officer Vest again tried to end the conversation, stating, "Alright, if I hear anything, I'll let you know." Charles indicated that he was going to call "this lady right here, I'm gonna call her—she works with her. Don't even know her last name." Officer Vest responded, "Let me write that down too." Officer Vest then prepared to leave again, stating, "Alright, if I hear anything I will let you know and you let me know if you hear anything." Charles asked, "What number? Do I call that same number?" Officer Vest said, "That's my cell phone." And Charles said, "And you are—Officer Vest. Are you from around here?"

The conversation then turned to where Officer Vest grew up and had worked, and Charles asked whether Officer Vest knew Jackie Norris, who worked with Charles and is from Sanger. Charles said, "Well, I appreciate you coming out. I'll tell you one thing. I don't know what happens, as far as this divorce thing; we know a woman, we went to church with a woman who went back to school in her 40s like my wife did and she ended up in the hospital in a nervous breakdown." Charles then explained that Kathy really changed after taking a psychology class, saying that a man always gets the better jobs, the man always rules, and the man gets all the toys. After that class, Kathy said that the pastor at their church was too dominating. Charles told Officer Vest, "It seemed like ever since then, I don't know, I think that the nerves, I'm not gonna say that she was fixing to have a nervous breakdown, but I figured that after she got out of school—[microphone breaking up]—she couldn't find a job, but then she just substituted and she got pretty depressed about that, then she got this

36

job at Nocona." He continued, "I don't know. It's like her brother told me tonight, 'She kinda lived a private life.'"

Officer Vest asked a few more questions before he left. He asked, "What do you think is going on?" Charles said, "I don't know. That is what her brother was asking me." Officer Vest asked, "What did she do for Christmas?" Charles said, "She went down there, I didn't go. And I asked her brother whether she was acting differently and he said, 'You know, she leads a private life and she lets you know what she wants you to know.'" Charles explained to Officer Vest, "And I said, 'Do you think she is more further distant from y'all than what you used to be?' And he said, 'Oh I don't know.'" Charles then said, "But you know, I got on her a few times about why she didn't let the cell phone bill go through the mail." Charles said he asked Kathy if she was trying to hide something by paying the bill online. Charles speculated that he could have called AT&T to get the bills, and Officer Vest said he could if his name was on the account. Charles then said that he did not have a cell phone but that Kathy had gotten one for herself and one for Charee.

Charles then volunteered, "There was nothing ever about finances, I've never had to borrow money or nothing." Officer Vest asked how Kathy was doing financially on her own since moving out in May. Charles explained that Kathy took out half of the $80,000 that they had in the bank. Charles said that he had told Mark earlier that night that because Kathy had half of the $80,000, "she ought to have plenty of money." Charles denied that Kathy drank, said she was

37

not on drugs, and had not been prescribed any drugs by a doctor that he knew of. Officer Vest asked whether Kathy went to the doctor regularly, and Charles said she did not.

Charles told Officer Vest, "I told her, you want out after all of these years, I want to make it fair and square, I've been waiting for you to come back but I'm going to get a lawyer, I am going to contest it and split it down the middle. It's the only fair way." Charles said, "That's when she just turned around right by the back door there and said, 'You know, I'm leaving and don't try to look for me. I'm going somewhere nobody is going to find me.'" Charles explained, "She could have called somebody, got on a plane, there's been a thousand things go through my head. I just hope nothing has happened to her."

Finally, Charles concluded, "That's about all I can tell you, that's all of it that I can think of."

### c. The Kish/Murphree statement recorded at the Sanger Police Department from 1:02 a.m. to 3:58 a.m. on January 4, 2005[20]

---

[20]As previously mentioned, the parties did not request that the DVD containing this interview—State's Exhibit 284—be transcribed by the court reporter when it was played for the jury. The author of this opinion has detailed the contents of this interview. The portions of the interview constituting a "clip" excerpted by the State are underlined and set forth in context exactly verbatim to show the question that preceded Charles's excerpted answer, as well as Charles's full answer and explanation. The State did not utilize all of the fifty-five clips contained on State's Exhibit 312; thirty-nine clips from State's Exhibit 312 were utilized. The clips not utilized during trial by the State are not underlined. References to the location that the particular questioning appears on the DVD (+/- ten seconds) are included as footnotes herein for the benefit of the parties in pursuing further review of this decision and for the benefit of any court subsequently reviewing this decision.

38

During the interview at the Sanger Police Department, Ranger Murphree and Investigator Kish had Charles sit in a chair in a corner, facing outward, so that Charles appeared on the video, but they did not. Ranger Murphree agreed that he and Investigator Kish "tag-teamed" Charles for three hours during the interrogation. On cross-examination, Ranger Murphree testified that he has conducted thousands of interrogations. Ranger Murphree testified that it is an interrogation technique to interview for a long period of time because the more the person talks, the more information the interviewer is likely to obtain, and that the interviewer is looking for inconsistencies. Ranger Murphree testified that he intentionally put pressure on Charles during the interview and that he was trying to wear Charles down and to create fatigue. According to Ranger Murphree, he proposed different scenarios and different possible motivations to Charles to try to get Charles to confess; the goal of the interrogation was a confession. Ranger Murphree agreed that Charles did not confess, consistently denied any involvement in Kathy's disappearance, and consistently denied knowing anything about Kathy's whereabouts.

The content of the three-hour interview is set forth below. The person speaking is identified by "M" for Ranger Murphree, "K" for Investigator Kish, and "C" for Charles. The trio entered the interrogation room, Charles shut the door, everyone stated their name for the recording, and the interview began at 1:02 a.m.:

C: I don't know what y'all think, but we didn't jump on this maybe as soon as we should have. But we just kept thinking she would come back.

M: Tell me that story again about the divorce and everything like that.[21]

C: She filed for divorce there at the end of May and moved out around the first of June. There hadn't been any arguments or anything of that nature whatsoever. <u>So I told her, you know, I wasn't going to contest it or anything; just whenever she wanted to make the next move, that was alright with me. Because it kinda took me by a total surprise.</u>[22]

So, it rocked along all during the summer. I seen her at least once a month, if not more. I changed the oil in her car about once a month, every 3,000 miles. She wanted me to do that. And it just rocked along on up til now, while she was off for the holidays. I guess that's when she decided to go to the lawyer and go on through with it. And I asked her two or three times between the summer and Christmas, I "<u>told her I still loved her, if she would reconsider and come back home, I would be there for her.</u>"[23] But she went ahead and made her mind up and told me how she wanted to divide everything up. And that's when she went to that lawyer on Tuesday. And I called her on Wednesday evening to see if she got everything set the way she wanted it. And she said yes.[24] I asked if she was going to tell me and she said she would rather come over and tell me in person. I said that was fine.[25] She arrived about 9:30 and was there probably about 30 minutes because the only thing

---

[21]State's Exhibit 284 at 1:27.

[22]State's Exhibit 284 at 2:11. The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Divorce took me by surprise.wmv."

[23]State's Exhibit 284 at 2:57. The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Still love her.wmv."

[24]State's Exhibit 284 at 3:19.

[25]State's Exhibit 284 at 3:26.

that was said was about the property division.  She told me that she wanted half the land, money for half the machinery that we acquired during the marriage, and most everything out of the house.[26]  I asked her, "Well, if I want to contest that, do I have to get a lawyer?"  And she said yes.  Because I had told her earlier that I wasn't going to fight nothing.  But then, after she told me the way she wanted to do it, I said no, I wanted to contest it.  I was going to contest it if she didn't do it the way I wanted to do it.[27]  And she asked, "Well, how do you want to do it?"  I told her I wanted to sell everything and split it down the middle.  And we'll just half it.  And I think that's the most fair way and that way on down the road you won't be able to come back and think you maybe got been cheated.[28]  I could tell she got a little frustrated, and then she looked at me and said, "Why does the man always have to try to win?"  And I said, "I'm not trying to win, I'm trying to do it the fairest way so we'll both be equal when we get out of this."[29]  And I said, "You don't have to do anything if you want to just come back home."[30]  And she said, "No, I've made my mind up."  So she got up and she said, "Are you sure you want to contest it?"  And I said, "That's the way I want to do it."  So right before she got to the back door to walk out she turned around and she just said, "I'm leaving."  And I said, "Okay."  And she said, "No, I mean I'm leaving."  And I said, "What do you mean you're leaving?"  And she said, "I'm leaving; don't try to look for me."  She said, "I'm leaving, I'm going

---

[26]State's Exhibit 284 at 3:58.

[27]State's Exhibit 284 at 4:22.

[28]State's Exhibit 284 at 4:40.

[29]During the interrogation, Ranger Murphree spent a significant amount of time questioning Charles about the value of the land and the property and questioning why Kathy would not want to sell everything and split it down the middle when she would end up with over half a million dollars that way.  But at trial, Ranger Murphree admitted that he had subsequently learned that Kathy had told Linda Janoe on either Monday, December 27, 2004 or Tuesday, December 28, 2004—before Kathy visited with Charles at the farm on the evening of December 29—that she did not want to sell the land because Tommy enjoyed it so much and she wanted it for him.

[30]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Just come back home.wmv."

41

where no one can find me."[31]   And I just looked at her, and she turned around and walked out and shut the door.  I saw the car go down the drive; I didn't see if she turned right or left.  She left.[32]

I got up the next morning probably about 8:30.  Always go to the front—the kitchen is there on the north where I can see out[33]—fixed my coffee, and looked outside.  You know, I didn't see that car sitting there cause it was pulled up pretty close to the garage.[34]  I guess I probably went outside an hour later and when I went around the garage there on the west that's when I saw it.[35]  I really didn't know what to think.[36]  I went back in the house.  I looked around in there.  I didn't see anything.  I went back outside and looked around the car.  I didn't touch anything.[37]  I didn't know what to think.  But I saw the keys was in it lying on the floorboard.  But her purse wasn't in there.

M: Did she bring her purse in the house?

C: No, she didn't.  She didn't bring anything in the house.[38]

M: Tell me about the living arrangements of your kids?

---

[31]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Kathy's final words.wmv."

[32]State's Exhibit 284 at 6:00.

[33]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Got up, outside hour later.wmv."

[34]State's Exhibit 284 at 6:31.

[35]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Car is close to garage.wmv."

[36]State's Exhibit 284 at 6:47.

[37]State's Exhibit 284 at 6:59.

[38]State's Exhibit 284 at 7:43.

42

C: Just a mutual agreement they could both stay with me or with her. My boy likes to stay with me more, because of being on the farm and stuff. And that was fine with her. There was never any arguments over that.[39]

M: Now did you take him to town earlier?

C: Yes, I did. That's when I come back I called her.

M: Was she there when you dropped him off?

C: Yes.

M: Did you talk to her there?

C: No, not at the house, I've never been up to the front door at the house.[40]

[M:] Is there any reason why if she was at the house you didn't just talk to her there?

[C:] No, well, the only reason I took him, he'd been with me several nights after Christmas and he got some games to play on his TV. And I asked him if he wanted to go home and play some of those Nintendo games and he said yes, and I said, "Well I don't blame you. I may call mom and see what she found out."[41] And she could have told me over the phone, but she said she just wanted to come out. But I guess she wanted to come out to see my reaction.

[M:] Did you tell him he needed to go home because y'all needed to talk about the divorce?

---

[39]State's Exhibit 284 at 8:25.

[40]State's Exhibit 284 at 8:37.

[41]State's Exhibit 284 at 9:29.

[C:] I just told him we was going to talk.  I told him that it really didn't matter.  He may have took it that I really wanted him to, but it really didn't matter.[42]

M: When you come around the corner and saw her car there did you look for her?

C: Yes, I did.

M: Where did you look?

C: All over the place.

[M:]  What did you think she did?

[C:] I was just bumfuzzled because it didn't make any sense. And the only thing that I could think of was the car, that car had been leaking water on the passenger side floorboard every time it rained and she was going to try to get that fixed or seen about while she was off during the holidays.[43]  But she never did or never brought it up.  I asked her once about it earlier that week and she said, "I really hadn't thought about it, but I need to get it fixed."  But I knew she hadn't got it fixed.  So I thought if she brought that up here that don't add up or else she would have said something about it when she was up here earlier.  So it didn't make no sense.  It just flat didn't make any sense.

But then I got to thinking she's got upset in the past and left a couple of times; she'd be gone for the weekend, cell phone off, not want to be disturbed.

M: How long ago was this?

C: The last time was about probably less than two years ago.

M: Where do you think she's at?

---

[42]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Why take Tommy.wmv."

[43]State's Exhibit 284 at 10:54.  The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "1st thought, fix car leaks.wmv."

44

C: I don't know.[44]  I think she is with somebody.

M: Why do you think she would park her car at your house?

C: I don't know.  That's what's got me.  [pause]  <u>Unless she planned on really staying away a long time or enough to really give us a scare or something and she just thought well she'd leave that car there.</u>[45]

M: If you sold all of your stuff out there, how much money do you think that would be worth?[46]

C: Quite a bit.  Land and everything?  I imagine you're looking at . . . I've been told by a realtor out of Fort Worth that that place would bring about a million dollars.

M: So, doing it your way, she's looking at $500,000.

C: Yeah.

M: And she knows that?.

C: Oh, yeah.  And another thing, she's not lacking for money right now.[47]  Because we had about $80,000 in the banking account, and when she moved out she told me that she took half of it, and I said, "That's fine."  And she's been working, and she's not a big spender, so she's still got plenty of money.

M: Let me ask you this.  When the divorce was filed there was a restraining order too.  Can you tell me why that was filed?

---

[44]State's Exhibit 284 at 12:25.

[45]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Leave car to stay away a long time.wmv."

[46]State's Exhibit 284 at 13:05.

[47]State's Exhibit 284 at 14:05.

C: No I cannot.  That's what got me.  To tell you the truth I just broke down.  I've never laid a hand on her and that's why I've never even went to the front door of her rent house.  I never got out of the car.

M: Was there a hearing on the 28th?

C: No, I've never received anything.[48]

[M:] Did she talk to you about a default judgment—what that meant if you did not respond to her divorce?  That she could get a default judgment and everything would go her way?

[C:] She just said the other night that if I did not respond, and contest anything, that it would go—I took it that it would just go right on through her way.

[M:] That's what she told you Wednesday?

[C:] Yeah.[49]

M: What about custody of the kids?[50]  What was y'alls thinking on that?

C: We never really discussed it, but she just said the other night probably that I would pay child support.  Which I figured that.  But I know my boy said that if mom left and that went through, he wanted to live with me, and I said well we'd have to talk that out.[51]

M: Who did she run off with?  Was she seeing somebody?  She have a boyfriend?

---

[48]State's Exhibit 284 at 15:38.

[49]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Default judgment.wmv."

[50]State's Exhibit 284 at 16:41.

[51]State's Exhibit 284 at 17:28.

C: The only thing that's got me suspicious and I talked to one of her friends tonight that used to work with her at NTCT in Corinth, I asked her that same thing. She said, "I don't know, I couldn't tell you." But the only thing that's kinda had me suspicious, when she filed was that she never would let the cell phone bill come on through the mail. I don't have a cell phone. She's got one and my daughter's got one.[52]

[M:] Do you know her cell phone number?

[C:] Yes, I do.

[M:] You tried calling her since this disappearance?

[C:] Oh, yeah.

[M:] Have you left messages for her?

[C:] Yeah.[53] She paid it online. And I tried to get into it one time before she moved out, and it's password protected. I never did call AT&T. And I asked her why she didn't send that bill through the mail and she said it is easier to pay it online.[54]

[M:] How many times you tried to call her since she disappeared?

[C:] Gosh, I don't know.

[M:] You left her a lot of messages on her cell phone?

[C:] Not really that many messages. We just called; my daughter's called.[55]

---

[52]State's Exhibit 284 at 19:22.

[53]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Charles says calls Kathy 1.wmv."

[54]State's Exhibit 284 at 19:41.

[55]State's Exhibit 284 at 20:32.

[M:] What did you tell her on the messages?

[C:] Said once, we wanna know where you're at.[56] As I said, we may have been a little late in callin', but we just kept thinking she'd come home. And then I got to thinking you know she left that car there to show me I've left like I said I was.

M: At the very worst if things don't go her way, and they go your way, she would get half a million dollars.[57] Did she say anything about looking for houses?[58]

C: [Shook head.]

M: Was there ever any mention that if you would buy her a house that would settle everything?

C: On the start she did. On the start she said, "Buy me a house." I said, "Where?" She said, "I don't know, maybe I can build one out here." And I said, "Why would you divorce me and build a house out here by me?" That didn't make any sense to me.[59]

M: Does she have family around here?

C: No. She's from Gatesville.

M: Does she have a brother in Fort Worth?

C: Yes, Chris.

M: Did you ever call him?

---

[56]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Charles says calls Kathy 2.wmv."

[57]State's Exhibit 284 at 21:55.

[58]State's Exhibit 284 at 22:04.

[59]State's Exhibit 284 at 23:17.

C: I couldn't find his phone number.[60] I just called the older brother Mark; he lives in Gatesville.

M: When did you call him?

C: Today.

M: You waited a whole week?

C: That's what I am saying. Nobody from down there ever called me. See she was supposed to go. That's what I told you we kept thinking she would probably come back. But when she didn't go to work this morning and the car was there today and the school secretary called about 10-10:30. We said she's gone. She's definitely gone somewhere.

M: Where would she go?

C: The last time she left she went to Granbury and got in a hotel. She didn't want to be bothered.

M: Do you think she would give up her job that she's worked so hard for because she is mad at you?

C: You wouldn't think so. That don't add up.[61] Not unless she thinks she is going to go ahead and end this and she's going to have a little money and she can make it awhile on that.

M: I talked to the kids, and they said it is not like her to go off and not tell them where she is going.

C: Not the kids.[62]

M: Your voicemails and stuff she might not pay any attention to, but your daughter's she would.

---

[60]State's Exhibit 284 at 23:35.

[61]State's Exhibit 284 at 25:04.

[62]State's Exhibit 284 at 25:36.

C: Right.[63]  I got real alarmed at first, and then I just thought, you know, I just didn't want to get everybody in a panic.[64]  I guess nowadays you just don't take no chances.[65]  With anything.  But knowing her and the way she is, I just thought maybe she's trying to put a scare in everybody.  But I can't see putting the kids in a scare like that.

M: Charles, let me tell you where we're at.[66]  Basically, you're the last person to see her.  She goes out to your house at night.  Going through a divorce, she's fixin' to take half of what you have [Murphree lists items].  And you're out in the middle of nowhere; she's not going to walk away from there.  She's not going to leave on foot.  So if she left with someone, she had to pull back in that driveway in there, someone had to pull in there to get her, open doors, shut doors, and leave without you hearing anything.

C: Yeah, and that very well could have happened.[67]

M: What about your dog out there?  Would he bark?

C: No he don't bark.  I sleep on the south end of the house, and I've always, well here with the weather, I've got my roaring fan going.[68]

M: Let me tell you another thing.  There's no voicemail messages from you on her cell phone.  You haven't called one time since she disappeared.

C: Well I dialed it several times.

---

[63]State's Exhibit 284 at 25:46.

[64]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Charles alarmed at first.wmv."

[65]State's Exhibit 284 at 26:02.

[66]State's Exhibit 284 at 26:19.

[67]State's Exhibit 284 at 27:20.

[68]State's Exhibit 284 at 27:33.

50

M: That's not what you told me. You told me you left messages.[69] You told me you called her and you haven't. The only time you got worried about her is when the police came out there to talk to you.

C: I guess I done hung the phone up. But I thought I said one time, "Where you at?"[70] How many times has it been called?

M: It's been called a lot . . . . [Ranger Murphree lists the individuals who called Kathy's cell phone.] I've listened to the voice messages, but you have not called her one time. Either one, you've made a mistake or you're lying to me.

C: I'm not lying.[71]

M: Either she goes out there and . . . . Let me tell you what it looks like from my point of view. You take your son and get him out of the house, and she comes over there to talk about a divorce where she is going to take half your stuff, that we've talked to other family members and stuff and you weren't real happy about that, the prospect of losing your money and your place. And she's in the middle of nowhere, and now she's disappeared off the face of the earth.

So here's the deal Charles, if something got out of control and you snapped, that's one thing. But if you planned that thing out and planned it for a long time. I don't think she's alive Charles.[72]

C: You don't think so?

M: No I don't. And I think you know that too. You were the last one to see her alive.

---

[69]State's Exhibit 284 at 27:55.

[70]State's Exhibit 284 at 28:13.

[71]State's Exhibit 284 at 29:22.

[72]State's Exhibit 284 at 30:11.

C: Yes sir.

M: So tell me what happened.

C: I don't know.  That is it.  That is all I can tell you.[73]  But I thought I did call her once.

M: Charles you haven't called her.  You haven't made one call to her phone.

C: From the house.

M: Listen Charles, I've seen them.  We got the records.  Her brother knew the password.  I've been listening to your daughter bawling on the messages.  So tell me what happened out there.  If something went crazy.  It's not making any sense Charles.

C: Well that's all I can tell you.

M: We'll find her.  It's not looking good Charles.

C: I know it's not.  Cause I told mom tonight,[74] whether she planned that to make it look like I'm some bad guy[75] or something.

M: That doesn't make any sense—she'd walk away from her kids and $500,000 to make you look like a bad guy.

C: But she didn't want to do it that way.[76]

M: She didn't want to do it your way.  That's why she walked away?

---

[73]State's Exhibit 284 at 30:38.

[74]State's Exhibit 284 at 31:21.

[75]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "To make me look bad.wmv."

[76]State's Exhibit 284 at 31:38.

C: No, because I told her I'd get a lawyer.  <u>I've never laid a hand on her.  And we've never had—</u>

[M:] <u>You've never laid a hand on her, ever?  I know more than what you think I know.</u>

[C:] <u>Well one time when I was leaving to go to work, and no tellin' what she told her, she grabbed me[77] and I grabbed her like this, and I guess I squeezed her arms and it left some bruises on her arm and the kids was there and they saw that.[78]</u>  But as far as a knock down drag out, no sir.  And I have dialed that number from the house several times.[79]  I am devastated.

M: You don't look devastated.  You don't sound devastated.  You're devastated enough to wait a week to call somebody.  And you haven't called nobody.  Somebody called you.

C: I know something was wrong when she didn't show up for school, when the school secretary called.

M: A while ago you thought she just went off somewhere, but now you think something's wrong.[80]  Which is it?

C: I don't know if she is in a motel or not.  What do you think?

M: I'm asking your opinion.

C: I don't know.  I wish I knew if she was in a motel or if she was in trouble.  <u>But I do know that she did not leave that car there and walk away.[81]</u>  Somebody had to come in there.[82]  I'm just saying in the past, she'd get in those moods and have to get away.

---

[77]State's Exhibit 284 at 32:11.

[78]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Domestic violence.wmv."

[79]State's Exhibit 284 at 33:23.

[80]State's Exhibit 284 at 33:58.

[81]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Kathy not walk.wmv."

M: So, she leaves your house and she is five minutes from her house and she decides to meet with someone and she leaves her car at your house.[83] She won't answer her daughter's calls.

C: Right. And did they find out if she picked up any clothes?

M: No clothes. Her purse is gone, that's it.

C: I do not know what to tell you. I can just tell you what has happened in the past.

M: And see I find it rather hard to believe too, that this thing is so docile is what you are trying to tell me. You're out there talking about divorce and half your shit disappearing and you're out there talking, there's no harsh words and everything is all cordial. Someone's been married twenty years and gonna lose half the stuff they've worked for, ain't nothing cordial about that. And you don't know why. And you're telling me everything is all nice, no harsh words; there had to be voices raised or something.[84] And if something happened and you snapped, that is one thing.

C: No because I'm nearly fifty years old. I'm know I'm probably not going to live a long life, my dad died when he was sixty-five. And what we've accumulated, I wasn't going to fight it.

[M:] That's not what I hear from everybody else I talked to; everybody else says you're not going to let go of your money. You're gonna fight for your money.

[C:] She knows—and she's told her parents, that's all I live for is my money.[85] But she didn't spend much money, and we wasn't big spenders.[86]

---

[82]State's Exhibit 284 at 34:34.

[83]State's Exhibit 284 at 34:56.

[84]State's Exhibit 284 at 36:04.

[85]State's Exhibit 284 at 36:38.

54

M: You said "she knows" and she told her parents. Does that mean that all you care about is your money?

C: No sir.

M: You said that's what she knows, you didn't say that's what she thinks.[87]

C: I know that's probably what she told her parents.[88] We just, we saved; we wasn't big spenders.

M: See, here's the problem I have. I'm getting a divorce and it's amicable and it's fine and it's great and no one is yelling at anyone and I wake up and my wife's car is there and I'm thinking something is wrong, I'm calling the police. And you didn't call anybody, not even her.[89] And now, all of a sudden the police show up, the school calls, and now all of a sudden you're concerned about her. Smooth, I'm going to call; not smooth divorce, I'm going to call because holy crap, they're gonna think I did something. You haven't done anything for a week Charles.

C: I kept thinking she was coming back. I just didn't get that alarmed at first.[90] If I hadn't of known, the way she does get sometimes, and what's happened in the past, I guess it would have been different, but I was more mad than worried. I told Charee, I'm more mad than I am scared. That's the reason I didn't go right in there and call the cell phone.[91] Her leaving that car setting there like that, she probably, most likely had to have left with somebody. She

---

[86]State's Exhibit 284 at 36:52. The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "$ importance, not big spender.wmv."

[87]State's Exhibit 284 at 36:58.

[88]State's Exhibit 284 at 37:05.

[89]State's Exhibit 284 at 37:58.

[90]State's Exhibit 284 at 38:58.

[91]State's Exhibit 284 at 40:03.

55

<u>had to leave with somebody.  She didn't park that car there and walk off of that hill.</u>[92]

M: What'd you do?  You're mad.  What'd you do?

C: I didn't do anything.

M: Charles, I'm going to find her.

C: The gas man came that morning about 10 a.m., and I was out of it.  I didn't know what to think.  I don't know.  I do not know.  But I think she is with somebody.  And I don't know why she wanted to do it that way except to get me riled up.  Because she didn't get me riled up.  And she could have told me over the phone, but she wanted to come out there to get me riled up.  But I didn't get riled up; she got riled up.  And it don't make no sense, but that is exactly what happened.[93]  If I was twenty or thirty years old, I might have more spunk to get hotheaded; but the way she always was, if I was going to go buy a piece of equipment or something, I would ask her, and then two or three days later she would come back and say, "Why you do that?  You shouldn't have done that."[94]

And then the last thing that really upset her before she filed for divorce and I found out afterwards, but she told my sister-in-law.  But my daughter had a wreck in this blue Lincoln car that we've had since 1991.  And when she got her driver's license, I give it to her, and she got in a wreck and tore the car up pretty good.  We brought it home, and I asked her, "Should I get it fixed?"  And she said, "I don't care."  And so I decided to fix it.  I took it to Dulocks in Gainesville.[95]  <u>And I fixed it.  And then I brought it home.  And of course I cancelled the insurance on it after the wreck.  And I just told her no one is driving it for now.  I didn't put the insurance back on it.  It probably hasn't been drove fifty miles since then.  It's sitting in the</u>

---

[92]State's Exhibit 284 at 40:01.  The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Kathy not walk off hill.wmv."

[93]State's Exhibit 284 at 41:57.

[94]State's Exhibit 284 at 43:11.

[95]State's Exhibit 284 at 44:22.

garage.[96]  And I think that is what was eating on her when she filed for divorce.  She told her sister-in-law that she couldn't understand why he got that car fixed and let it sit in the garage.  She got steamed but didn't tell me that.  She told her sister-in-law after she moved out.[97]

K: You said she got riled up out there at the house.  How was she acting?

C: She -- just when she stood up and got kinda red faced.

K: How do you act when you get riled up?  Do you raise your voice?  Different people act different ways.

C: I guess I have raised my voice some.  But I didn't that night because I said I'm gonna contest it, I'm gonna get a lawyer, and I want this done, split right down the middle.

K: In the past, how long did she stay gone?

C: Three days, and two days.[98]

K: You know, she's got some pretty good friends that she talks to a lot.  She's made no phone calls.[99]  Zero.  There's no messages from you.

C: I thought I said once, "Where you at?"

K: The car was near the garage that morning, what did you do?  You got a lot of buildings out there.

C: Yeah, I got a hay barn, oat barn, kind of a shop.

---

[96]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Don't drive car in garage.wmv."

[97]State's Exhibit 284 at 45:33.

[98]State's Exhibit 284 at 46:43.

[99]State's Exhibit 284 at 47:11.

K: So between the time you found her car and the gas man came around 10, what did you do?

C: I just messing around, I guess.

[M:] Charles, I have a hard time believing that she is going to be pissed off at you because you want to split the land up and split it all up even.[100]  The -- the options she has on this paper that she typed up, one is to sell everything and she is willing to do that.  I find it hard to believe that she is going to be so mad at you when she took the time to type this up and one option is to sell all.

[C:] She did not want to do it that night when she come out there because that is exactly what I said I wanted to do.  But she said she did not want to split and that was after she went to the lawyer.  She told me the option the way she wanted it after she went to the lawyer.  And that was not selling all of it.[101]  She did not want to sell the land.  I've not seen anything she typed up.[102]

M: Here's where we stand right now . . .

C: This is when they filed the divorce and served me the papers.[103]

M: It looks like she asks her lawyer what to do . . . because you wouldn't show up.  And she typed this up to try to get an agreement, and the option was half of the market value.  She is not going to walk away from $500,000.  Here's the deal.  I don't think she's alive.  I've done this for too long.

---

[100]State's Exhibit 284 at 48:47.

[101]State's Exhibit 284 at 50:52.

[102]State's Exhibit 284 at 50:55.  The underlined words constitute the pertinent portion of the clip from State's Exhibit 312 that is titled, "Options document 1.wmv."  This is the longest of the clips, running one minute and fifty-five seconds.  The State used this clip in an effort to show that Charles had seen Kathy's options document, so only that portion of the clip is set forth here because of the clip's length.

[103]State's Exhibit 284 at 51:23.

C: She's got to be.

M: If when I find her, things got out of hand and some things happened that you wish hadn't a happened, that's one thing, but if this thing is premeditated out and planned, that's another thing.

[C:]  What does she got on there [The options sheet Murphree is reading from]?

[M:] I told you Charles, options of division: option one—divide 105 acres into two 52.5 parcels of land; that's one option she's willing to make.[104]  The other one, she wants the house and front and back yard and the front acreage with the tank, update the house as previous requests before moving in with access and privileges to all barns and equipment. Option three, half the market value of land and improvements and equipment, and option four, buy her a house worth between $200,000 and $300,000, and she will be satisfied.

C: She did not want to sell it.  Don't ask me why, I don't know.[105]

M: I'm going to be talking to her lawyer in the morning.  When her lawyer tells me, "Oh yeah, she'd be happy to take half of the value of everything," that's going to blow your story up.[106]

C: That is what she said. . . .  I don't know why she didn't want to sell the whole thing and split it in half so it would just be equal to both of us.

---

[104]State's Exhibit 312, clip titled, "Options document 2.wmv."

[105]State's Exhibit 284 at 53:53.

[106]State's Exhibit 284 at 54:15.  Ranger Murphree conceded on cross-examination that, after he interviewed Charles, he found out that in fact Kathy did not want to sell everything and split it down the middle; she wanted the land for Tommy.  Kathy's divorce lawyer also testified that Kathy did not want to sell the land.

59

M: I understand from talking to some folks <u>you didn't want this divorce, and you were fighting tooth and nail to keep her from leaving.</u>

[C:] <u>That's right.</u>[107]

M: She gave you the ultimatum and she said this is the way it is -- it is going to be, it's over. Did it piss you off? It'd piss me off. You have to see it from my point of view Charles. You're telling me you offered her a half a million dollars, and she got mad, walked out of that house, and drove off. And all of a sudden her car is back. And you are not concerned enough to call anybody.

C: I was going to talk to her family today first.[108]

M: After the school called you and the police showed up.

C: I know it don't look good. But I'm just saying, I hadn't heard anything from them. I finally got ahold of Mark on his cell phone. I told Charee to go to the house to get some phone numbers. Charee stopped by the police station to report her missing because I said I'm gonna call Mark, then we're going to report her missing.[109]

M: No one's heard from her after you talked to her, not her family, her children, not her friends.

C: That don't make no sense. You gotta find her. You gotta find her.

M: Where is she? Tell me where she's at. Let's get this over with. Where is she? You're gonna feel better. Tell me what happened if things got out of hand; I can understand that. Tell me where she's at.

C: I do not know where she's at. I don't know where she's at.

---

[107]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Charles not want divorce.wmv."

[108]State's Exhibit 284 at 57:18.

[109]State's Exhibit 284 at 58:40.

60

K: Is she on your property out there Charles?

C: No, at least I didn't see her.  I walked it all.  I walked all over it.

K:  Let me just tell you my point of view.  There is quite a few deceptions in what you're saying.  Knowing the court system, they notify you when it's time to go to court.  They have to; it's a legal process.

C: Nobody ever—

K: Let me talk.  There's some concerns of mine.  This car being there.  You not taking any action.  You saying you don't know what you did between when you found the car and the gas guy showed up, and now you're saying you walked all over the property; I don't think you're being truthful with us.  I think you're holding something back.[110]  You're going through a really, really tough time.  This divorce is not an easy deal.  I don't think you're being truthful with us, but we will find her.  And I think you know something that you're not telling us.  Now is the time to tell us.  We're going to search and search, and we're going to find her.

C: I want you to find her.

K: If there was voices raised in the house, if there was a disagreement, now is the time to tell us.

C: No, there was none of that.

K: So, she just gets in her car and leaves, drives down the driveway.

C: Yes, sir.

K: What did you do?

C: I went on to bed.

---

[110]State's Exhibit 284 at 1:01:13.

K: Did your daughter call you the next day?

C: She came up about the time the gas man was there or right before. I said, "Is mom down there?" And she said, "No." I looked around there; she wasn't there. She did not park that car and walk off of here. She had to leave with -- left with somebody.

K: Is it normal to leave the keys in the car?

C: Up there we do. The madder I got . . . I thought what is this. I had just told her -- and did not get upset or anything -- I wanted to split everything. It is enough money for me to get a house. I want to split it half and half, and that's when I told her I was going to contest it. And I think that when I told her that I was going to contest it, that is when she got ruffled. And when I was thumbing through those papers and saw that restraining order, I couldn't believe it. I didn't read it; I just took it to mean that I had to stay away from where she was living.[111] Is that true?

K: That's pretty much it.

C: And that's why I never got out of the car when I went down there.

K: Here are some notes about the divorce in her writing. Her lawyer told her they could get a default judgment for failure to respond.

C: She went to the lawyer on Tuesday; she told me she was going to get it straight how she wanted it. And I said, "Are you going to pretty much get that etched in stone?" And she said, "Yes."

K: Would you have a problem with us looking on your property?

C: No sir.[112]

---

[111]State's Exhibit 284 at 1:05.

[112]State's Exhibit 284 at 1:07:35.

M: Your house, your barns, your pickup?

C: There's nothing there though.

[K:] I just have a hard time with her walking away from the house—

[C:] She didn't walk away[113] from there. No, she didn't walk away from there; no, there's no way.[114] What kinda calls has she made before?

M: How did y'all get along last Christmas, of '03? How's things going then?

C: I don't know.

[M:] She made a few notes about it: Charles off for a week at Christmas, didn't do anything with us or the kids, Charles got upset, Charles didn't want anything for Christmas, did not want to buy me anything. Doesn't sound like a marriage where you'd be shocked if somebody decided to file for divorce.

[C:] We never did buy anything for each other, the kids—

[M:] She is writing this stuff down.

[C:] She was always writing stuff down like that and leaving notes in the house.[115] What we always done for Christmas, I went with the kids and picked out stuff for her from them, and we'd call it from the kids.[116] And then she'd take the kids and they'd get stuff for me and we'd call it from the kids.

---

[113]State's Exhibit 284 at 1:08:04.

[114]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Kathy not walk away.wmv."

[115]State's Exhibit 284 at 1:09:55. The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "No Christmas presents.wmv."

[116]State's Exhibit 284 at 1:10:12.

K: Did you look to see if her purse was in her car?

C: I looked in backseat, in front, I opened the trunk, and that was it.

M: Did you work last Thursday through Sunday?

C: No. I had to go in and get everything going today. The plant closed, had to go in and start the equipment.

M: Did you do anything to try to find her?

C: I didn't leave no messages. I just figured she would come back putting a scare in me to make me say, "Hey, okay, we'll do it your way."[117]

M: Do you still think that? She would put her kids through that?

C: She wouldn't do that to the kids, not this long, no.

M: So you think something's happened now?

C: I think she's with somebody or something happened.[118] She did not park that car there and walk off—

M: Even if she was with somebody, she would probably call her kids, huh?

C: You would think so. I would think so.

K: Unless somebody hurt her, right?

C: Uh huh.

M: You think that's possible?

[117]State's Exhibit 284 at 1:12:06.

[118]State's Exhibit 284 at 1:12:46.

64

C: It's looking that way, in my book.

M: My book too.

C: I mean, I've never done anything against the law.  I grew up there out on that dairy, and we worked all of our life.  And she used to get pretty PO'ed at me.  I liked to work.  I was like my dad; I didn't really care to go anywhere.  I wasn't real big on vacations.  We'd take one vacation in the summer.  And I wasn't a big spender, and she wasn't a big spender.[119]

M: Growing up, did you have money?

C: Not really.

M: Were you poor?

C: We was pretty hard when I was little.

M: You worked hard for your money?

C: Yes.

M: You're a good ol' Cooke County boy, got a million dollar land, that's pretty damn good.

C: That's why I wanted to split it equal.

M: How much work did she do to get that land?

C: She helped me, like what?

M: She didn't have a job, did she?

C: Yeah, she's always worked.

M: Where'd she work before?

C: She's had several jobs before, at the college, and she helped me out there on the farm.

---

[119]State's Exhibit 284 at 1:13:51.

M: You got any home place in Cooke County where you were raised?

C: Yes, where I was raised, about 350 acres.

M: How much of that is yours? Is your mom still living? Does your wife own some of that?

C: Nothing was ever said about that.

M: When was the last time you were on that land?

C: New Year's Day, Saturday about 12:30.

M: P.M.? During the day?

C: Yes.

M: How long did you stay?

C: Till about 2.

M: What did you do while you were there?

C: Eat lunch. Kids went with.

M: Didn't go up there any other times after Christmas till today?

C: [Shook head no.] I don't know. I was up there Christmas. Take a load of round bales up there, I think the day after New Year's. No, I took a load of ten round bales up there the day after lunch on New Year's Day.

M: How come didn't take the round bales with you when you went?

C: We didn't have time to get it loaded up, hooked up and loaded up.

K: Where's that land at?[120]

C: It's off Spring Creek Road off Wolf Sterring.

M: What kind of lands is it out there?

C: It's got a creek that runs through it.  My property doesn't have a creek or trees.  It's all open land.  My land where I grew up, the home place, it's on both sides of Spring Creek Road, and it's got a creek that runs through it.[121]

K: How can you help us find your wife?

C: I wish I knew.  That is why I am asking you what kind of calls she made before?

M: To her friends, different people, nothing unusual.  Charles, I'm going to ask you two things.[122]  I know you already gave us permission to search your place.  I'm gonna search your house, your vehicles there, your outbuildings there, and your land.  You have any problem with that.

C: No, I sure don't.

K: Are you nervous right now?

C: Not really.  But you're sitting there telling me you think I done something with my wife.

M: What would you be thinking if you were sitting in this chair over here?  Here's what I know.[123]  Here's what I know to be facts. You're going through a divorce that you don't want.  True?

C: That's true.

---

[120]State's Exhibit 284 at 1:19:32.

[121]State's Exhibit 284 at 1:20:41.

[122]State's Exhibit 284 at 1:21:26.

[123]State's Exhibit 284 at 1:22:28.

M: I know that, at best, your divorce is in your own estimation going to cost you about a half a million dollars. True?

C: That's true.

M: I know that you took your son into town who is usually with you. True?

C: Yes.

M: I know that you didn't go up and talk to her or knock on the door then or ask your son to tell her to come out to talk to her to ask her those questions; you went home and called her. True?

C: Yes, and I didn't ask her to come out there.[124] I just called to ask her to tell me on the phone—

M: Regardless of how that conversation went, she came out to your house, and there was only two people there. You and her.

C: That's correct, yes.

M: She leaves, and all of a sudden her vehicle ends up back at your house.[125] True?

C: Yes.

M: And you would agree with me that it's highly unlikely that she would walk away from your house and walk anywhere.

C: Yes.

M: And five days have passed and you haven't contacted anybody. True?

C: That's true. And like I say, that's what I told Mark tonight—

---

[124]State's Exhibit 284 at 1:23:02.

[125]State's Exhibit 284 at 1:23:26.

[M:] So, with all of that, if all that is true, and you are sitting in this chair, what would you be thinking?  If you were sitting in this chair right here, what would you be thinking?

[C:] You probably be thinking hey, this guy here done something with his wife.[126]  And I thought that immediately when I saw that car sitting there; man, she is trying to make me look like I'm some kind of a ----.[127]

M: So you immediately thought when you saw that car that she was trying to get me on something?[128]

C: Well no, no, but after I kinda calmed down from being mad, I kinda thought, boy this looks real good.  But then I kept thinking, and I told the kids, "No, she'll come home."  She just wants me to get the car fixed.  That's just a hint for me to get that car fixed.[129] Because she wasn't going to get it fixed.

M: So she's got a leaky window in her car; in order for to fix it, she is going to walk away, or leave with somebody, pick her up, and not call her kids or her family.  That's your theory.

C: Well, that's just what I was thinking right there at the very start.[130]  I didn't know what to think.  And then after a couple of days went by, I thought, nah.  Like I say, I was mad more than anything. Cause I knew she didn't, she didn't walk back to the house.

[M:] I agree with you, not when she has a perfectly good car right there.

---

[126]State's Exhibit 284 at 1:23:56.

[127]State's Exhibit 284 at 1:24:13.  The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Car to make me look bad guy.wmv."

[128]State's Exhibit 284 at 1:24:15.

[129]State's Exhibit 284 at 1:24:30.  The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Car hint to fix car.wmv."

[130]State's Exhibit 284 at 1:24:49.

[C:]  No, she didn't walk.  No.[131]  That's all I know, that's all I can tell you.

M:  A couple more facts.  Since she's been at your house she hasn't made one phone call.  Highly unusual.

C: Yeah, it is.[132]

M: Charles, did you hurt or kill Katherine?

C: No, I did not.

M: You're not under arrest here.  You drove up here in your own car.

C: Yes sir.

M: We haven't had any handcuffs on you or nothing like that.

C: No sir, no sir.[133]  I mean, to me, my word oughta be good enough for y'all in here right now.

M: Well, unfortunately, I don't know you from Adam, Charles.  Here's the deal: your wife's missing, she hadn't made any phone calls, she hadn't called her kids, she didn't show up for her job, you're going through a divorce, you're about to lose half a million dollars, and you're the last person to see her.  And I'm supposed to take your word that everything is kosher?  Okay Charles, go home and go to bed and maybe she'll show up?  Would I be doing my job if I did that?

C: No, no you wouldn't.

---

[131]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Kathy did not walk away.wmv."

[132]State's Exhibit 284 at 1:25:55.

[133]State's Exhibit 284 at 1:26:14.

70

M: I damn sure wouldn't.  All I got to go by is you're the last person to see her, and her car is at your house.

C: I know that.

M: She's divorcing you, and she is about to take you for half of everything you've got.[134]

C: I know that.

M: People kill for a lot less.

C: Oh gosh, I wouldn't kill for any amount of money.

M: In a fit of rage sometimes there's no telling what people will do.

C: That's why I just wanted to split everything half and half.  I wanted to get rid of all of it.

[M:] But according to you, that's not what she wanted.

[C:] No, she didn't want to split it in half; I don't know why.

[M:] But the papers we got off her computer shows that was an option.

[C:] Yeah, I know, like I told him, I haven't seen those papers; I'm just going by what she told me she told the lawyer.[135]  She told me exactly what she wanted.  She didn't bring no papers into the house.  And I said, "No, I want to split it down the middle and sell everything."

M: When we get on her computer and show that she typed up those papers on the 28th, that's going to shoot down your story pretty good.

---

[134]State's Exhibit 284 at 1:27:19.

[135]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Options document not seen.wmv."

C: I can only tell you what she told me. She told me exactly what she wanted: 55-acre tract, half of the machinery, most everything out of the house, and I would pay child support.[136] And I said no, I wanted to split it down the middle and sell everything.

Because I had told her once, <u>we was talking about it one time, I guess while I was changing the oil on the car, she asked me one of those times I was changing the oil would I ever sell all of it, and I said, "Oh, probably not." And she said, "Nah, I don't want to sell it."</u>[137] And then I just, at the last I just thought you know, I am almost fifty years old, fixin' to be, and if you're not going to be here to help me, I don't need this place; let's just sell it all and split it. I've worked, she's worked,[138] she's helped me. And at my age, it's enough. I've never had a lot of money. It's enough. I can go buy me a house. It's fair and equal. It's even Steven. I don't think I deserve any more than she deserves. I mean twenty years, we've both worked and helped each other. And anybody married twenty years, that's hard to end it.

K: And that's another reason to be honest with you what doesn't look good for you. Everything's kinda stacked against you.[139]

C: I know that. But you gotta look at this, after twenty years, what would you say? Would you want to just say half and half after being married all those years? I'm not the type after twenty years, stand up there and say, "I'm better than you."

K: Honesty is the best policy to operate with. And that's how I do my job. And I can't imagine what you're going through. Twenty years of marriage for it just to be ended just like that. And it's over. It's in the court system. . . .

---

[136]State's Exhibit 284 at 1:28:24.

[137]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Charles not want to sell land.wmv."

[138]State's Exhibit 284 at 1:29:26.

[139]State's Exhibit 284 at 1:30:47.

C: And I've had all these months to realize that is going to be the end. I'm a very particular person. I always took care of my vehicles very well.[140] I worked at my job for twenty years. You can ask anybody down there. I do everything 150 percent. I'm always there. I've never got into it with anybody. I'm an A number 1, I guess. They think a lot of me down there. And that's just the way I grew up. I grew up to be honest. I never been in -- got any kind of trouble other than a couple of speeding tickets back when I was a youngster.

[M:] This dragged on through the summer. Did you think she might be coming back home? Changed her mind?

[C:] Oh, I didn't really know.[141] I didn't really know. Because I told her, you know, "You need to come on back." And I said, you know, because she was always wanting to do something to the house, to improve it.[142] And I said, "You come back, we'll just tear down that house and build a new one. You know, I always put you off and said, 'Hey, I don't want to do a lot of stuff to the house[143] when the kids are little, tear it up. You know, we'll wait til the kids are older, and we'll either remodel or we'll build a new house.'" And I told her one time during the summer, you know, "You just come back home." I said, "We'll remodel that house or just tear it down and build a new one and you can call all the shots." And she said, "You won't do it."[144] And I said, "Yes I will." I said, "Yes I will." It wasn't like we never did have no money in the bank account; the money was always there. And she wouldn't ever spend it. And I'd tell her, "Hey, you can do this," but she wouldn't do it.[145]

---

[140]State's Exhibit 284 at 1:31:34.

[141]State's Exhibit 284 at 1:32:30.

[142]State's Exhibit 284 at 1:32:46.

[143]State's Exhibit 284 at 1:32:54.

[144]State's Exhibit 284 at 1:33:25.

[145]State's Exhibit 284 at 1:33:53. The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Charles wanted to reconcile.wmv."

73

M: What's your zip code out at the house?

C: 76266.  [Ranger Murphree leaves the room.]

K: You gotta see where we're coming from, okay.

C: I see where you're coming from.

K: . . . And if we're wrong, we'll be the first people to come to you and say, "Hey, here's your wife."  And if we're wrong, we'll apologize to you.  But I don't think we're wrong.  Something is not adding up.[146]

C: I know what it looks.  But I just kept thinking she's come back.[147]  The reason I didn't get in a hurry about getting everybody alarmed.  I didn't want to get everybody alarmed.  I just thought she would come back.

K: But now everybody is alarmed, pretty seriously alarmed.

C: Yes, they are.[148]  And I'm even more alarmed.

K: Rightfully so, you probably oughtta be.

C: But after she called this morning and she didn't go to school and I got up and saw that car sitting out there, I said, man.

K: But you saw the car sitting out there the day after you had your talk, though, right?

C: Yeah, but that didn't hit me as like a panic, like something you know had happened to her.  But when she didn't go to work, I come more thinking maybe something did happen to her this morning when she didn't go to work.

---

[146]State's Exhibit 284 at 1:34:55.

[147]State's Exhibit 284 at 1:35:00.

[148]State's Exhibit 284 at 1:35:10.

K: Do you normally come home from work after you get there?[149]  Or do you stay for your whole shift?  How does that work? You work the first shift or the third shift?  So are you a supervisor?

C: No, I didn't take the supervisor's job; they wanted me to just six months after I started.

K: So is it normal for you to get things started and leave, come back home?

C: I can; like tonight, I just come back.[150]

K: What made you come home tonight?

C: I didn't want them kids, I knew they was upset.

K: They're real upset.  They think something's happened to their momma.  Been talking to your kids out there.  They're upset; they're hurt.  . . . .  Those kids know that something is going on. They can sense it, just like we do.  And it don't add up.  It don't add up.

C: No, it don't.

K: And that's what we're trying to get to the bottom of.  I just strongly believe that if she just ran off for a couple of days to get away, she would have returned those calls on her voice mail.  She would have called her kids.  Maybe not to you.  She might not have taken your calls.[151]  What is your boy, twelve or thirteen? And your daughter, sixteen, she's fixing to be seventeen?  The truth of the matter is something has happened to her.

C: And[152] <u>I just kept telling Charee, "She'll come home; she'll come home.  This is -- this is -- either to get my attention or to scare me.</u>

---

[149]State's Exhibit 284 at 1:35:49.

[150]State's Exhibit 284 at 1:36:26.

[151]State's Exhibit 284 at 1:37:39.

[152]State's Exhibit 284 at 1:38:05.

[K:] I think we've come to an agreement that is not the case now though is it?

[C:] No.[153]

M: Have you ever made the statement that you would kill yourself before you got a divorce?[154]

C: Yeah, I did one time. She got all riled up there one time about saying one time there, "I'll leave," and I said if you ever left I'd probably kill myself cause I couldn't live.[155]

M: Was that before she left or during your talks, or was it recent?

C: Well when she filed those papers on me that morning, I was fixing to go -- she knew I was going to have to go in the field to harvest. I was fixing to get on the combine, and I said, "Well what do you want me to do? Kill myself?" She said, "No, you won't do that." I said, "Well, I just as well kill myself if you're going to leave here." But she got mad about something one other time,[156] and I told her, I said, "I'd kill myself if you ever left here."

M: So you told her that a couple of different times?

C: Yeah.

M: Were you serious about it?

---

[153]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Kept telling Charee she'll be back.wmv."

[154]State's Exhibit 284 at 1:38:31.

[155]State's Exhibit 284 at 1:39:00.

[156]State's Exhibit 284 at 1:40:01.

C: Gosh, I'd have to be crazy to kill myself or kill somebody else.[157] I'm not that kind of person. I think there's got to be something wrong with somebody to take their own life.

M: Did you ever make the comment that if you got any paperwork you weren't going to sign it, as far as the divorce went?[158]

C: I asked her was I going to get anything in the mail after she served me the papers, there probably a month or so after, and she said, "I don't know." I think she said she didn't know. <u>But I remember, yeah, I remember I told her once, "I ain't signing nothing. I ain't contesting nothing. I ain't getting a lawyer. Just take it on, if you got to take it on, just take it on."</u>[159]

M: Here's the big difference Charles; there's a big difference in, "Hey, do whatever you got to do things are great, da, da, da," and "Hey, I'm not signing anything."[160] That's a defiant act. That's saying, "I ain't signing anything; I'm not going through with this divorce." . . . . Were you in denial that a divorce would actually take place?

C: One person can't stop a divorce; it's going to take place.

M: Well you can damn sure slow it down. You can damn sure cause some heartache.

C: I guess a person could.

M: Right after she got a phone call from you at the house, she gathered up paperwork and heads out the door. Why would she bring any paperwork to you? She's going to show you what the lawyer said.

---

[157]State's Exhibit 284 at 1:40:14.

[158]State's Exhibit 284 at 1:40:30.

[159]State's Exhibit 284 at 1:41:12. The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "I ain't signing anything.wmv."

[160]State's Exhibit 284 at 1:41:53.

C: That's about all there was to say.  That's pretty much cut and dried, exactly what I told you.  Unless she wasn't telling me the truth, but she didn't have no reason not to tell me the truth because she'd already been to the lawyer.

M: When you got served with the citation on temporary restraining order and there was a hearing, how come you didn't go to the hearing?[161]

C: I never did get no notice for a hearing.

M: Says right here, temporary restraining order delivered on 6/2, and hearing is on 6/10.

C: Never did get anything.  Oh, I remember; she cancelled it. She told me she cancelled it because I was in the field harvesting all there for about three weeks straight.[162]  And she told me there was supposed to be a hearing, and she cancelled it.  I do remember that. And I never did get anything or hear anything since.

K: How can we resolve some of these inconsistencies?[163] These things are not adding up.  And you say, "Yeah, they are not adding up."  How can you help us make those things add up?  What I'm trying to say is it's not adding up to anyone in this room.  And you tell us, "Yeah, it's not adding up."  How can we get to a common denominator here?[164]  I really feel like you're holding something back.  Maybe you don't know how to tell us.

C: No, I'm not holding back anything; I'm just worried.

K: I am worried too.

---

[161]State's Exhibit 284 at 1:43:12.

[162]State's Exhibit 284 at 1:43:35.

[163]State's Exhibit 284 at 1:44:09.

[164]State's Exhibit 284 at 1:44:34.

C:  <u>She didn't walk away from that car.</u>[165]

K:  What happened to her Charles?

C: You're going to have to find out.  You're going to have to find out.  You're going to have to find her.  Have you ever run on something like this?  Could she be with somebody and just vanish like that?[166]

K: Highly unlikely.  Highly unlikely that she is going through this divorce and getting all her life in order and planning on getting a house. . . .

Where your house is out there in the country is a distance back into town.  Even your driveway to the next road is a pretty good jog back in there, you know?  You yourself said she didn't walk back to that road.  What was the weather that night?  Do you remember what the weather was that night? On Wednesday.

C: It wasn't raining.

K: I don't remember what it was, but even if the weather was nice, somebody isn't going to walk down that road, just walk aimlessly down the road when they got their car just because their window is leaking.[167]  She's not going to leave it there on the day she comes to talk to you.  I'm just trying to come to some conclusions or something.  My conclusion is something has happened to that lady.[168]

C: But she went, she left.  She left because I saw the car go down the drive.  But I don't know if she went to the left or the right.

---

[165]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Kathy not walk away 2.wmv."

[166]State's Exhibit 284 at 1:46:04.

[167] State's Exhibit 284 at 1:47:02.

[168] State's Exhibit 284 at 1:47:11.

M: Did she come back?  Did she come back?  Did she come back and knock on the door and try to talk to you?

C: I don't know.  I went to bed, and I was out.

M: Did she come back Charles, and that's when the fight happened?[169]

C: I went to bed.

M: Did she leave and come back, and that's when the yelling and screaming started?

C: I went to bed.[170]

M: That's what happened, wasn't it Charles?

C: No.  I'll look you in the eye on that one.  I went to bed.  And when I lay down, I'm out.  And normally when I am in the room with that fan on, if she were here, she could tell you the thunderstorms don't even wake me up.[171]  Cause I don't hear anything.  But she's not here.  I know.

But when she come back and parked that car there, I don't know what happened.  I don't know why it was parked there.  I don't know how she got away from there.[172]  But I know she didn't walk away from there.  She had to have gone with somebody.  There was no fight whatsoever.[173]  If I had known anything like this was going to come about, anything like this, I would have had a tape recorder going on.[174]  But there was no foul words used at all.  There just was

---

[169]State's Exhibit 284 at 1:47:41.

[170]State's Exhibit 284 at 1:47:56.

[171]State's Exhibit 284 at 1:48:51.

[172]State's Exhibit 284 at 1:48:45.

[173]State's Exhibit 284 at 1:49:08.

[174]State's Exhibit 284 at 1:49:20.

not.[175] That's all I can tell you. I do not know. And that splitting that land up, there's nothing wrong with anybody doing it that way. That's just the way I want to do it.[176]

M: Apparently that's one of the ways she wanted to do it too.

C: Well, that's not what she said was etched in stone from the lawyer.[177] I'm curious to see what you find out from the lawyer.

M: Well, I'm curious about that myself. I'll be finding that out around 8 a.m. in the morning, five hours from now.[178]

C: Fifty-five acres, the machinery, half of that, half of the retirement, <u>401s, IRAs and her stuff out of the house. And she didn't bring no papers in. She didn't bring no papers in, that was, I mean that was exactly what she said. I mean, that's it.</u>[179] There was no need for her to bring any papers in; that is what she said, and I took her word for it.[180]

K: When you left work tonight to come home, did you tell anyone? I mean is your machine still going? Or what's the deal with that?

C: Yeah, I told my supervisor I was going to leave and go to the house.

K: Is that normal for you to do that?

---

[175]State's Exhibit 284 at 1:49:44.

[176]State's Exhibit 284 at 1:50:00.

[177]State's Exhibit 284 at 1:50:13.

[178]State's Exhibit 284 at 1:50:20.

[179]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Kathy not bring papers in.wmv."

[180]State's Exhibit 284 at 1:51:08.

C: No, I didn't give him no explanation, but as long as I've been there, that's -- that's fine.

K: And did you plan on going back, or are you done for the night?

C: I don't have to go back.[181]

K: But did you plan on going back is what I asked you.

C: Well if I was just gonna be here an hour, I mighta gone back. But I don't think I'll go back; I'll just go to the house.[182]

K: Well did you know we was at your house when you left work?

C: No.

K: Well, I guess I gotta ask you again. When you left work at Tetra Pak to come home, did you plan on going back to work tonight, or what was your plans?[183]    Why did you come home tonight?[184]

C: I called Charee's cell phone, and she didn't answer it.

K: And that made you come home?

C: And I thought -- I told my supervisor, "I'm gonna go to the house."

K: You didn't tell your supervisor your wife was missing or nothing like that?

---

[181]State's Exhibit 284 at 1:51:44.

[182]State's Exhibit 284 at 1:51:53.

[183]State's Exhibit 284 at 1:52:12.

[184]State's Exhibit 284 at 1:52:30.

C: No. This is my first night back.[185] Getting everything going and everything back in there since everything'd been down for the weekend.

K: So I guess we need to figure out on this going out to your property and looking around. And I've got a, here, it's a consent to search form. And I know you verbally told us we could go out there and everything. But I need to get this signed.[186] Your address is [-----] Metz Road?

C: Yes.

K: Is there lights out there in your barns and stuff? Probably not, is there?

C: Just the shop areas.[187]

K: Trying to figure out the most reasonable way to handle this situation. Lot of acreage to walk around and look across and everything. How would you suggest we handle that?[188] You have any ideas on that?

C: I mean you want to come out now or in the daytime or what?

K: I want to do it as soon as possible because if your wife is there, I want to show that, and if she is not, I want to show that. I want to put some closure to this thing. Not only for me and for you and for the Ranger, but for them kids out there. They need their momma and their daddy. I looked your boy in the eyes, and he's hurting. They know something is going on. They know you're talking to us right now. And no telling what is going through their mind. Well, I'll tell you what is going through my mind right now: I

[185]State's Exhibit 284 at 1:52:45.

[186]State's Exhibit 284 at 1:53:33.

[187]State's Exhibit 284 at 1:53:49.

[188]State's Exhibit 284 at 1:54:10.

don't believe based on everything we've talked about that you are telling us the truth.[189]

C: Well, I'm sorry.

K: Don't be sorry. I just don't believe you. I'd love to find her alive. But for right now, we just can't walk away from it.

C: Yeah, I hear ya there.

K: Let's get this resolved.

C: Yes.

K: I am asking you is there any special place we should look or that she might be? Is she an outdoors person? Could she live off the land for a few days?

C: She probably could. She's pretty durable.

K: Does she have a place she likes to go to get away? The property in Cooke County? Is there any one place, any quiet place, that she had that you knew of?

C: She liked to go to the park in Gainesville.[190]

K: If you were in our shoes, where would be the first place you would look? If you was sitting here, where would you start looking?

C: If I knew a place to look, I'd done been there and looked.[191]

K: Where would you start? Your house, the park in Gainesville, the place in Cooke County?

---

[189]State's Exhibit 284 at 1:55:50.

[190]State's Exhibit 284 at 1:57:58.

[191]State's Exhibit 284 at 1:58:15.

C: Well, I'd start somewhere other than the place there because she is not home.  She is not there.  She is not home.  I looked around there pretty good.

K: What all did you look through?

C: I didn't get up on the hay and look to the back of the barn.  I got round barrels stacked in there.  I didn't physically get up on top to look to the back of the barn around there to the edges or to the very back.

K: Has your wife ever threatened to kill herself?[192]

C: She only said that one time, but it's been a long time ago.

K: Did you believe her?

C: No.

K: So you don't think she'd kill herself?

C: No.  Probably about like what she thought when I said that time I'd kill myself.

K: So you've looked around your property, but you didn't actually look in the nooks and crannies of the hay.[193]

C: No, I didn't get up on that hay.  No, I didn't -- I didn't get up on top.[194]

K: Is that that big barn right by the house?

C: No, that's on down.

K: What is in that big barn by the house?

---

[192]State's Exhibit 284 at 1:59:38.

[193]State's Exhibit 284 at 1:59:51.

[194]State's Exhibit 284 at 2:00:01.

C: Right there where the car was parked? That's just a shop. Combine, machinery, my pick up, and another car is in there, an old antique truck. That's where I back my vehicles in and change the oil and stuff. It's got a dirt floor with a square of concrete in the floor. There's nothing in there.

K: We'll look out there.[195] . . . .

C: And the old barn, I looked through there. It's got some old granaries in it. It's the next barn out.

K: And you're pretty much sure she's not on the property?

C: I don't think so; no, I don't. I just hope she's alive.[196]

K: Yes.

C: I mean, you know, I'm the kind of guy that when it comes to this divorce here, I'm not, I didn't think of it like trying to be a hog with the money.

K: And I believe you on that.

C: Because I know the way I grew up, and I didn't have nothing. And there's been several times that she wanted to do stuff to the house, and I said, "No, let's wait until the kids grow up, and we can remodel it." And we never did spend much. And that's why I say I honestly say it needs to be divided half and half.

M: Well, right now we've got to get past that with -- before we deal with the divorce situation. We have to find her either dead or alive.

M: You've been sitting here talking to us for a while, <u>do you think she's dead or alive?</u>

[C:] <u>Well, I'm hoping she's alive.</u>

---

[195]State's Exhibit 284 at 2:01:20.

[196]State's Exhibit 284 at 2:02:00.

[M:] What are you thinking?  I know what you're hoping, we're all hoping.[197]  What are you thinking?

[C:] Well if I thought she was dead when I saw that car parked there, I would have called probably immediately.  But the first thing that come to my mind was you know is she pulling a prank on me?[198]  Because when before she walked out that door she said, "I'm leaving and you're not gonna find me."[199]  That's the first thing that come to my mind—is she playing a trick on me here?  And then I started getting pretty PO'ed.

M: But now, what's your thought right now?

C: Y'all are the experts on this.  I can only tell you what happened.[200]

M: I've told you what I think.  I've been as honest as I can with you.  You look at it from my point of view.  I think she's dead.  And you're the last person to see her.  And I think you know what happened to her.[201]  I really do.  I've been doing this for a long time.  I'll tell you right now, things got out of hand and there was a heat of the moment thing and damn it, I snapped and damn, I wish I could take it back, that's one thing.[202]  But if it was an ambush from the word go, a set up thing and premeditated murder, that's another thing.  So I want to be perfectly clear to you if it was an accident, if something just snapped, and it couldn't be controlled, then I need to

---

[197]State's Exhibit 284 at 1:23:27.

[198]The underlined words—cutting off Charles's answer before his "because" explanation—constitute the entirety of the clip from State's Exhibit 312 that is titled, "Saw car, first thought was prank.wmv."

[199]State's Exhibit 284 at 2:04:06.

[200]State's Exhibit 284 at 2:04:40.

[201]State's Exhibit 284 at 2:04:58.

[202]State's Exhibit 284 at 2:04:50.

know.  Because that is a different thing than planning out a cold-blooded murder.[203]

C: I am not a murderer.

M: Because we're going to find out what happened, and now is the time to -- if that is what happened -- is to say it because if that is what happened, and you don't tell me now, then I'm going to have to assume that you planned the thing from the word go and you set up the meeting and you set up the deal, and you took your son over there to get him out of the house.  And that's what I'm going to have to assume because I'm gonna find her.  There's no doubt about it.

C: I want you to find her.

M: I'm gonna find her.

C: I want you to find her.

M: And I don't think it is gonna be good when I find her.  It is not looking good.  And when we do find her, could you have done something that you don't know you did?  Something you're blocking out of your head?  That's happened before.  Could it be that you blacked out or don't remember?

C: No.

M: Because I'll tell you this Charles, when I do find her, there is going to be some evidence.  You don't walk in this room without leaving something behind that I can find, whether it be under a microscope or whatever.  And just so you do know, when I find her, whoever did something to her, there is going to be something there.  There always is.  No doubt about it.

C: I'm sure there is.[204]

---

[203]State's Exhibit 284 at 2:05:33.

[204]State's Exhibit 284 at 2:08:10.

M: And just for your information, with today's science, there's gonna be something there, and we're going to march it back to whoever did it.

C: Let's hope she's alive.

M: I don't think she is.

C: I hope she is.[205]

M: I don't think she is. I think she would have called her daughter, called her boss, shown up for work; I think she's gonna see that those kids are taken care of; she's not gonna miss New Year's with those kids; she's not gonna miss their first day going back to school.

[Silence]

C: Did y'all take the car to get it fingerprinted and everything?[206]

M: We're gonna do that. We've got it. Do some of those scientific tests we talked about. But I don't think anything happened in the car.

C: Are y'all gonna bring it back when you're through with it? Or is that my responsibility?

M: We'll bring it back. I didn't see anything in the car.

C: Y'all got a restroom here.

M: Sure.[207]

[Charles leaves room and then returns.]

---

[205]State's Exhibit 284 at 2:08:50.

[206]State's Exhibit 284 at 2:09:45.

[207]State's Exhibit 284 at 2:10:53.

M: Charles, I think your boy and your daughter deserve to know what happened to their momma, don't you?[208] Generally, whether it is good or bad. I've listened to the voice mail and your daughter leaving messages bawling wanting to know what happened. And your son, he is shaking out there seeing Texas Rangers and police officers towing off his momma's car that he hasn't seen in a week.[209] I'd sure want to know if something happened to my momma. We're gonna find her.[210] I'm gonna ask you again if you know where she's at.

C: No, I don't know.

M: You've gotta tell me.

C: I've been with the kids day and night since this happened.

M: Not Wednesday night you weren't. That's the one night you took your boy into town and the one night you were out there by yourself; that's the one night she came out there, and that's the one night she disappeared.

C: He was there the night before—

M: I don't care. She was there and you were there and then only you're there, so what happened to her?[211]

C: I do not know.

M: It's gonna be better off if you tell me what happened, where she's at. We can get it done and get it taken care of.

C: Believe me, I would tell you if I knew where she was.[212]

---

[208]State's Exhibit 284 at 2:13:58.

[209]State's Exhibit 284 at 2:14:12.

[210]State's Exhibit 284 at 2:14:42.

[211]State's Exhibit 284 at 2:15:53.

[212]State's Exhibit 284 at 2:16:01.

M: Charles, I don't believe you.  Here's what I think happened. I think you love her.  I think you didn't want a divorce.  I don't think you're greedy; I don't think it had anything to do with money.  I think you loved her and wanted her back, and she wasn't having any part of it.  She was gonna leave you.[213]  And I think you snapped.  I think something went off in you that you didn't know you were capable of. I think you hurt her and I think you panicked and I think you did something with her.  And I think you're wishing to God right now that it didn't happen and I think you're just wishing God if I could take it back I would cause I loved her and I didn't mean to hurt her, but it happened thinking that you wish to God you could take it back.[214] But now you don't know what to do.  I've seen your eyes right now. Something happened, and you snapped.  Charles, tell me what happened.[215]

C: Nothing happened.  That was it.  She walked out of there and said, "You're not gonna find me."

M: Bullshit.

C: But that wasn't enough to get upset over to me.[216]

M: Bullshit.  What got you upset was that she was leaving you after twenty years of busting your ass and giving her everything.[217] You didn't want her to leave.  And you didn't mean to hurt her.  You didn't plan it out there.  Something happened and you snapped and you hurt her and now you don't know what to do.  But I'm telling you right now, I'm gonna find her.

C: I've had seven months.

---

[213]State's Exhibit 284 at 2:16:24.

[214]State's Exhibit 284 at 2:16:58.

[215]State's Exhibit 284 at 2:17:13.

[216]State's Exhibit 284 at 27:14.

[217]State's Exhibit 284 at 2:17:22.

M: I'm not worried about seven months.  I'm worried about one night.[218]  When it's coming down, seven months of limbo, not knowing what's gonna happen, not knowing maybe she is coming back, she's not pushing it, and now it's all coming down.  And damn, over the Christmas holidays, she's going to a lawyer, she's got papers for you to sign, she got options for you to sign, and she is telling you it is over.[219]  All your hopes of her coming back is gone.  And you're beggin' her to come back; you're asking her to come back, and she says, "No, it's over," and you snapped.[220]

C: I know it looks that way, and I don't blame you for looking at me and saying what you're saying.  But I think when somebody files for divorce, if they don't come back in the first few months, they're not coming back.

M: You're going off on tangents Charles; I'm talking about people dying, and you're talking about what people do when they get a divorce.[221]  I don't give a shit what people do when they get divorced.

C: I'm just saying, if she didn't come back in two months, she wasn't going to come back.[222]

[K:] But didn't you tell us earlier though, you hoped she'd come back, you wanted her to come back?  You love her?

[C:] I still love her, yes.[223]

---

[218]State's Exhibit 284 at 2:17:57.

[219]State's Exhibit 284 at 2:18:14.

[220]State's Exhibit 284 at 2:18:48.

[221]State's Exhibit 284 at 2:18:50.

[222]State's Exhibit 284 at 2:18:58.

[223]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Charles still love Kathy.wmv."

K: You know who is going to suffer the worst out of all of this? Those kids.

C: Yeah, if I would have done something to her, they would have suffered the most.

K: They're going to suffer enough if we don't find her. You know what would hurt them even more? If we find her dead, and we find out that you're the one that done it to her. . . . That's gonna be the one that hurts them children. If I can say anything, forget about -- Charles, forget about your wife; think about your son there. Everyone out there has the same gut feeling. Something is wrong with this lady. I think you have the answer but you don't know how to share it with us— <u>Every single thing you've told us the truth about?</u>

<u>[C:] Yes, except for the phone call, and I did not say—</u>

M: [interrupting] <u>Except for the phone call,</u>[224] except for the grabbing of her. . . . You're cooperating, but I think you have a big ol' burden on your chest that you don't know how to get it off . . . I just have a hard time believing it is a calm conversation. You've gotten frustrated with us. I'd probably be a little upset. . . .

C: I don't know what else to tell you.

M: Let me ask you this, do you think she is alive right now? After everything we've talked about?[225]

C: I hope she is.

M: No, answer my question.

C: I really honestly think she is.

M: I'm not asking you honestly; I'm asking you straight up.

---

[224]The underlined words constitute the entirety of the clip from State's Exhibit 312 that is titled, "Told truth except phone calls.wmv."

[225]State's Exhibit 284 at 2:24:47.

93

C: It just depends on what happened. If she left with somebody, I don't know. I just can't believe a woman would not call the kids. I don't believe Kathy would not call the kids.

M: And based on that, do you think think she's alive right now?

C: I guess I'd have to say no, but I don't want to think that.

M: Do you know what hurt me earlier? That little boy standing out there. Because I think he knows.[226] Daddy knows something happened to momma. I think deep down that boy knows something is not right. We all know something is not right.[227] Living out there with you Charles, he's heard you raise your voice and talk bad about your wife.[228] Maybe heard you say things that you wish you didn't say in front of him.

C: No, there wasn't none of that.[229]

M: Like there wasn't any phone calls?

[Ranger Murphree leaves.]

K: Charles, when you hauled that hay, the other day,[230] do you keep your hay buggy loaded, or is it a pretty big trailer?

C: It is a big trailer.

K: Were you out at 3 or 4 in the morning the other day on Wednesday or Thursday night? There's a police officer saw a truck and a trailer right up by your house the other night at 3 or 4 o'clock in the morning Wednesday or Thursday night. Was that you?

---

[226]State's Exhibit 284 at 2:25:57.

[227]State's Exhibit 284 at 2:26:22.

[228]State's Exhibit 284 at 2:26:22.

[229]State's Exhibit 284 at 2:26:54.

[230]State's Exhibit 284 at 2:27:17.

94

C: [Shook head no.]

K: It wasn't?[231]   What would somebody be doing with a hay trailer that time of morning?  There's no reason for somebody to be out.  They don't haul hay that time of the morning, do ya?

C: Somebody's trying to steal some hay or something.[232]

K: But that wasn't you in your vehicle going back towards the house?

C: No.

K: Well let me step out here and talk to the ranger about how we're going to do the search.[233]   There's a lot of stuff to look into, those out buildings and stuff.  You get two or three people doing it, it's going to take a while.  So let me step out here and get that resolved.

[Investigator Kish leaves the room, and Charles sits alone in room for twenty-two minutes before Ranger Murphree and Investigator Kish return.]

M: Sorry about that Charles.[234]   [Ranger Murphree shows Charles papers.]  Charles, this is that consent to search to conduct a complete search of the premises and property and outbuildings and car and permission to take property and things from my house without a search warrant.  Sign here; you're giving us that consent.

[Charles signed.][235]

---

[231]State's Exhibit 284 at 2:27:29.

[232]State's Exhibit 284 at 2:27:44.

[233]State's Exhibit 284 at 2:28:04.

[234]State's Exhibit 284 at 2:51:12.

[235]State's Exhibit 284 at 2:52:47.

K: We're still waiting on a phone call to get some extra people. I was a little bit concerned 'bout the children; don't want to upset them. Anything to add, any questions of us?

C: I can't think of any. Y'all hit me pretty hard. But I don't blame you. I'd been sitting there, I'd probably been saying the same thing. I'm getting sleepy.

K: You usually work all night?

C: Yeah, but I'm moving around. Been a long day. You got a drink of water?[236]

[The tape stops at 2:57:46.]

### d. The Horton Verbal Statement Recorded by Private Investigator Mike Horton on March 3, 2005 at the Stobaugh Farm

Kathy's family hired private investigator Mike Horton in an effort to locate Kathy. Approximately two months after Kathy disappeared and two months after Charles made the Murphree/Kish statement, on March 3, 2005, Horton interviewed Charles and asked him to write down in his own words what happened on the evening of December 29, 2004. Charles agreed to talk to and to cooperate with Horton and agreed to write a statement.

While they were talking, Charles told Horton that he had used $5,000 from Kathy's account to hire a private investigator to find her. Horton told Charles that was illegal. Charles replied, "It is?"

Horton did not testify at trial. During trial, the State did not play for the jury the complete recording of Horton's interview of Charles; the complete Horton

---

[236]State's Exhibit 284 at 2:55:30.

96

recorded verbal interview was admitted as State's Exhibit 285. The State played certain clips from this interview.

### e. The Horton Written Statement Made by Charles at Horton's Request on March 3, 2005

Horton requested that Charles write down in his own words what happened on the evening of December 29, 2004; Charles agreed. Charles wrote the following:

> Wed[.] 29, Tommy my son was with me all day until about 7:00 p.m. I took him to Kathy[']s house to play nitendo [sic] games because he wanted to go. I called Kathy probably about 8:00 p.m. to get information about what she had decided on the splitting of property. I said, you can tell me over the phone, but she said she would rather come out. She got here about 9:30, left at 9:55 p.m. Saw car lights go down the drive way.
>
> We during this time she was here, discussed how she wanted to divide the property. She said she wanted 55 acres, 1/2 of the machinery cost, things out of the house she wanted, 1/2 of my 401K and 1/2 of the IRAs plus if there was to be child support, I would pay child support. And I told her Tommy might live with me. But that would be decided. We then talked about what she was going to do with her part of the land, and she said she probably would build a house out here. I told her it would cost alot to put a drive all the way down to the west end of the property. But I told her that if I wanted to contest what she wanted I would have to get a lawyer. And she said yes. I said I was going to contest what she wanted, because I wanted to sell everything. She seemed to be surprised and asked why, and I said I just wanted to be fair about everything and do it this way. She got up from the table and started walking toward the back door to leave and turned toward me and ask, why does the man always think he has to try to win? I said, still setting [sic] at the table, I wasn't trying to win, I wanted this done fair and get through with it. When Kathy got right at the back door and I couldn't see her, cause I was still in my chair, she said she was leaving and I said O.K., and she said again I['m] leaving and you might not see me again. I said, yeah, right, just kidding, and she left. I never went outside, stayed in house. Went to bed later.

97

Saw car lights go down driveway. Got up next morning approx. 7:30 a.m.-8:00 a.m. and saw car in drive way, up by or in front of garage. I panicked at first, went outside, keys in floorboard, no purse or anything else in car. I looked through the buildings, around them, around house, and on the property here close. I come back in, calmed down wondering who[m] she would have left with. Charee, my daughter came up about 9:00 a.m. I asked her if she knew anything or was Kathy at the house. And she said no. I told Charee that Kathy may have got a little upset the night before. I told Charee being Kathy had left before for these weekend get away trips, that maybe we shouldn't panic, Charee agreed.

## 6. Events and Activities After December 29, 2004

Kathy had planned to attend a ninetieth birthday party for her grandfather on Sunday, January 2, 2005, in Gatesville. Kathy spoke with her brother Chris on December 29 at 12:55 p.m. During an eight-minute cell-phone conversation, she confirmed these plans with Chris. Kathy also told her mom, Jeanne Munday, that she was planning to attend the birthday party. But neither Chris nor Jeanne ended up attending the party. Because the two people who knew of Kathy's plans did not attend the party, the Mundays were not worried by Kathy's absence from the birthday party and did not alert Charles or Charee that Kathy had not attended the party.

The Stobaugh family held a New Year's Day get-together at Helen Stobaugh's home in Cooke County. The entire Stobaugh family attended. Tim Stobaugh, Charles's younger brother, testified that Charles was happy and talkative and did not say anything about Kathy being missing. Tim said that he

98

assumed at the time that Kathy must have gone to her mother's home on New Year's Day because she was not there.

After Kathy disappeared, eventually life went on for the Stobaugh family; Charee and Tommy lived with Charles at the farm. Charee and Tommy, who were sixteen and twelve at the time of Kathy's disappearance, both subsequently graduated from high school. Both Charee and Tommy were over eighteen years old at the time of trial. A little over a year after Kathy's disappearance, Charee graduated salutatorian of her high school class. She attended Tarleton State University, where she earned her bachelor's degree and obtained her teaching certificate.

### 7. Charee's Trial Testimony

Charles was on vacation over the Christmas holidays in 2004; he took vacation every year at Christmas.[237] During the Christmas holidays, Kathy or Charee would drop off Tommy at the farm sometime before noon; Charles would typically drop off Tommy back at the rent house usually around dinnertime, about 6 or 7 p.m. Tommy would eat dinner at the rent house and enjoyed being there at night because he had high-speed Internet, his own TV in his room with cable, and a video game system with video games that he could play. Charles never went inside the rent house.

---

[237]In addition to Charee's testimony, Charles's records from Tetra Pak were introduced into evidence, establishing that Charles took vacation every year over Christmas.

99

Charee testified that on the morning of Wednesday, December 29, 2004, she woke up at Kathy's house around noon; Kathy had already dropped off Tommy at the farm. Charles drove Tommy back to the rent house around dinnertime that night. Charee left the rent house around 7 p.m. to go to a friend's house to watch a movie. When she left, Tommy was playing video games.

Charee arrived back at the rent house at approximately 1:30 a.m. Kathy was not at home, so Charee woke Tommy and asked where Kathy was. Tommy said that Kathy had gone to the farm to talk with Charles about the divorce. Charee went to bed, woke up at 7 a.m., and drove to the farm. She saw Kathy's car parked in the driveway and believed that Kathy was there and that everything was okay, so she went back to the rent house and slept a few more hours.

Charee returned to the farm around 9 a.m. on December 30 and saw Charles outside headed toward the barn. Charles indicated to Charee that although Kathy's car was parked in the driveway, he had looked in the house and in the barns and did not see Kathy. He asked Charee if Kathy was at the rent house, and Charee said that she was not. Charee went back to the rent house to pick up Tommy and then returned to the farm. Charee, Tommy, and Charles looked in the house and in the other buildings on the farm for Kathy. Charee noticed nothing out of the ordinary anywhere: no sign of a struggle and no sign of Kathy.

Charles told Charee that Kathy had come over to talk about the divorce, that he had again said that he wanted to sell everything and split it down the

middle to be sure it was all even, that Kathy did not want to agree to that, and that she ended up leaving. Charles said he saw the tail lights of Kathy's car as she drove away down the driveway. He went in, took a bath, and got ready for bed.

Charee testified that she thought Kathy must have left with someone. She thought that maybe Kathy had become overwhelmed by the divorce and had decided to go spend New Year's Eve weekend with someone. Charee testified that she did not report Kathy missing right away because she knew Kathy had been talking to men and she was worried that if Kathy came home on Sunday, "she's going to be like, 'What the heck? Why did you report me missing? Because I was just out having a weekend of fun,' or 'I was out relieving stress because I was overwhelmed because of the divorce.'" Charee testified that Kathy had left before to go away by herself. She recalled a teacher's workshop in Wichita Falls when Kathy was gone until Sunday afternoon.

Charee testified that she had tried to call Kathy from her cell phone and from the land-line at the farm. She said Charles was standing there with her at the farm when she called Kathy. Charee said she had left messages asking Kathy where she was.

Charee explained that Charles was very particular about their cars and that no one parked on the concrete slab where Kathy's car was initially parked because of the overhanging tree branches. When Kathy had not returned to get her car by Friday, Charee suggested to Charles that they move Kathy's car out

101

from under the tree, and Charles moved it straight back. Charee said Charles later moved Kathy's car again to get it out of the way so that they could pull a trailer through the driveway unimpeded to haul some hay. Finally, law enforcement towed Kathy's car away for forensic testing. Charee was present each time Kathy's car was moved.

Subsequently, a few weeks after Kathy disappeared, Charee and Jeff Boykin took the computers from Kathy's house so that they could be sent by Charles's attorney to an investigator to see if they contained any clues as to Kathy's whereabouts.

Charee testified that in 2008 and 2009, three to four years after her mother had disappeared, the prosecutors in the courtroom at trial and two other prosecutors or people with the District Attorney's Office had come to visit her at Tarleton. The prosecutors did not, prior to either interview, show Charee the written statement that she had previously made. Two days after their second visit in 2009, Charles was indicted. Charee conceded that she had declined to meet with the prosecutors after Charles was indicted. Charee eventually met with prosecutors again briefly four days before trial.

The State cross-examined Charee extensively for over 150 pages in the reporter's record. The State questioned Charee on whether she remembered telling Officer Vest at the Sanger Police Department on January 3, 2005, that Charles did not know she was there. Charee said she did not remember making that statement; and during trial, Officer Vest did not testify that Charee had told

102

him that Charles did not know she was there. The State cross-examined Charee on whether Toni Campbell had "adamantly [told her she] need[ed] to go to the police and told her, "[I]f you don't, I will." Charee testified that she just remembered Toni offering to go with her to the police department. The prosecutor then asked, "Would it surprise you to learn that Toni Campbell came in here and told the jury she said that?" Toni Campbell testified at trial only that she urged Charee to go to the police. The State contends on appeal that Charee admitted on cross-examination that she drove out to the Stobaugh farm twice during the early morning hours of December 30 and that Kathy's car was not there. The record reflects, however, that Charee testified that she did not see Kathy's car, despite the lighting at the farm, not that she said Kathy's car was not there. On re-direct, Charee explained, utilizing pictures of the farm, that only two lights exist out at the farm: one by the well house and one further away. The light closer to where Kathy's car was parked, as demonstrated in the pictures, is blocked by a building and by trees. And the second light is further away and not bright enough to illuminate the area where Kathy's car was parked. Charee mostly testified on cross-examination either that she did not say what the prosecutors claimed she said in their post-2005 interviews of her or that she did not remember. The State did not offer documents or statements refuting Charee's testimony on these points.[238] Charee testified that she remembered the

---

[238]The following exchange is representative of Charee's cross-examination:

103

Q. And do you remember telling us––telling me that the reason that your dad wanted to get the computer was because he was afraid that it would have something on it that would be bad for him?

Do you remember telling me that?

A. No.

Q. Do you remember specifically saying that he didn't know a lot about computers, that he didn't know what Kathy had on the computer, and he was afraid that there would be something on the computer that might be bad for him?

Do you remember telling me that?

A. No, I don't.

Q. Did you tell me that?

A. I don't remember telling you.

Q. Is it possible that you told me that?

A. The part about him not knowing computers, yes, but I don't know about the afraid part.

Q. Is it possible that you told me that your dad did not want the Mundays or the police looking on the computer because he was afraid there would be something on there that would be bad for him?

Did you tell me that?

A. No. Because we sent the computers off to get analyzed.

We point this out because the prosecutor's questions of whether Charee made various statements are not evidence of any fact, will not support an inference of any fact, and are not included in our sufficiency analysis. *See, e.g.*, *Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007) (recognizing that the questions posed by the attorney are not evidence) (citing *Wells v. State*, 730 S.W.2d 782, 786 (Tex. App.—Dallas 1987) (noting that "remarks by counsel are not evidence," that "[q]uestions put to a witness are not evidence," and that "[t]he

104

events best six years earlier when she made her written statement on January 3, 2005, as well as when she spoke with Officer Vest at the Sanger Police Department on January 3, 2005.

### G. The Searches[239]

### 1. December 30, 2004 Searches of the Farm by Charles, Charee, and Tommy

When Charee arrived at the farm at around 9 a.m. on December 30, Charles told her that Kathy was not there; he had looked around for her. After Charee picked up Tommy that morning, Charles, Charee, and Tommy searched the farm for Kathy.

### 2. January 3, 2005 Search of Kathy's Car by Officer Vest

As reflected in Officer Vest's dash-cam video, he conducted a search of Kathy's car on Janary 3, 2005, when he went to the Stobaugh farm to talk to Charles after Charee reported her mother missing. Officer Vest's search of Kathy's car revealed nothing.

---

answers and not the questions are determinative"), *pet. ref'd*, 810 S.W.2d 179 (Tex. Crim. App. 1990)); *Johnston v. State*, 230 S.W.3d 450, 456 n.6 (Tex. App.––Fort Worth 2007, no pet.) (refusing to consider as evidence for sufficiency review question by attorney because the question itself was not evidence).

[239]Numerous searches were conducted for Kathy, several by the same people on different dates. The record is confusing as to the exact number of searches and the people involved in each of them; the list of searches here is not exhaustive—the State's brief indicates that "23 different searches [] were conducted at various locations to find Kathy, but no forensic evidence has ever been discovered."

### 3.  January 4, 2005 Search by Ranger Murphree and Law Enforcement Officers and January 3, 2005 Confiscation of Kathy's Car and Subsequent Processing of Kathy's Car

At the conclusion of Charles's interview by Ranger Murphree and Investigator Kish, at 3:58 a.m. on January 4, 2005, Ranger Murphree requested, and Charles signed, a consent form authorizing law enforcement to search the Stobaugh farm.  Ranger Murphree accompanied a team of fifteen to twenty law enforcement officers out to the farm that day, on January 4, to search.  They used four-wheelers and searched all of Charles's property, as well as some of the adjoining properties.  They searched all of the barns and outbuildings on the property and also searched the house.  Although they searched for a long time, "several, several hours," they found no evidence that a crime had been committed.  Ranger Murphree testified, "[I]t's January. There's no crops in the field. . . .  We drove every acre back and forth with deputies on four-wheelers . . . there was absolutely no evidence of Kathy anywhere on that property."

Also on the morning of January 3, with Charles's consent, Ranger Murphree took Kathy's car, and in due course, the FBI processed it for forensic evidence.  The report issued by the FBI indicates that "[t]wo cadaver dogs were utilized and no trained indication was observed."  Also, Kathy's car was sprayed with Luminol to detect the presence of blood, and no blood was found in the vehicle.  Ranger Murphree testified that when a vehicle is processed, in addition to using Luminol and cadaver dogs, the entire vehicle is searched everywhere for

hairs, fibers, and DNA. The processing of Kathy's vehicle did not reveal the presence of any of these items or substances.

### 4. January 4, 2005 Search by Ranger Murphree of Helen Stobaugh's Farm in Cooke County

On January 4, 2005, Ranger Murphree and other law enforcement personnel obtained consent from Helen Stobaugh, Charles's mother, to search her property. They searched her "house, the buildings, everywhere." Ranger Murphree testified, "We looked all over. We looked everywhere." The search revealed nothing.

### 5. January 8, 2005 Search by the Stobaughs of Kathy and Charles's Farm

Tim Stobaugh testified that on Saturday, January 8, 2005, he and his wife Debbie, Toby Stobaugh and his wife Keela, a cousin Billy Stobaugh, an aunt and uncle Louis and Betty Hames, and some of Kathy's friends went to the farm to conduct a search themselves. Tim said they asked Charles for permission to search when they got to the farm, and he granted it. Charles told Tim that he had already searched the farm, and he did not participate in their search. Tim said that the group had no prior experience in conducting a search and that the search was "kind of unorganized." They basically looked in the buildings on the property and drove around on nearby roads looking for anything. They found nothing.

### 6. January 14, 2005 Search by the FBI of the Farm
### Pursuant to a Search Warrant

On January 14, the FBI executed a search warrant at the farm. They asked Charles to leave the premises while they searched, and he complied. They brought an FBI mobile transportable crime scene lab—housed in an eighteen-wheeler. They utilized canine units, cadaver dogs, and bloodhounds. Ranger Murphree said that pursuant to the warrant, they could—and did—go through Charles's underwear drawers and bathroom closets, virtually anything they wanted to go through. According to Ranger Murphree, they combed every inch of Charles's property.

The return and inventory prepared by Ranger Murphree based on the search warrant executed by the FBI at the Stobaugh farm on January 14, 2005, indicates that the following were seized: two bed sheets, one mattress cover, one pair of men's boots, and miscellaneous papers. The papers were taken from the kitchen counter—an area cluttered with papers and other items.[240] One of the papers was taken from inside Charles's Bible, which was on the kitchen counter. That paper lists six men and their relationship to Charles, lists two ministers, and states that Charles's insurance and social security are good. The other two papers contain information on the type and quantity of oil Charles used in his various pieces of farm equipment and vehicles.

---

[240]The kitchen countertops are visible in various State's Exhibits.

Ranger Murphree testified that the seized items, except for the papers, were sent to the Texas Department of Public Safety lab for testing. The bed sheet and an electric blanket—which was accidently listed on the inventory as a second bed sheet—as well as the pair of men's boots, were all taken from the master bedroom of the Stobaugh home. The lab report from the DPS indicated the following: no semen was detected on stains on the fitted sheet; a presumptive test for the presence of semen was negative on stains on the mattress pad and electric blanket; a presumptive test for blood was positive on a stain on the electric blanket, but human origin testing was not performed on this stain due to the limited sample size—meaning the stain was extremely small; a presumptive test for the presence of blood was negative on stains on the boots; no stains having the appearance of blood were detected on the fitted sheet or mattress pad; and no hairs were detected on the boots.

The other vehicles at the Stobaugh farm were processed by the FBI at the farm on January 14, 2005, pursuant to the search warrant. They were processed in the same way that Kathy's car was processed—with the use of Luminol and cadaver dogs and by searching for hairs, fibers, and DNA. The processing of the vehicles at the Stobaugh farm revealed nothing.

### 7. January 15, 2005 Search of the Farm by the United Response Search and Rescue

The day after the FBI searched the farm, volunteers with the United Response Search and Rescue conducted a search of the farm. According to

Ranger Murphree, the volunteers are "trained in finding -- if you have a missing child, a missing person, you're looking for a body, things of that nature, they come out." Dana Ames was in charge of the search at the Stobaugh farm.

Ames testified that several years ago the cumulative number of searches performed by United Response Search and Rescue had exceeded 150 searches; she said at that point, she stopped counting how many total searches her organization had performed. Ames testified that ninety people searched the Stobaugh farm on January 15 and 16, 2005. They utilized a ground team, an ATV team, and an equestrian team, along with volunteers. Ames explained how a search grid is created and executed and how that method was utilized in the search of the Stobaugh farm. They did not find Kathy's body, and nothing suspicious was located.

### 8. Other Searches of Neighboring Properties, Prior Residences, Gravel Pits, Creeks, an Abandoned Well, and Lake Ray Roberts

One of the Stobaugh brothers reported seeing a raised area that he thought could be a grave on some property that adjoined the Stobaugh farm. Ranger Murphree obtained the neighbor's consent to enter the property and examined the spot. It was a small open area with no grass. He had a DPS helicopter fly over the area and take pictures; he ultimately got a search warrant and dug up the area with a backhoe. He discovered nothing.

For an entire day, the Lewisville Dive and Rescue Team searched nearby gravel pits that were filled with water. They found nothing. They searched

nearby stock ponds on neighboring property; they found nothing. They searched an abandoned old well that someone had reported finding on neighboring property. Again, they found nothing. Divers also searched Lake Ray Roberts near an overhead bridge and found nothing.

### 9. Search of Kathy and Charles's Prior Residence by the United Response Search and Rescue

The United Response Search and Rescue also conducted a search of the residence owned and lived in by Kathy and Charles before they moved to the farm. They found nothing.

### 10. Second Search by the Stobaugh and Munday Families

There was a second family search for Kathy. A combined group of the Stobaugh and Munday families searched the Stobaugh farm. Charles did not join in the search; he was moving hay or loading hay onto a trailer part of the time that the group was searching. They found nothing.

### 11. May 2005 Search at Helen Stobaugh's Farm Pursuant to a Search Warrant

Ranger Murphree obtained a search warrant in May 2005 to search Helen Stobaugh's farm for a clandestine grave. He brought in a back hoe to dig up an area where the dirt looked like it had been overturned. Nothing was found.

111

**12. June 2005 Search of Helen Stobaugh's Farm**
**by the United Search and Rescue Team**

Dana Ames testified that the United Search and Rescue Team searched Helen Stobaugh's farm in June 2005 with fifty people and with dogs. They found nothing.

**13. Searches by Kurt Beauchamp**

Kurt Beauchamp testified that he works for the Department of Homeland Security in the Office of the Inspector General. Beauchamp testified that he was a police officer before he became employed by Homeland Security. He previously was a Denton County Sheriff's Deputy and a commander of the narcotics task force in Denton County. He explained that "this is one of the few places that has the benefit of being able to call me up and ask for this type of information." As a result of a request from the Denton County District Attorney's Office, Beauchamp utilized all of the search resources and techniques available to Homeland Security to conduct a "global" search for Kathy. Beauchamp said he used the same techniques that he would use if he were trying to locate a terrorist. Ultimately, Beauchamp testified:

> Q. Is there any evidence that you have found in your investigation of the planet earth that Kathy Stobaugh existed at all after December 29, 2004?
>
> A. None.
>
> Q. None?
>
> A. No.

112

Q. Anywhere? Anytime? Anyplace?

A. No.

Q. Thank you.

### III. SUFFICIENCY OF THE EVIDENCE

In his first point, Charles argues that the evidence is insufficient to support his conviction. Charles does not challenge on appeal the sufficiency of the evidence that Kathy is dead.[241] He concedes that "there is circumstantial evidence of a potential motive on his part" and that "the evidence showed he had a potential opportunity to cause [Kathy's] death given that he freely admitted he saw her on the night she disappeared and the circumstantial evidence was that no one else has seen or heard from her since." He argues, however, that no rational juror could infer that he acted with the requisite *mens rea* to commit murder and that "[w]ithout any physical evidence, forensic evidence, or other evidence to explain how or when she died, there are no actions from which [his] intent can be inferred." In short, Charles argues that the evidence is insufficient to establish that "with intent to cause serious bodily injury to an individual, namely Kathy Stobaugh, [he] commit[ted] an act clearly dangerous to human life that

---

[241]During oral argument, Charles's counsel explained that, being intellectually honest, he could not argue that a rational finder of fact could not have concluded beyond a reasonable doubt that Kathy was dead. But he asserted that the evidence is insufficient to support an inference that Kathy necessarily died from foul play as opposed to a freak accident or bizarre event. Counsel contended that it was more likely that Kathy had died from some freak accident or bizarre event than it was that Charles had killed Kathy without leaving a shred of forensic evidence or a body behind.

113

caused the death of said Kathy Stobaugh, by manner and means unknown" as alleged in the indictment or that he intentionally or knowingly caused Kathy's death by a manner and means unknown as alleged in the indictment.

## A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Wise*, 364 S.W.3d at 903. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex.

114

Crim. App. 2011). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Isassi*, 330 S.W.3d at 638; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

## B. The Circumstantial Evidence the State Contends is Incriminating[242]

### 1. Ranger Murphree's Testimony Concerning Charles's Statements

The evidence that the State asserts is incriminating consists predominately of alleged contradictions in Charles's statements. As discussed previously, the State brought out these contradictions primarily through the testimony of Ranger Murphree by playing various clips from Charles's statements and having Ranger

---

[242]The State's brief on appeal directly joins issue with Charles's contention on appeal that the evidence is insufficient to show that he acted with the requisite *mens rea*. The State's brief provides, "Accordingly, the State will focus its argument on the sufficiency of the evidence showing Appellant's intent to cause the death of his wife or his intent to cause serious bodily injury while committing a dangerous act that resulted in her death."

Murphree comment on the alleged inconsistencies and other aspects of the clips. Ranger Murphree conceded, however, that despite these purported inconsistencies, Charles was not arrested after he made the Murphree/Kish statement on January 5, 2005; Charles was not arrested after Ranger Murphree, Investigator Kish, and fifteen to twenty other law enforcement personnel searched the Stobaugh farm on four-wheelers for hours on January 5, 2005; Charles was not arrested after the FBI executed a search warrant with its mobile crime scene unit at the Stobaugh farm on January 14, 2005; Charles was not arrested when the lab results came back on the items seized by the FBI; and Charles was not arrested after he made his verbal and written statements to private investigator Mike Horton on March 3, 2005. Charles was not indicted until almost five years later, on November 12, 2009; Ranger Murphree conceded that nothing new had developed and that no new evidence had surfaced between March 2005 and Charles's November 12, 2009 indictment.

The State argues on appeal that Charles's "many untruthful, conflicting, or implausible statements to authorities and others, are circumstantial evidence of guilt . . . from which the jury could have inferred Charles's intent." The State focuses on the following contradictions in Charles's statements and describes and lists these statements as follows: Charles lying about leaving voice messages on Kathy's cell phone after her disappearance; Charles giving mutually exclusive "first thoughts" about Kathy's disappearance; Charles giving inconsistent statements about searching for Kathy before 9:00 a.m. on December

116

30; Charles giving inconsistent statements about how he spotted Kathy's car on the morning of December 30; Charles lying about how he hired a private investigator; portions of Charles's statement allegedly being inconsistent with Tommy's statement; Charles giving conflicting and different versions of his location when Kathy made her "you'll-never-see-me-again" statement; Charles giving police an inaccurate version of a January 3, 2005 conversation he had with one of Kathy's brothers; and Charles giving inconsistent statements about whether he and Kathy had argued on the evening of December 29.[243]  We address below all of the evidence concerning each of the statements that the State claims are untruthful, implausible, and contradictory and constitute circumstantial evidence that "with intent to cause serious bodily injury to an individual, namely Kathy Stobaugh, [he] commit[ted] an act clearly dangerous to human life that caused the death of said Kathy Stobaugh, by manner and means unknown" as alleged in the indictment or that he intentionally or knowingly caused Kathy's death by a manner and means unknown as alleged in the indictment.

### a. Charles's statement about leaving a phone message

During the Murphree/Kish statement, Ranger Murphree asked whether Charles knew Kathy's cell phone number and whether he had tried to call her and had left messages.  Charles answered, "Oh, yeah."  Ranger Murphree then

_____

[243]The State's brief lists these items on pages 30 and 31.

asked whether Charles had left many messages on Kathy's cell phone, and Charles responded, "Not really that many messages, *we just called, my daughter's called.*"[244]  [Emphasis added.]  Later in the interview, Ranger Murphree confronted Charles with the fact that there were no voice messages from Charles on Kathy's cell phone.  Charles said, "Well I dialed it several times."  And Ranger Murphree responded, "No, that's not what you told me.  You told me you left messages."  Charles explained, "I guess I must have hung the phone up, but I thought I said one time, 'Where you at?'"[245]  Ranger Murphree said, "You don't have a cell phone, so either your work or your home are where you would be calling her from, and those numbers are not on there [the cell phone records].  So either you made a mistake or you are lying to me."  Charles affirmed, "I'm not lying to you," and attempted to say that he thought he did leave a message for Kathy once from the house phone.[246]  But Ranger Murphree interrupted, "You didn't call her one time Charles, her brother knew the password to her phone."  Later in the Murphree/Kish statement, Ranger Murphree asked Charles whether he had been truthful about everything, and Charles said that he had, except for leaving Kathy a cell phone message.

---

[244]State's Exhibit 284 at 20:23.

[245]State's Exhibit 284 at 20:27:52.

[246]State's Exhibit 284 at 30:51.

Charee testified that between December 30, 2004, and January 3, 2005, she called her mom's cell phone several times from the land-line at the farm; she testified that her dad was standing next to her when she made the calls. Charee also testified that it was a holiday weekend, her mom was off of work, and Charee thought she might have gone out of town for New Year's.

The State contends that Charles's failure to call Kathy's cell phone any time between Thursday, December 30, 2004, and Monday evening, January 3, 2005, and lying about calling her cell phone support an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### b. Charles's statements about his "first thoughts" when he saw Kathy's vehicle

Ranger Murphree testified that Charles gave disparate answers during the Murphree/Kish interview concerning what his first thoughts were when he saw Kathy's car in the driveway on the morning of December 30, 2004. According to Ranger Murphree, "[I]t can only be one first thought." Seven of the clips created by the State from the Murphree/Kish interview were played for the jury on this issue. The clips were not played for the jury in the order they were made by Charles in the actual interview, and most of the clips do not contain the question asked to Charles.[247] In most of the clips, however, Charles was not answering a

---

[247]The clips from State's Exhibit 312 that were played for the jury during Ranger Murphree's testimony quoted here are—in the order they were played for the jury—the clips titled, "1st thought, fix car leaks.wmv," "Car to make me look bad guy.wmv," "Charles alarmed at first.wmv," "Saw the car thought it was a

119

question as to what his first thought was; he was simply speculating on why

Kathy might have left her car parked at the farm.

Ranger Murphree testified as follows:

A. Your first thought is your first thought, whatever that is.

Q. Or only thought or whatever.

A. Your only thought.

Q. And by his words, that changes.

A. It does.

(A portion of State's Exhibit 312[, the clip titled, "1st thought, fix car leaks.wmv,"] was published.)

Q. "Only thing I could think of."

A. That's correct.

Q. Not, "a million thoughts came through my head and this is one of them."[248]

A. "The only thing I could think of was she wanted me to fix the car."

Q. The woman that's going to default judgment him in 11-and-a-half hours –

A. That's correct.

Q. – would somehow leave her car at his house to fix a leak.

---

prank.wmv," "To make me look bad.wmv," "Leave car to stay away a long time.wmv," and "Car hint to fix car.wmv."

[248]But in the first statement Charles made—the dash-cam video statement recorded by Officer Vest—Charles stated, "She could have called somebody, got on a plane, there's been a thousand things go through my head."

A. Yes.

Q. In the middle of nowhere.

A. Yes.

(A portion of State's Exhibit 312[, the clip titled, "Car to make me look bad guy.wmv,"] was published.)

Q. So when you bring up appearances, now he's –

A. He has changed his immediate thought.

Q. "Immediately I thought she's trying to make me look like a bad guy."

A. Right.

Q. What happened about the car fixing?

A. That changed.

(A portion of State's Exhibit 312[, the clip titled, "Charles alarmed at first.wmv,"] was published.)

Q. When he says, "I didn't want to get everybody in a panic," does that alarm mean to you alarm for her safety?  How do those two –

A. Well, it's hard to say because he's already said that she's trying to make me look like a bad guy.  So I'm not sure whether the alarm is for her or for himself.  I do not know.

Q. But when he says, I didn't want everybody else to panic, why would they panic if he's referring to her setting him up?

A. That's correct.  They would not panic about that.

Q. So if he's panicked for her safety, that's different than bad guy, different than –

A. Sure.  To me, that's completely different – a different thing.

121

(A portion of State's Exhibit 312[, the clip titled, "Saw the car thought it was a prank.wmv,"] was published.)

Q. Prank.

A. Yes.

(A portion of State's Exhibit 312[, the clip titled, "Leave car to stay away a long time.wmv,"] was published.)

Q. Give us a scare.

A. Scare.

(A portion of State's Exhibit 312[, the clip titled, "To make me look bad.wmv,"] was published.)

A. Once again, we're back to she's trying to make me look like a bad guy.

(A portion of State's Exhibit 312[, the clip titled, "Car hint to fix car.wmv,"] was published.)

Q. So he's back to the car fixing.

A. Correct.

Q. That his ex-wife of 11-and-a-half hours –

A. Yes.

Q. – has abandoned her vehicle with her keys that look like they could have her house keys and school keys on it.

A. Yes.

Q. In the middle of the country.

A. Yes.

Q. With her two kids alone at home.

122

A. Yes.

Q. As a hint for him to fix a water leak.

A. Yes.

The State contends that Charles's differing statements about his initial thoughts when he saw Kathy's car support an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### c. Charles's statements about searching for Kathy on the morning of December 30

During Ranger Murphree's testimony, the State played a clip for the jury from the Murphree/Kish statement where Charles said that he got up the next morning [December 30] about 8:30 a.m.[249] Ranger Murphree then testified that Charee consistently indicated that she had arrived at the farm at around 9:00 a.m. on December 30. The State then played a clip from the Murphree/Kish interview where Ranger Murphree asked Charles, "When you come around the corner and saw her car there, did you look for her?" And Charles said, "Yes, I did." Ranger Murphree asked, "Where all did you look for her?" And Charles said, "I looked all over the place."[250] Ranger Murphree was then asked:

> Q. Now, if he gets up at 8:30 and leisurely has a cup of coffee in the kitchen and Charee arrives 30 minutes later, is there any time for that?

---

[249]State's Exhibit 312, the clip titled, "Got up, outside hour later.wmv." In the Horton written statement, Charles wrote that he "[g]ot up next morning approx. 7:30 a.m. – 8:00 a.m."

[250]State's Exhibit 312, the clip titled, "I looked all over the place.wmv."

123

A. No.

Q. You've been out there.

A. Yes.

Q. He's got a lot of buildings.

A. He does.

Q. In two minutes can you look through all that?

A. You cannot.

The State contends that Charles did not have time to search all over the farm before Charee arrived at 9:00 a.m. if he got up at 8:30 a.m. and leisurely had a cup of coffee and that this supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### d. Charles's statements about seeing Kathy's car

Ranger Murphree testified that during the Murphree/Kish interview, Charles said that on the morning of December 30 he woke up, went to the kitchen, and, although he looked out the window, he did not see Kathy's car because it was parked close to the garage. Charles said that about an hour later, he went outside and saw Kathy's car. The State played a clip from the Murphree/Kish interview where Charles said this.[251] The State then had Ranger Murphree read two sentences from Charles's written Horton statement where Charles wrote, "I got up the next morning and saw the car in the driveway, up by

---

[251]State's Exhibit 312, clip titled, "Car is close to the garage.wmv."

or in front of the garage. I panicked at first, went outside, keys in floorboard."

The prosecutor proceeded to ask Ranger Murphree whether Charles's written statement differed from Charles's statement on the clip from the Murphree/Kish interview that he had just played for the jury. Ranger Murphree testified:

A. It's the exact opposite of what we just heard.

Q. And then later in the same statement he says, ["]I came back in["] -- I guess from when he says he went outside – ["]and calmed down.["]

A. Yes.

Q. Now, if Mr. Stobaugh is innocent, then he would be seeing the car for the first time when he got up. Is that fair?

A. Yes.

Q. Would you expect that to be a seminal or dramatic moment in his life?

A. I would expect it to be, yes.

Q. Would you expect it to be where he tells it in two polar opposite ways?

A. I would not expect that, no.

Q. Is that relevant to your investigation as to the guilt of Mr. Stobaugh?

A. It is.

Q. How?

A. They both cannot be true. If we talk about a dramatic event, something that's very shocking to you, I would expect you to remember exactly how that went down.

The State points out the discrepancy between Charles's statement during the three-hour Murphree/Kish interview that he did not see Kathy's car from the kitchen window because it was parked close to the garage and saw it only after he went outside and Charles's three-paragraph written Horton statement that he saw the car in the driveway, up by or in front of the garage, and then went outside after he saw the car. The State contends that this discrepancy supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

e. **Charles's statements concerning an options paper typed up by Kathy**

The State contends that Charles made contradictory statements about whether he had ever seen a typed-up, four-property-division-options paper that Ranger Murphree found in Kathy's black binder on her kitchen table in the rent house; the State claimed at trial that Kathy had typed this four-property-division-options paper on her computer.[252] Charles consistently recited in all of his statements that Kathy did not bring any papers into the house when she came to the farm on the evening of December 29. The State played these clips for the jury.[253] Charles also consistently recited that Kathy went to the farm on Monday night, December 27, before she had a 2:00 p.m. appointment with her lawyer on

---

[252]The State offered no evidence at trial that Kathy had typed up this paper.

[253]State's Exhibit 312, clips titled, "Kathy brings nothing in.wmv" and "Kathy not bring papers in.wmv."

Tuesday, and wanted Charles to sign one of *three* options as to how the couple's assets should be divided. Charles never denied seeing papers on Monday night. Charles said he told Kathy on Monday night that he was not signing anything and that she should just go to the lawyer and get it set the way she wanted it. The State played these clips for the jury. [254]

The State asserted at trial and asserts on appeal that these two documents—a three-options document that Charles admitted seeing on Monday night and the four-options document that he claimed he had not seen—were the same document and that Charles was lying about not having seen the four-options document. [255] The State also points out Keela Stobaugh's testimony that Charles had told her that Kathy had "the divorce papers"[256] when she came over on December 29 and Tommy's written statement that Kathy had "gotten out some paperwork" before she left to go to the farm on December 29.

The State contends that Charles lied about whether he had seen the four-options document and lied about whether Kathy had brought papers into the house at the farm with her on the evening of December 29, 2004, and that these

---

[254]State's Exhibit 313, clip titled "Kathy out here Monday.wmv."

[255]The prosecutor asked Ranger Murphree, "[W]hen she came out on Monday, she did have most likely, that right there [the four-property-division-options paper?]" And Ranger Murphree answered, "Yes."

[256]Kathy's divorce lawyer testified that she had not prepared or forwarded to Kathy the final divorce decree prior to December 29.

lies support an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### f. Charles's statement about hiring a private investigator

During Charles's verbal statement to Horton, Charles said, "We took $5,000 dollars out of Kathy's account to put on a private investigator."  Horton told Charles, "That's as illegal as it can be."  Charles replied, "It is?"[257]  The State played the clip from the Horton verbal statement recording this exchange for the jury.

Ranger Murphree testified that Charles's statement to Horton that he had taken $5,000 from Kathy's account to hire a private investigator was not true because there had been no activity on Kathy's bank account from December 29, 2004, through the time of trial.  Ranger Murphree testified: "There's only been a little bit of interest accrued.  Absolutely no withdrawals or no activity by anyone other than some interest being gained on the account since she disappeared."  Ranger Murphree was asked:

> Q.  Did he [Charles] hire a PI?
>
> A.  I've never been contacted by any PI hired by Charles Stobaugh.
>
> Q.  Did he do it the way he said here?
>
> A.  He definitely did not do it the way he said he did it.

---

[257]State's Exhibit 313, the clip titled, "Charles hires a PI with K's $.wmv."

The State contends that Charles lied about hiring a private investigator with Kathy's money and that this lie supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### g. Charles's statement of his reason for dropping Tommy off at the rent house

Charles took Tommy to Kathy's rent house around 7 p.m. on December 29. In the Murphree/Kish interview, Ranger Murphree asked Charles why he took Tommy to Kathy's house. Charles said that Tommy had been at the farm with him for several nights over the Christmas holidays and had received several Nintendo games for Christmas so Charles had asked Tommy if he wanted to go to the rent house to play the Nintendo games on his TV. And Tommy said, "Yes." Charles said that he told Tommy he did not blame him and that he might "call mom and see what she found out."[258] The State claims that Charles's explanation for taking Tommy to Kathy's rent house on December 29 is inconsistent with Tommy's written statement. Tommy wrote in his statement, "My Dad had brought me to my moms [sic] house so he could talk to her about what the lawyer had to say about what was going to happen. I went in and sat down and she said hi and I said hi. Then I asked her if I could was [sic] the dog in the bathtub."

The prosecutor then asked Ranger Murphree:

---

[258]State's Exhibit 312, the clip titled, "Why take Tommy.wmv."

129

Q.  All right.  Charles, did he say that it was because Tommy wanted to play Nintendo is the reason why he took Tommy back to Kathy's?

A.  He did.

Q.  And if that was true, does it make Charles look like – less like I took Tommy home so we could be alone out here?

A.  That makes it look like it's Tommy's idea.

The State contends that the alleged discrepancy between Charles's and Tommy's explanations of why Charles took Tommy to Kathy's house supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### h.  Charles's statements about Kathy's last words

The State argues that Charles gave inconsistent statements about where he was when Kathy made her "I'm leaving" statement.  Charles wrote in his Horton written statement that he was sitting at the kitchen table, but he said in the dash-cam video statement recorded by Officer Vest that he "shut the door" and went to bed, which the State contends means that he was outside, not sitting at the kitchen table.  As set forth above, in his written Horton statement Charles wrote:

> She got up from the table and started walking toward the back door to leave and turned toward me and ask, why does the man always think he has to try to win*?  I said, still setting at the table*, I wasn't trying to win, I wanted this done fair and get through with it.  When Kathy got right at the back door and I couldn't see her, cause I was *still in my chair*, she said she was leaving and I said O.K., and she said again I['m] leaving and you might not see me again.  I said,

130

yeah, right, just kidding, and she left.  I never went outside, stayed in house.

[Emphasis added.]  In the dash-cam video statement recorded by Officer Vest, in a clip played for the jury, Charles stated, "She said, 'I'm leaving.'  I shut the door. I went in and took a bath and went to bed."[259]  The State established that if Kathy made her "I'm leaving" statement at the back door while Charles was sitting at the table, that would mean that they could not see each other when Kathy made her statement.  The prosecutor then asked Ranger Murphree:

> Q.  Where if something happened at the back door, if she in fact went somewhere where she's never seen again ever, two months later [in the Horton written statement] we're making the point, I didn't get out of my chair.
>
> A.  That's correct.
>
> Q.  I'm still sitting at the table.
>
> A.  That's right.

The State contended at trial that this discrepancy in where Charles said he was when Kathy made her "I'm leaving" statement means that Charles was in fact outside and supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### i.  Charles's statement concerning his conversation with Mark Munday on January 3, 2005

Phone records from Mark Munday—Kathy's older brother—showed that Charles called Mark's home phone number at 5:37 p.m. and again at 5:39 p.m.

---

[259]State's Exhibit 314, the clip titled, "The back door 1.wmv."

on Monday, January 3, 2005, and that Charles then called Mark's cell phone at 5:51 p.m. on January 3, 2005, and talked to Mark for eighteen minutes. During the dash-cam video statement recorded by Officer Vest—made within an hour after Charles's eighteen-minute conversation with Mark Munday—Charles stated that during this call, he asked Mark whether Kathy was acting differently or seemed more distant from the Mundays than she used to be.[260] During Mark's trial testimony, the State played this excerpt from the dash-cam video statement and then asked Mark whether Charles "gave an accurate description of [their] phone conversation?" Mark answered, "No." On cross-examination, Mark agreed that he was in Lowe's when he was talking to Charles for eighteen minutes and agreed that he did not remember the specifics of everything they talked about because "it's been six years ago."

The State contends that Charles's statement to Officer Vest that he had asked Mark whether Kathy had been acting differently or seemed more distant from them than she used to be and Mark's testimony that Charles did not accurately portray their conversation supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### j. Charles's statements concerning whether he and Kathy had argued on December 29

The State asserts that Charles gave inconsistent statements about whether he and Kathy had argued on the evening of December 29. Charles

---

[260]State's Exhibit 283 at 35:00.

repeatedly stated that Kathy became angry, upset, red-faced, or flustered but that he did not. Keela Stobaugh testified, however, that Charles characterized the December 29 meeting as a "casual conversation, not heated."

The State contends that the alleged discrepancies in the way Charles characterized the December 29 conversation between him and Kathy supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### 2. Other Testimony and Evidence Concerning Charles's Conduct After Kathy Disappeared

The State argues that, in addition to the above circumstantial evidence of the requisite *mens rea* provided by Charles's statements, his "questionable behavior in the aftermath of Kathy's disappearance also could have contributed to the jury's inference of [his] intent." The State describes and lists these actions as follows: Charles did not attempt to call Kathy after the evening of December 29; Charles did not attempt to go to court on December 30 to contest Kathy's division of property and did not attempt to learn whether he was divorced on that date as Kathy had planned; Charles had a surprisingly calm and relaxed demeanor about the disappearance of his wife in interviews with police; Charles had his friend take Kathy's computers out of her house even though he knew police were investigating her disappearance; Charles asked his brother-in-law, a police officer, about whether a cell phone could be tracked across the border; Charles acted very strange toward a brother-in-law the day after Kathy's

133

disappearance, as though he anticipated he would be suspected in her disappearance; Charles did not participate in any of the organized searches for Kathy; Charles did not tell anyone in either family that Kathy had disappeared until after Charee reported her missing to police in the late afternoon of January 3, 2005, even though he knew something was definitely wrong that morning; Charles did not accompany Charee to the police station, and the jury could rationally infer that Charee did not tell Charles she was going to the police station, knowing he would be opposed; Charles moved Kathy's car under less-than-clear circumstances, and his explanation likely conflicted with Charee's; and Charles maintained that he took Kathy's computers to get them forensically analyzed, but no forensic analysis was done.[261]  We set forth below all of the evidence concerning each of Charles's behaviors in the aftermath of Kathy's disappearance that the State asserts are questionable and constitute circumstantial evidence that "with intent to cause serious bodily injury to an individual, namely Kathy Stobaugh, [he] commit[ted] an act clearly dangerous to human life that caused the death of said Kathy Stobaugh, by manner and means unknown" as alleged in the indictment or that Charles intentionally or knowingly caused Kathy's death by a manner and means unknown as alleged in the indictment.

---

[261]The State's brief lists these items on pages 31 and 32.

134

## a. Charles's failure to call Kathy

Charles did not own a cell phone.  During trial, the State proved that only long distance calls show up on phone records from a land-line and that Charles did not make any long distance calls from the land-line at his home before Kathy was reported missing by Charee.  The State pointed out that all of Kathy's family are "Gatesville people"—which would be a long distance call from the farm—and that Charles did not call any of Kathy's family to try to determine where she was prior to the time Charee reported Kathy missing.  The prosecutor asked Ranger Murphree at trial:

> Q.  Now, in some divorces, a potential ex-spouse could be so indifferent that he doesn't call.
>
> A.  Sure.
>
> Q.  Does Charles relate to us that he was indifferent, or that he still loved her and he wanted her to come home and he loves her now and he wanted to reconcile and all those things?
>
> A.  I believe indifferent is the only one he left off.
>
> Q.  Does he say, I still love her?
>
> A.  He did.
>
> Q.  Just come on home.
>
> A.  Absolutely.
>
> Q.  You need to come on home.
>
> A.  Yes.
>
> Q.  Didn't want the divorce.

135

A.  That's right.

Q.  So is there any shred of evidence from him where he says, ["]I was so indifferent I didn't want to pick up the phone?["]

A.  No.

Q.  So what is the only explanation left when he doesn't leave a message?

A.  Like he said in his interview, he knows she's not answering that phone.  She's dead.[262]

During closing argument, the State argued,

My wife that I've loved for 20 years that says you'll never see me again, her car is in the driveway and she ain't there and I call nobody.  Well that's ridiculous.  I call nobody.

And every time I'm asked, I throw out every possible explanation I can: Panic, anger, fear, setup, bumfuzzled, didn't know.  Whatever it is, every one of them is a phone call.

What did you do you witch?  You left Tommy alone.
Honey, where are you?
What are you trying to do, set me up?
Every one of them is a phone call.
Under those circumstances that he lays out, the only reasonable explanation for not calling is because he doesn't need to call because he knows where she is because she's where he put her.  Okay?

The State contends that Charles's failure to call Kathy's cell phone any time between Thursday, December 30, 2004, and Monday evening, January 3, 2005, as argued in closing argument, supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

---

[262]Charles's Murphree/Kish interview, set forth above, does not contain such a statement by Charles.

### b. Charles did not go to court on December 30
### to contest Kathy's property division

Kathy's divorce lawyer testified at trial that she was going to meet Kathy at the courthouse on the morning of Thursday, December 30 to obtain a default divorce judgment. No particular hearing time is set forth in the record, and because Charles did not file an answer, Kathy's lawyer testified that she did not provided him with notice of a hearing date or time or with any papers in the proceeding. Charles stated in the Murphree/Kish interview that he had not received notice of any court proceedings.[263]

The State argued at trial and argues on appeal that the fact that Charles did not show up at the courthouse on December 30 at 8:30 a.m. to contest the default judgment and the fact that he did not immediately hire a divorce lawyer means that Charles knew that Kathy was dead. Kathy's divorce attorney, however, did not testify that a hearing was set at 8:30 a.m. on December 30. She testified only that she and Kathy were going to meet at the courthouse on the morning of December 30 to obtain the default judgment. No evidence exists in the record of an 8:30 hearing time. Charles did hire a divorce lawyer, and he filed an answer on January 24, 2005.

Ranger Murphree was asked:

> Q. Did you – did Charles – do we have any evidence in your investigation that he got a lawyer and they came up to the courthouse the next morning to try to stop this default judgment?

---

[263]State's Exhibit 284 at 1:43:12.

A.  He said he didn't.

Q.  Do we have any evidence that he called to find out from any person, hey, am I divorced?

A.  He did not.  No evidence of that.

. . . .

Q.  Does that make any sense to you?

A.  It doesn't make sense.

Q.  Why?

A.  The entire argument is about him going to contest this divorce.  That's why she walks out the door and said, ["]I'm leaving and you're never going to see me again.["]  She's mad because he won't do it her way.

Well that's not the time for her to be mad.  The time for her to be mad is if she's standing in the courtroom and he shows up and then he contests it.  She knows she is going to get what she wants at 8:30 in the morning.  As far as Charles knows, at 8:30 in the morning, she's getting what she wants and we're divorced.  But he's not standing in the courtroom at 9:00 a.m. waiting for a judge or hollering, hey, that's not the way I want to do it.

The State contends that Charles's failure to appear in court the morning of December 30 to contest the no-answer default judgment and his failure to hire an attorney for twenty-five days, until January 24, 2005, support an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### c.  Charles was calm

Many of the State's witnesses testified that Charles seemed calm and not upset in the aftermath of Kathy's disappearance.  Ranger Murphree agreed that

138

"[t]here was a lot of testimony that [Charles] didn't get all excited and didn't do this and didn't do that when Kathy was missing, but he [Charles] didn't get excited during the interrogation either." Ranger Murphree agreed that "[t]hat's just his personality."

The State contends that Charles's calm demeanor during his interviews and in the aftermath of Kathy's disappearance supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### d. Charles acted strangely to his brother-in-law

Chris Munday, Kathy's younger brother, testified that sometime on the evening of Monday, January 3, 2005, he learned that Kathy was missing and spoke with police. Because he was the family member that lived closest to Kathy, he went out to the Stobaugh farm on the morning of Tuesday, January 4. Chris said that he knocked on the door and that no one answered. As he was getting ready to leave, Charles answered the door. Chris said that Charles initially opened the door widely but then closed it to a crack just big enough for them to talk through when he saw who was at the door. Chris said that he asked Charles what was going on and where Kathy was; Charles said he did not know what was going on and wished that he knew where Kathy was. Charles did not ask any questions of Chris, and Chris left.

The State contends that this behavior by Charles on the morning of January 4, 2005, was strange and showed that he anticipated that he would be a suspect in Kathy's disappearance. Charles was at the Sanger Police

139

Department being interviewed by Ranger Murphree and Investigator Kish until 4:00 a.m. on January 4, 2005, and the interview reflects that Charles understood at that time that he was a suspect in Kathy's disappearance.

The State contends that Charles's behavior toward his brother-in-law on the morning of January 4, 2005, supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### e. Charles asked a follow-up question about tracking a cell phone

Chris Munday testified that on the evening of Thursday, January 6, the Munday family—Mr. and Mrs. Munday, Mark Munday and his wife Kim, and Chris and his wife Keela—had a "sit down" meeting with Charles, Charee, and Tommy at the Stobaugh farm. He said the meeting was very tense. Chris said that Charles told his story of what had happened: that Kathy had come over and had become angry "because he said he was going to sell everything off and give her half"; that Kathy had asked why the man always had to be right; that Kathy had said no one would see her again; and that Kathy had left. Chris testified that Charee and Tommy then told the family their stories of what had happened; their stories were consistent with the statements that they provided to police. At some point, either Charee or Charles asked Chris, who is a police officer, "if anybody could track a cell phone." Chris decided to bluff, "yanked [his] phone apart, pulled out [his] SIM card," and said, "Well, if this is in the phone, you can track it anywhere, no matter what." At that point, Charee said that Kathy's phone was just like hers; Charee got her phone out and took the SIM card out of her phone.

140

Chris said that at this juncture, Charles asked, "Even across the border?" Chris took this to mean across the Oklahoma border.

The State contends that Charles's questions about whether a cell phone could be tracked, including across a border, support an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### f. Charles failed to participate in the searches

According to the Murphree/Kish statement, Charles searched the farm twice for Kathy on the morning of December 30, 2004—once before Charee arrived at around 9:00 a.m. and again shortly after that with Charee and Tommy after Charee had picked up Tommy and arrived back at the farm. It is undisputed that Charles did not participate in any other searches of the Stobaugh farm. Chris Munday said that Charles did not participate in searches. Tim Stobaugh thought that Charles, Charee, and Tommy should have participated in the searches; Charles was on a tractor moving hay during one of the searches. Each of the State's witnesses conceded, however, that Charles had consented to allow them to search his property, that Charles had already searched his property, that Texas Rangers had searched his property, that Denton County investigators had searched his property, and that in January there were no tall crops on the Stobaugh farm and visibility across the entire property was good, making it unlikely that the prior searches had missed something.

The State consistently emphasized Charles's failure to participate in the searches of the Stobaugh farm. In closing argument, the State argued:

141

And when his family comes out, his family, Tim, Debbie, Louis, Toby, he doesn't look. I want you to try to think about that. He's laid up in the house with two teenagers, not five-year olds. A 13-year old boy, man-child, and a 16-year old girl who's about to be 17. And they sit in that house while their uncles and aunts look for their mom, and he don't come out. There ain't no TV, no lawyers, no cops. It's his brother and his sister-in-law and his cousins, and he won't come out to search.

Why? Because that's who he is. He's done with her. She's been put in her place literally and figuratively.

People don't do that. I couldn't–I can't imagine being in there with your children that are that age while your Uncle Rick and Ryan is looking for her. Good God Almighty. Go look. But he doesn't, ever.

The State argues on appeal that Charles's failure to join in the family searches and other searches of the farm supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### g. Charles did not tell anyone that Kathy was missing until Charee reported her missing

The evidence at trial established that after Charles found Kathy's car on the morning of December 30, he did not call anyone or tell anyone that Kathy had disappeared until after Charee reported Kathy missing at around 4:30 p.m. on January 3, 2005. Although Charles said in the Murphree/Kish statement that he became concerned or panicked after the Nocona school secretary called him at around 10:00 a.m. on January 3, 2005, and told him that Kathy had not reported to work that morning for a teacher workday, he still did not call anyone until after Charee reported Kathy missing.

142

The State contends that Charles's failure to call anyone after Kathy disappeared until Charee reported Kathy missing supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

## h. Charles did not accompany Charee to the police department

The record establishes that Charles did not accompany sixteen—almost-seventeen—year-old Charee to the Sanger Police Department to report Kathy missing. Differing explanations exist in the record as to why Charles did not accompany Charee.

In the Murphree/Kish statement, the following dialogue occurred between Charles and Ranger Murphree:

C: I was going to talk to her family today first.[264]

M: After the school called you and the police showed up.

C: I know it don't look good. But I'm just saying, I hadn't heard anything from them, I finally got ahold of Mark on his cell phone, I told Charee to go to the house to get some phone numbers, Charee stopped by the police station to report her missing because I said, "I'm gonna call Mark; then we're going to report her missing."[265]

Charee testified that she reported Kathy missing on January 3, 2005. She testified that she had a conversation with her dad and her brother about reporting Kathy missing. Charee said that she volunteered to report Kathy missing and also explained that they "knew that [police] were going to need to search both

---

[264]State's Exhibit 284 at 57:18.

[265]State's Exhibit 284 at 58:40.

places" and that she was the only one with keys to Kathy's house. She conceded on cross-examination that Charles had the keys to Kathy's car that had been left in her car parked at the farm; those keys contained a house key.

Concerning his meeting with Charee at the Sanger Police Department at approximately 4:30 p.m. on January 3, 2005, Officer Vest testified:

A. She was wanting to report her mom that had been missing for quite a few days. I believe it was five at the time. She had tried to have contact with her mother and had no response from her.

Q. Was she alone?

A. Yes, she was.

Q. How old was Ms. Charee Stobaugh?

A. 16.

Q. 16-year old girl.

A. Uh-huh.

Q. Her dad wasn't with her?

A. No.

Q. Is that unusual?

A. Yes.

Q. Why? How?

A. Yes, it is, if there's a dad and a mother still married together. These days, sometimes that's not the case.

144

The State contends that Charles's failure to accompany Charee to the Sanger Police Department to report Kathy missing supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### i. Charles moved Kathy's car

Ranger Murphree testified that Charles "never says why" he had to back Kathy's car out of the way the first time. He testified:

Q. You've been out there.

A. I have.

Q. Is there any physical physics, you know, world [sic] reason that you'd need to move her [Kathy's] white car to get into any of his other outbuildings?

A. No.

Q. So from the neutral evidence, the fact that the car [the blue one in the garage] isn't driven, the fact that the junk is junk, the fact that the barns are way over yonder, is there any reason he had to back her car out of the way that we can see?

A. I could think of none except one.

Q. What's that?

A. To get her body out of the garage.

Q. Because if he killed her back by the back door there, where is her body?

A. It's in the garage or in the – just the inside of the door of the house.

The State then played a clip for the jury from the January 3, 2005 dash-cam video statement where Charles told Officer Vest, "And when I got up

Thursday morning, that car was sitting right here, of course, I had to back it out of the way, so we backed it out right there, I did. And I had to get a trailer out of the barn and I parked it right there. And it hadn't been touched."[266] After the State played this clip, the prosecutor and Ranger Murphree had the following exchange:

Q. "We."

A. "We" and then "I."

Q. They've been married 20 years.

A. They have.

Q. It would be hard to break that attachment even if he's –

A. I believe so.

Charee testified that on Friday, December 31 she suggested to Charles that they move Kathy's car because a tree overhangs the spot where Kathy's car was parked and drops sap and bird poop and sometimes branches. Charee said that Charles agreed and that she was standing there while Charles backed Kathy's car straight back, out from under the tree. Pictures of the farm show the large tree overhanging the drive. Charee said that she also was there when Charles moved Kathy's car a second time. Charee testified, "We had to haul some hay somewhere, and the way—where the car was parked, it was in the

---

[266]State's Exhibit 314, the clip titled, "Had to back it out of the way.wmv."

146

way of getting the truck out of the barn.  And also whenever we went to hook up the trailer and pull back through the drive, it would have been in the way."

The State contends that Charles's moving Kathy's car supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### j. Charles took Kathy's computers for forensic analysis but did not have them analyzed

Kathy had two computers at her rent house—one computer tower and one laptop.  After law enforcement had twice searched Kathy's rent house and did not confiscate Kathy's computers, a friend of Charles's, Jeff Boykin, accompanied Charee to the rent house to obtain Kathy's computers.  Charee testified that she and Charles wanted to turn the computers over to Charles's attorney to send them off to be analyzed to see if there were any clues regarding Kathy's whereabouts.  Law enforcement requested that the computers be returned to them, they were, and testing established that the hard drives had not been scrubbed or altered in anyway; the seal on the back of Kathy's computer tower had not been broken.

Ranger Murphree was asked:

> Q.  Did your investigation uncover that he had sent one of his buddies over there [to Kathy's house] with his daughter to take stuff [computers] out of her house after the investigation began?

> A.  Yes.

> (A portion of State's Exhibit 313[, the clip titled, "Moving computers, Boykin.wmv,"] was published.)

147

Q. Just happened to be over there one day and said, hey, go over to my wife's house and get her computers out of there.

This – the timing of this is – this is after the investigation begins. Is that correct?

A. That's correct.

Q. Before her family can get down there.

A. That's correct.

Q. So between the time he meets Vest and then you and before the Mundays can get into town. Right?

A. Yes.

Q. He sent Jeff Boykin out there to take stuff out of her house.

A. Yes.

Q. You eventually got them back.

A. Yes.

Q. Tell the jury about that.

A. We learned the information. I contacted Jeff Boykin. And actually one computer had been stored at his house they were able to get, and then there was another computer, I believe, that was given to an attorney. And they'd sent it off, and it took me a while to get that one back.

Q. So is that relevant to your investigation of someone being – trying to hide something or being totally innocent?

A. To me, it makes absolutely no sense why he would do that unless – either trying to hide something or afraid something is on there.

148

The State argues that the fact that Charles said he retrieved the computers from Kathy's house to give to his attorney for forensic testing, which was contrary to evidence at trial showing that the computers had not been forensically analyzed, supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### 3. Other Clips and Testimony Elicited by the State at Trial

Although not mentioned by the State in its appellate brief, the State elicited the following testimony at trial and argued that it constituted circumstantial evidence that Charles murdered Kathy.

### a. The oil change information and the list found in Charles's Bible

Ranger Murphree testified that the papers seized from the kitchen counter at the Stobaugh farm on January 14, 2005, pursuant to the search warrant executed by the FBI show that Charles was contemplating suicide. The papers seized from the countertop on January 14, 2005, consist of two sheets of paper containing handwritten lists and information on the type and quantity of oil Charles used in his various pieces of farm equipment and vehicles as well as a sheet of paper taken from inside Charles's Bible, which was on the kitchen countertop, listing six men and their relationship to Charles, naming two ministers, and stating that his insurance and social security were good. Ranger Murphree testified:

> Q. Now, you talked to a lot of people about Charles and the way he is with his money and his equipment, things like that.

149

A.  I have.

Q.  And is he incredibly meticulous about his stuff?

A.  There's no doubt. I saw it firsthand in the search warrant, the way his equipment is taken care of and vehicles.  Very meticulous.

Q.  So we found these notes.  What do these notes appear to be to you?

A.  These are -- to me, these are instructions.  These are instructions to someone about changing the oil on just about every piece of equipment he has on the farm: His '89 Mercury, his '89 Lincoln, '87 Mercury, his 2000 pickup, 3020 tractor, 4440 tractor. Everything -- everything from the lawn mower to his welder, he has detailed instructions on the type of oil -- how many quarts of oil and what kind of oil to use. Once again, he's got his lawn mower, the push mower, his tiller, the three-wheeler, the motorcycle, detailed instructions on how to do all of that.

Q. Knowing Charles as you do, why do you think there are instructions to somebody?

A.  They're not for him. Charles knows this equipment like the back of his hand.  There's no doubt in my mind. He's a farmer.  I've been raised around farmers my entire life.  They know their equipment.  They know when things are due. They know when maintenance is needed to be done on it.  These are instructions to someone else.

Q.  And does our third document also reinforce that idea to you?

A.  It does.  What this document meant to me then and means to me now -- if you have Doug Hammond, a close friend; Billy Stobaugh, cousin; Jerry Stobaugh, cousin; Jeff Boykin -- J. Boykin is Jeff Boykin -- a good friend; Moose, a good man;  Mark Munday, a good man.  It appeared to me that day and today -- if you count those names, there are six names there.  You look under that, you have the names of two ministers.  You look under that and you have notations about his insurance at work is good, his Social Security is good.  What this means to me is these are pallbearers.  These are

preachers. This is telling someone my insurance is good; my Social Security's good. This is who I want at my funeral. This is who I want to preach my funeral. By the way, I want you to take care of my equipment, and this is how you do it. In my opinion, Charles Stobaugh is contemplating suicide.

. . . .

Q. Okay. And so this [the papers] is picked up on the 14th of January, '05.

A. Yes.

Q. And the police have been out there speaking to him on the 3rd of January of '05.

A. That's correct.

Q. So there's two weeks in between.

A. That's right.

This testimony makes it seem that Charles wrote down the oil change information and the list of six individuals, two ministers, and his insurance information during the two-week time period after he spoke to police on January 3 and before the FBI executed the search warrant on January 14. The papers were admitted into evidence and they are not dated; they do not indicate on what date Charles wrote down this information. No evidence exists in the record as to the date Charles prepared these papers; they could have been ten years old or ten days old.

At trial, the State contended that Charles's list of types and quantities of oil used in his vehicles and equipment and the piece of paper found in Charles's Bible listing six men, naming two ministers, and noting that his insurance is good

151

supports an inference that Charles was going to commit suicide because he had acted with the requisite *mens rea* to support his murder conviction.

### b. Charles's use of time in his written statement

Ranger Murphree testified that Charles's "use of time" in the written statement he made to Horton establishes that a "significant event" happened at 9:55 p.m. on December 29. Ranger Murphree testified:

> Q. What do you notice about the use of time when Charles writes about time?
>
> A. Well, I notice in these particularly, in the beginning and the ones on the bottom, he uses time like I would use or what I would think a normal person would use: It's about 7:00 p.m.; probably about 8:00 p.m.; she got here about 9:30; approximately 7:30 to 8:00; about 9:00 a.m. I would expect that. I would use that; you would use that; everybody would use that. One that concerns me, she left at 9:55 p.m. That's "about 10:00." What that tells me and what I believe to be true is that's a significant time for him. Something happened at 9:55 p.m. Something happened where that's a visual reference, I believe. And that's the only time that we don't have a rounded-off number. That's the only time we're not 7:30 to 8:00; we're not 7:00; we're not 8:00. I never say, I got there about 9:55 p.m. I got there about 10:00. And so that stands out to me.
>
> Q. And would that time be precisely in the time that he has told us that she arrived and so she would be at his residence when they were discussing the divorce?
>
> A. What's even more significant at that time, that's the time he says she leaves. The only time that's like that is the time she leaves. What I believe is that's when a significant event happened.
>
> Q. Now, the time frame where she's killed --
>
> A. Yes.
>
> Q. -- is the 29th of December of 2004.

152

A.  Right.

The State contended at trial that because Charles used a specific time—9:55 p.m.—as the time that Kathy left the farm on the evening of December 29, but used a general time, about 9:00 p.m. and about 9:30 p.m., as the time he called her and the time she arrived at the farm, something significant happened at 9:55 p.m., which supports an inference that the significant thing that happened was that "with the intent to cause serious bodily injury to an individual, namely Kathy Stobaugh, [he] committ[ed] an act clearly dangerous to human life that caused the death of Kathy Stobaugh, by a manner and means unknown" as alleged in the indictment or that he intentionally or knowingly caused Kathy's death by a manner and means unknown as alleged in the indictment; that is, that Charles acted with the requisite *mens rea* to support his murder conviction.

### c.  Charles's concern with money

The State contended at trial that Charles murdered Kathy to avoid losing half of his money and possessions in the divorce.  Ranger Murphree testified:

> Q.   And tell us about what your investigation revealed to you.
>
> A.   Talking with family, talking with his family, her family, the picture I've got of Charles Stobaugh is that he is monetarily driven, he's possession driven, and that he doesn't want – he likes to make a lot of money but he doesn't like to spend a lot of money and he doesn't like anybody else spending his money.
>
> Q.   Now, we're going to see him talk on these topics, about money and how much money.  Right?
>
> A.   Correct.

153

Q.  When we hear Charles Stobaugh's own words, do they match what your investigation has revealed to you?

A.  Yes.

Q.  Exactly?

A.  Yes.

(A portion of State's Exhibit 312[, the clip titled, "$ importance, not big spenders.wmv,"] was published.)

Q.  "She knows."

A.  That's what he says, yes.

Q.  That I --

A.  "All I live for is my money."[267]

Q.  So I don't want to sign, I'm fighting tooth and nail, and I love my money.

A.  Correct.

(A portion of State's Exhibit 312[, the clip titled, "No Christmas presents.wmv,"] was published.)

Q.  Didn't buy his wife Christmas because he didn't want anything.

A.  Correct.

Q.  How long have you been married?

---

[267]In the very next question after this clip, which is cut off and not contained on the clip, Ranger Murphree asked Charles, "You said 'she knows' and she told her parents.  Does that mean that all you care about is your money?" And Charles answered, "No sir."

154

A.  About eight years.

Q.  Would that work for you?

A.  No.

Q.  You've got four kids in eight years?

A.  Yes, sir.

Q.  All right.

On cross-examination, Ranger Murphree testified:

Q.  No offense, Charles, but Charles isn't the fastest motor in the garage, is he?

A.  That's correct.

Q.  He doesn't have a college degree.

A.  Not to my knowledge.

Q.  But he's a dang hard worker.

A  I believe that.

Q.  Manages his money well.

A.  I believe that.

Q.  Let's touch on that a minute. Because you brought that up in your testimony earlier, that he liked to make a lot of money but he didn't like to spend money.

A.  Correct.

Q.  Does that make a person a bad person?

A.  No.

155

Q. I thought that's the implication there. But it doesn't make a person a criminal, correct, just because they make money and save money?

A. No, it does not.

Likewise, members of Charles's family testified that he was thrifty and did not like to spend money. The State contended at trial that Charles loved money and loved his possessions and property and that this evidence supports an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

### d. Charles's statements that Kathy would not walk off without her car

The State played five clips from the Murphree/Kish statement concerning Charles's opinion on whether Kathy might have walked away on foot from the farm. The DVD of the entire Murphree/Kish interview shows that Ranger Murphree, not Charles, was the first to express an opinion that Kathy did not walk away from her car and leave the farm on foot; Ranger Murphree brought up his opinion that it did not make sense that the Stobaugh farm was "out in the middle of nowhere" and that Kathy would leave a car that had gas and was drivable to walk on foot away from the farm. At trial, Ranger Murphree was questioned and testified as follows:

Q. And did Charles Stobaugh weigh in on the issue of whether or not Kathy could have walked away?

A. He did several times.

Q. Go ahead.

156

(A portion of State's Exhibit 312 was published.)

Q.  Crystal clear?

A.  Crystal clear.

Q. And the next?

(A portion of State's Exhibit 312 was published.)

A.  Very clear -- sorry.

Q.  You can talk.

A.  Very clear she didn't. She did not walk away from that house.

Q.  That body language and posture is dismissive of that idea.

A.  It is.

(A portion of State's Exhibit 312 was published.)

A.  Once again, very clear.

(A portion of State's Exhibit 312 was published.)

A.  Once again.

Q.  Now, if he killed her and took her somewhere, she didn't walk away, did she?

A.  That's absolutely correct.

(A portion of State's Exhibit 312 was published.)

A. Once again, five times during the interview at the minimum he agreed she did not walk away from there. [268]

---

[268]The five clips played here for the jury from the DVD admitted as State's Exhibit 312 are titled, "Kathy did not walk away.wmv," "Kathy not walk away 2.wmv," "Kathy not walk away.wmv," "Kathy not walk off hill.wmv," and "Kathy not

At trial, the State argued that Charles's repeated statements that Kathy did not walk away from her car support an inference that Charles acted with the requisite *mens rea* to support his murder conviction.

## C.  Analysis

### 1.  Challenge to the *Mens Rea* Element of Murder

Charles's first point challenges the sufficiency of the evidence to support a finding by a trier of fact beyond a reasonable doubt that he acted with the requisite *mens rea* necessary to support his conviction for murder.  Applying the standard of review set forth previously herein, we view all of the circumstantial evidence in this case in the light most favorable to the State and determine whether based on the cumulative force of all of the circumstantial evidence and the reasonable inferences from that evidence, any rational factfinder could have found beyond a reasonable doubt the essential element of *mens rea*.  *Accord Gross v. State*, 380 S.W.3d 181, 185 (Tex. Crim. App. 2012).

The *mens rea* element of the offense of murder—as charged in the indictment here—required proof that "*with intent to cause serious bodily injury* to an individual, namely Kathy Stobaugh, [Charles] commit[ted] an act clearly dangerous to human life that caused the death of said Kathy Stobaugh, by manner and means unknown" or that Charles *intentionally or knowingly caused*

walk.wmv."  We are unable to determine the order in which these clips were played.

158

*Kathy's death* by a manner and means unknown. [Emphasis added.] *See* Tex. Penal Code Ann. § 19.02(b)(2), (b)(1) (West 2011). Although penal code sections 19.02(b)(2) and (b)(1) differ in their descriptions of the mental state required for culpability, jurors are not required to agree on the defendant's specific mental state; rather, they need only agree that the defendant possessed one of the alternate mental states that satisfy the element of intent under the statute. *See, e.g.*, *Jefferson v. State*, 189 S.W.3d 305, 313 (Tex. Crim. App.), *cert. denied*, 549 U.S. 957 (2006); *see also Yost v. State*, 222 S.W.3d 865, 877–78 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). Murder is a "result of conduct" offense, which requires that the culpable mental state relate to the result of the conduct, i.e., the causing of the death. *See, e.g.*, *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012); *Roberts v. State*, 273 S.W.3d 322, 328–29 (Tex. Crim. App. 2008).

## 2. Circumstantial Evidence, Inferences, and Proof of Intent

Circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). And while juries are permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *See, e.g.*, *Megan Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013). "'[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them,' while '[s]peculation is

159

mere theorizing or guessing about the possible meaning of facts and evidence presented.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 16). "A conclusion reached by speculation . . . is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* (quoting *Hooper*, 214 S.W.3d at 16). If the evidence presented at trial raises "only a suspicion of guilt, even a strong one, then that evidence is insufficient [to convict]." *Richard Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010) (brackets in original). In circumstantial evidence cases, it is unnecessary for every fact to point directly and independently to the defendant's guilt; it is enough if the finding of guilt is warranted by the cumulative force of all of the incriminating circumstances. *Megan Winfrey*, 393 S.W.3d at 778; *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013).

A requisite culpable mental state, *mens rea*, is almost always proved by circumstantial evidence. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991), *cert. denied*, 504 U.S. 974 (1992). A defendant's overt acts are generally reliable circumstantial evidence of one's intent. *See Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009). Likewise, the specific intent to kill may be inferred from the use of a deadly weapon. *See, e.g.*, *Cavazos*, 382 S.W.3d at 384. An intent to kill may also be inferred from the wounds inflicted or from an autopsy on the body. *See, e.g.*, *Ex parte Henderson*, 384 S.W.3d 833, 838 (Tex. Crim. App. 2012) (Cochran, J., concurring) (noting that "[t]he State's primary evidence to prove that applicant intended to kill Brandon consisted of the

160

circumstantial evidence produced by the autopsy [of Brandon]"); *see also Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012) (holding that "jury could not have inferred from the totality of the circumstantial evidence viewed in a light most favorable to its verdict that appellant intended to cause the death of child").

### 3. Application to the Present Facts

Recapping all of the evidence and reasonable inferences from the evidence in the light most favorable to the State: Charles did not want a divorce; Charles loved money and his property; on the evening of December 29, Charles knew that Kathy was going to obtain a default judgment and would be awarded half of his property and possessions; on the evening of December 29, Charles dropped off Tommy at Kathy's house, went back to the farm, and called Kathy; after Kathy spoke with Charles on the phone, she started humming and gathered up some paperwork; Kathy drove to the farm and arrived about 9:30 p.m. on December 29; Kathy had a conversation with Charles at the farm on the evening of December 29; Kathy has never been seen or heard from again; Kathy's car was parked at the farm on the morning of December 30; Charles moved Kathy's car twice; Charles lied about making calls to and leaving a message for Kathy between December 30 and January 3; Charles lied about hiring a private detective with Kathy's money; Charles did not participate in searches of the farm; Charles acted strangely toward Chris Munday and mischaracterized a phone conversation that he had with Mark Munday; Charles asked a question and a follow-up question about tracking a cell phone and whether it could be traced

across the border; Charles took Kathy's computers, gave one to his attorney, but did not present forensic analysis at trial although Charee said that she and Charles gave the computer to his attorney for forensic testing; Charles was calm; Charles did not go with Charee to report Kathy missing; Charles's stated times about when he got up on December 29 and when and where he searched for Kathy that morning are too close to be possible when considered with Charee's testimony about when she arrived at the farm; Charles did not call anyone or tell anyone Kathy was missing until after Charee reported her missing; Charles did not go to court on December 30 to contest the divorce or to try to find out if the divorce had gone through; and Charles gave inconsistent statements concerning where he was when Kathy said her final words, concerning his initial thoughts when he saw Kathy's car, and concerning whether he had seen a four-property-division-options paper. Charee was the only defense witness at the guilt-innocence phase of trial. Eliminating—in deference to the factfinder's ability to make credibility determinations—every explanation that Charee provided for some of Charles's statements and conduct, these recited facts constitute the evidence that the State contends is incriminating.

This evidence, along with the other evidence, viewed in the light most favorable to the State supports a reasonable inference that Kathy is dead and certainly establishes that Charles possessed a possible motive and a definite opportunity to kill Kathy. This evidence viewed in the light most favorable to the State likewise establishes that Charles lied about certain events surrounding

162

Kathy's disappearance—calling Kathy's cell phone and leaving a message and hiring a private investigator with Kathy's money—and that Charles's conduct after December 29 was suspicious. But the question is whether the cumulative force of the facts in the record before us support a deduction by any rational finder of fact of the logical consequence or conclusion that "*with intent to cause serious bodily injury to an individual*, namely Kathy Stobaugh, [Charles] commit[ted] an act clearly dangerous to human life that caused the death of said Kathy Stobaugh, by manner and means unknown" or that Charles *intentionally or knowingly caused Kathy's death* by a manner and means unknown. [Emphasis added.] *See Megan Winfrey*, 393 S.W.3d at 771 (explaining that an inference is a conclusion reached by considering other facts and deducing a logical consequence from them).

Viewing all of the evidence in the light most favorable to the State, no facts exist in the record before us that Charles committed any specific act directed at Kathy. The State conceded in closing argument at trial that no facts exist concerning what act Charles purportedly committed against Kathy. In final closing argument, the prosecutor summed up the evidence of the State's position on how Charles killed Kathy:

> So when and where? She goes out there at about 9:00 at night on the 29th to talk to a man that absolutely does not want to be divorced.

> Now, I don't know how the confusion came about with their presentation, but I don't have to prove this guy's the biggest money miser in the world to kill. My friends, people kill when you back them

up all the time.  And you don't have to be the biggest woman chaser in the world to kill or the biggest drug addict in the world to kill or the biggest miser in the world to kill.  You've just got to look like that guy and be like that guy.

Because Susan [the other prosecutor] is right, of course.  If you think about how much we work to maintain our families, how much love.  He never gave them his time.  I don't know why he's that way.  Maybe his momma raised him that way.  But at some point as a man looking at another man who's 50 years old, I don't give a dang why you're that way, Charles.  Maybe it's not your fault.  But here you are.  And if I was a woman, I bet it's just a peach to be married to him.  So she's had enough.

But he's exactly the man that kills you when you back him into a corner about the only thing he's ever given any attention to, which is his house on the hill.  That's when they kill you.  That's why they kill you.

People that are like that, in my many, many murder trials, they're always like that. . . .  It's his fault for being so inattentive.  And here he is at the most critical moment of his entire life, and he kills her at that instant, probably about 9:55.

Now I want to be clear that, despite what Derrell [defense counsel] says, we're not in any way—Can I have a thingamajig?  You know what that means.  Right?

*We're not wedded to one example of what Tracy [Murphree] and I showed you.  We're giving you a for-instance.  There's no set of circumstances on this earth that we're saying that this only occurred at these steps.  That's not what we're saying.  It could happen anywhere in here.  Anywhere.  I don't know.  It has to be almost certainly here because this is the life of the house and the center of the house.  But I'm not wedded to the stairs at all.*

*They could be arguing by the table and he jumps on her here.  She could be headed for the door and he jumps on her as she's going out.  She could be in the garage and he jumps on her here.  She could be on the back sidewalk because, man, there ain't nothing behind them.  I don't care how many lights you got.  When there ain't nobody there, it don't matter.  There's just nothing but dirt back there forever.  **Anywhere in any way.  That's our theory**, is*

*manner and means unknown, not some narrow – that's a for-instance example*.

There are many, many ways to take human life without leaving large blood spatters all over the place. And by the time of the search, he's had 17 days before the dogs come out to clean or anything else.[269] Mr. Clean. Right? Mr. Clean. That's a long time. Long time.

***Anywhere in any way is our theory***.

[Emphasis added.]

The State is certainly entitled to indict a defendant and to charge the jury that the manner and means of how the offense was committed is unknown. *See, e.g.*, *Moulton v. State*, 395 S.W.3d 804, 811–12 (Tex. Crim. App. 2013) (Cochran, J., concurring).[270] The State here was entitled to indict, seek a jury charge, and argue to the jury that the manner and means of the alleged murder by Charles was unknown; we point out this argument by the State simply to show that no facts exist in the record concerning Charles's conduct—any act by Charles directed towards Kathy—from which the jury could have logically inferred that Charles possessed the requisite *mens rea* to support a conviction for murder. *See Megan Winfrey*, 393 S.W.3d at 771.

---

[269]The record establishes that the numerous searches of the Stobaugh farm began on January 4, 2005. The FBI search warrant was executed on January 14, 2005.

[270]The term "manner and means" refers to the *actus reus* of the crime. *Sanchez v. State*, 376 S.W.3d 767, 773 (Tex. Crim. App. 2012) (op. on reh'g).

165

The record before us likewise contains no evidence that a deadly weapon was used: no deadly-weapon facts exist from which the jury could infer Charles's intent. *Accord Cavazos*, 382 S.W.3d at 384. And Kathy's body has never been found and no autopsy has been performed, so no evidence exists concerning the types of injuries purportedly inflicted upon Kathy from which the jury could infer Charles's intent. *Accord Louis*, 393 S.W.3d at 251; *see also, e.g.*, *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (explaining that intent to bring about the victim's death could be inferred from entry into victim's home with a butcher knife, victim's slashed throat, and victim's broken ribs, bruises, lacerations, and age of eighty years old), *cert. denied*, 517 U.S. 1106 (1996).

Although motive and opportunity are not elements of murder and are not alone sufficient to prove identity, they are circumstances indicative of guilt. *Temple*, 390 S.W.3d at 360; *see also Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012). Evidence of motive helps link a defendant to wrongful conduct or is supportive of other evidence of such conduct. *Hacker v. State*, 389 S.W.3d 860, 870–71 (Tex. Crim. App. 2013). The same is true of evidence of opportunity. *Id*. But without evidence that wrongful conduct has occurred, there is nothing for motive and opportunity evidence to link the defendant to. *Id*. The court of criminal appeals explained in *Hacker*:

> If, for example, John has a motive for murdering Mary, but there is no evidence that Mary is dead (much less evidence that her death was a homicide), then John's motive is meaningless. His motive alone does not establish that a murder occurred, and the motive cannot link John to a murder without evidence that there was a

murder. Motive alone is not even some evidence of a murder that could be used to revoke John's probation.

*Id.* at 871. Here, as in *Hacker*, no evidence exists that wrongful conduct occurred. *See id.* Here, although an inference exists that Kathy is dead, there is no evidence that her death was a murder—there is no body, no murder weapon, no witnesses, no blood or DNA evidence; there are no fibers, hairs, or any type of forensic evidence establishing that a murder occurred; and there is no confession or directly incriminatory statement by Charles. Although the evidence viewed in the light most favorable to the State does establish a possible motive for Charles to kill Kathy and a definite opportunity to do so, Charles's motive and opportunity to murder cannot alone establish that a murder has occurred, cannot link Charles to a murder without evidence that there was a murder, and certainly cannot establish the *mens rea* for murder. *See id.* In the absence of evidence of a murder, Charles's motive for murder and opportunity to murder are meaningless. *See id.*

We next examine the two lies made by Charles and the inconsistent statements made by Charles that the State relies upon as incriminating circumstantial evidence that Charles murdered Kathy with the requisite *mens rea*. The two lies are that Charles lied about calling Kathy's cell phone and leaving a message between December 29, 2004 and January 3, 2005, and that Charles lied about hiring a private investigator with $5,000 of Kathy's money. The inconsistent statements are that Charles gave mutually exclusive "first thoughts"

167

about Kathy's disappearance; Charles gave inconsistent statements about searching for Kathy before 9:00 a.m. on December 30; Charles gave inconsistent statements about how he spotted Kathy's car on the morning of December 30; portions of Charles's statement were inconsistent with Tommy's statement; Charles gave conflicting and different versions of his location when Kathy made her "I'm leaving" statement; Charles gave police an inaccurate version of a conversation he had with one of Kathy's brothers on January 3, 2005; and Charles gave inconsistent statements about whether he and Kathy had argued on the evening of December 29.

When the commission of a crime is established by evidence other than the giving of false testimony, the concealing of evidence, or the making of false statements, then evidence of false testimony, concealing evidence, or false statements may be considered as affirmative evidence of guilt. *Id.* at 870–71. That is, once the commission of a crime is established, attempts to conceal incriminating evidence, the making of inconsistent statements, and the giving of implausible explanations to authorities may be considered as evidence linking the defendant to the crime that has been established. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (holding that husband's inconsistent statements linked him to the murder of his wife committed by his mistress). But, as with evidence of motive and opportunity, the utterance of false statements or inconsistent statements is, by itself, not sufficient to support an inference that the

commission of a separate crime or wrongful conduct has occurred. *Hacker*, 389 S.W.3d at 870–71.

Because no evidence exists in the record before us that a murder has occurred, Charles's utterance of false statements or inconsistent statements does not, by itself, create an inference that a murder or any wrongful conduct has occurred. *See id.* The State here urged the jury to draw the inference prohibited in *Hacker*—that is, to infer that a murder had occurred from Charles's lies and inconsistent statements. As in *Hacker*, because none of the evidence established that the offense (in *Hacker*, prohibited contact; here, murder) had occurred, all of the rest of the State's circumstantial evidence that "was perhaps suspicious" but did not establish the commission of the offense, was mere "suspicion linked to other suspicion*." Id.* at 874. In short, neither Charles's lies nor his inconsistent statements support as a logical deduction therefrom that a murder occurred, that Charles committed the *actus reas* of murder, or that Charles possessed the requisite *mens rea* to support his murder conviction—that is, that "*with intent to cause serious bodily injury to an individual*, namely Kathy Stobaugh, [he] commit[ted] an act clearly dangerous to human life that caused the death of said Kathy Stobaugh, by manner and means unknown" or that Charles *intentionally or knowingly caused Kathy's death*. [Emphasis added.]

Moreover, Charles's lies and inconsistent statements are not on such topics or of such a nature that they are capable of supporting an inference of *mens rea* for murder. The fact that Charles lied about calling Kathy or lied about

hiring a private investigator with $5,000 of Kathy's money does not support as a reasonable deduction therefrom the logical consequence or conclusion that Charles possessed the intent to cause serious bodily injury to Kathy that resulted in Kathy's death or that he intentionally or knowingly killed Kathy. *See Megan Winfrey*, 393 S.W.3d at 771 (recognizing that an inference is "a conclusion reached by considering other facts and deducing a logical consequence from them"). Lying about these facts does not support an inference of *mens rea* for murder. *Accord id.* Likewise, the fact that Charles gave inconsistent statements about where he was when he saw Kathy's car on the morning of December 29 or what his "first thoughts" were when he saw her car—or any of the other inconsistencies in Charles's statements brought out by the State through Ranger Murphree's compare-and-contrast-the-clips testimony—do not support as a reasonable deduction therefrom the logical consequence or conclusion that Charles possessed the intent to cause serious bodily injury to Kathy by committing an act clearly dangerous to human life that resulted in her death or that he intentionally or knowingly killed Kathy. *See id.* Charles's *mens rea* for the offense of murder simply cannot—especially in the absence of evidence of the occurrence of a murder—be inferred from the evidence of Charles's lies and inconsistent statements. *See id.* In summary, the jury could draw a conclusion from Charles's lies and inconsistent statements that Charles possessed the *mens rea* necessary for the offense of murder only through theorizing or guessing as to the meaning of these facts, which is speculation, and a conclusion

reached by speculation will not support a finding beyond a reasonable doubt. *See id.*

We next examine the evidence concerning Charles's actions after December 29 that the State contends is incriminating. This conduct as set forth in the State's brief is as follows: Charles did not attempt to call Kathy after the evening of December 29; Charles did not attempt to go to court on December 30 to contest Kathy's division of property and did not attempt to learn whether he was divorced on that date as Kathy had planned; Charles had a surprisingly calm and relaxed demeanor about the disappearance of his wife in interviews with police; Charles had his friend take Kathy's computers out of her house even though he knew police were investigating her disappearance; Charles asked his brother-in-law, a police officer, about whether a cell phone could be tracked and whether it could be tracked across the border; Charles acted very strange toward a brother-in-law on the morning of January 4, 2005; Charles did not participate in any of the organized searches for Kathy; Charles did not tell anyone in either family that Kathy had disappeared until after his sixteen-year-old daughter Charee reported her missing to police in the late afternoon of January 3, 2005, even though he knew something was definitely wrong that morning; Charles did not accompany Charee to the police station; Charles moved Kathy's car; and Charles maintained that he took Kathy's computers to get them forensically analyzed, but no forensic analysis was done.

171

As mentioned, it is true that intent may be inferred from the acts and conduct of the accused. *See Merritt*, 368 S.W.3d at 526; *Guevara*, 152 S.W.3d at 50; *Patrick*, 906 S.W.2d at 487; *Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd). As with Charles's words, however, none of Charles's post-December 29 actions proved by the State, either individually or cumulatively, support as a reasonable deduction therefrom the logical consequence or conclusion that Charles possessed the intent to cause serious bodily injury to Kathy by committing an act clearly dangerous to human life that resulted in her death or that he intentionally or knowingly killed Kathy. None of Charles's actions are probative of the *mens rea* element of the offense of murder. The conclusion that Charles possessed the *mens rea* for the offense of murder was simply theorizing or guessing by the jury as to the meaning of Charles's post-December 29 suspicious conduct, not a logical deduction from that conduct. *See Megan Winfrey*, 393 S.W.3d at 771; *see also Hacker*, 389 S.W.3d at 874 (recognizing that without proof of wrongful conduct "all of this evidence was mere 'suspicion linked to other suspicion'"); *Richard Winfrey*, 323 S.W.3d at 882 (holding that evidence giving rise to only a suspicion of guilt, even a strong one, is insufficient to support a conviction); *cf. Patrick*, 906 S.W.2d at 487 (holding evidence sufficient to support *mens rea* for murder).

Finally, even if—based on the cumulative force of all of the circumstantial evidence presented by the State and detailed above of Charles's lies, inconsistent statements, and suspicious post-December 29 conduct—the jury

172

could have logically deduced a conclusion that something happened to Kathy at the farm on the night of December 29, 2004, and also could have logically deduced that Charles was responsible for that something and that the something caused Kathy's death, no facts or evidence exist from which the jury could—based on these inferences and the surrounding circumstances—also logically have deduced that while that something was occurring, Charles possessed the requisite *mens rea* for the offense of murder. *Cf. Hooper*, 214 S.W.3d at 16 (utilizing a hypothetical to explain multiple reasonable inferences from the same set of facts). In other words, the circumstantial evidence, even if it supports an inference that Charles did something to Kathy and that Kathy died as a result of that something, nonetheless wholly fails to provide the jury with any facts from which the jury could also reasonably infer that the *mens rea* Charles possessed when he did that something to Kathy was the *mens rea* for murder, as opposed to some other *mens rea*, such as the *mens rea* for manslaughter. *See Cavazos*, 382 S.W.3d at 384 (explaining that causing death while consciously disregarding a risk that death will occur is the *mens rea* for manslaughter and that this is a less culpable *mes rea* than the *mens rea* for murder—either by intending to cause serious bodily injury resulting in a death or by intentionally or knowingly causing a death). The jury's finding in this case that Charles, with the requisite *mens rea*, committed an act clearly dangerous to human life that resulted in Kathy's death or intentionally or knowingly caused Kathy's death is based on

173

speculation and cannot support a finding of guilt beyond a reasonable doubt. *See Megan Winfrey*, 393 S.W.3d at 771.

We note that the present facts are distinguishable from the facts in *Temple*, a case where the court of criminal appeals recently found the evidence sufficient to support a jury's finding that a husband was guilty of murdering his wife. 390 S.W.3d at 341. The issue in *Temple* was the identity of the perpetrator. The wife was found by the husband shot in the back of her head with a 12-gauge shotgun while she kneeled in the bedroom closet. Although no direct evidence existed linking the husband to his wife's murder, the court of criminal appeals noted that motive and opportunity are circumstances indicative of guilt. *Id.* at 360. The court pointed out that the husband was having an affair, indicated to a friend that he "didn't know" whether he would leave his wife for his mistress, and spent the weekend with his mistress and lied to his wife about it; that the husband's whereabouts were unaccounted for twice for approximately eighteen to thirty-three minutes; a window on the back door was broken, and police testified that because of where the glass was located, it appeared that the door had been open when the windowpane was broken; the house had been "staged" to look like a burglary; a burglary was unlikely while the neighborhood was bustling at 4:30 p.m.; the husband and his brothers owned and used numerous shotguns—including a 12-gauge shotgun; the husband lacked emotion after finding his wife shot in the back of the head; shortly after the wife's murder, the husband resumed his affair; the husband confronted and threatened

174

two people who testified before the grand jury; and he later followed these same two people in his car and told them to "keep your damn mouth shut*." Id.*

Here, there is no body; there is no evidence that Charles had a mistress or remarried after Kathy's disappearance; there is no evidence of staging a crime scene; there is no evidence that Charles possessed the type of weapon used in the murder; and although Charles appeared calm, unlike Temple, he did not claim that he had just discovered his wife murdered.  Further, Charles did not threaten witnesses or tell them to keep their mouths shut.  Charles cooperated with police, gave consent to search to anyone who asked to search his property, and made oral and written statements to anyone who asked him for an oral or written statement.  And in *Temple*, there was evidence of wrongful conduct—the wife's body contained a wound to the back of the head from a 12-gauge shotgun round.  Consequently, in *Temple*, unlike here, there was evidence of wrongful conduct, and evidence of the husband's motive and opportunity helped to link the husband to the wrongful conduct.  The facts of *Temple* distinguish that case from the present case.

We have thoroughly reviewed all of the evidence.  Although we necessarily detailed each piece of evidence in our opinion to ascertain exactly the nature of that piece of evidence—sometimes this was difficult because of the extensive use of the video clips—and although we categorized the evidence in accordance with its presentation in the State's brief, we make it clear here that our sufficiency review encompassed the cumulative force of all of the circumstantial evidence

175

and the reasonable inferences supportable from that evidence viewed in the light most favorable to the State. Because, viewing all of the circumstantial evidence and any reasonable inferences from that evidence in the light most favorable to the State, the cumulative force of all of the circumstantial evidence and any reasonable inferences from that evidence are insufficient to convince any rational factfinder beyond a reasonable doubt that Charles acted with the requisite *mens rea* necessary to support his conviction for murder, we hold that the evidence is insufficient to establish the *mens rea* element of murder.

We sustain Charles's first point.

## V. CONCLUSION

Having sustained Charles's first point challenging the sufficiency of the evidence to support his conviction, we reverse the trial court's judgment and render a judgment of acquittal. *See* Tex. R. App. P. 43.2(c), 51.2(d); *Greene v. Massey*, 437 U.S. 19, 24–25, 98 S. Ct. 2151, 2154–55 (1978); *Burks v. United States*, 437 U.S. 1, 16–18, 98 S. Ct. 2141, 2150–51 (1978); *Megan Winfrey*, 393 S.W.3d at 774.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  WALKER, MCCOY, and GABRIEL, JJ.

PUBLISH

DELIVERED:  January 23, 2014

176